No. 22-2454

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

JANE DOE,
*Plaintiff-Appellant,*

v.

BOARD OF REGENTS OF THE
UNIVERSITY OF WISCONSIN SYSTEM,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the Western District of Wisconsin
Case No. 3:20-cv-856
The Honorable William M. Conley

**BRIEF OF PLAINTIFF-APPELLANT JANE DOE**

John Clune
Christopher Ford
Lucy Walker
HUTCHINSON BLACK AND COOK, LLC
921 Walnut Street, Suite 200
Boulder, CO 80302
(303) 442-6514
clune@hbcboulder.com
ford@hbcboulder.com
walker@hbcboulder.com

Alexandra Z. Brodsky
Adele P. Kimmel
Mollie Berkowitz
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600
abrodsky@publicjustice.net
akimmel@publicjustice.net
mberkowitz@publicjustice.net

Counsel for Plaintiff-Appellant
*Additional Counsel on Inside Cover*

Robert Theine Pledl
DAVIS & PLEDL S.C.
1433 N. Water Street, Suite 400
Milwaukee, WI 53202
(414) 488-1354
rtp@davisandpledl.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Save As    Clear Form

Appellate Court No: 22-2454

Short Caption: Doe v. Board of Regents of the University of Wisconsin System

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Jane Doe

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Public Justice; Hutchinson Black and Cook, LLC; Davis & Pledl, SC

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: /s Mollie Berkowitz    Date: 9/6/2022

Attorney's Printed Name: Mollie Berkowitz

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐    **No** ☑

Address: 1620 L Street NW, Suite 630

Washington, DC 20036

Phone Number: 202-797-8600    Fax Number: 202-232-7203

E-Mail Address: mberkowitz@publicjustice.net

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Save As          Clear Form

Appellate Court No: __22-2454_____

Short Caption: __Doe v. Board of Regents of the University of Wisconsin System_____

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

        ☐      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)      The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

      _Jane Doe_____

      _____

(2)      The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

      _Public Justice; Hutchinson Black and Cook, LLC; Davis & Pledl, SC_____

      _____

(3)      If the party, amicus or intervenor is a corporation:

      i)      Identify all its parent corporations, if any; and

            _____

      ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

            _____

(4)      Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

      _____

(5)      Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

      _____

Attorney's Signature: _/s Alexandra Z. Brodsky_____    Date: _August 29, 2022_____

Attorney's Printed Name: __Alexandra Z. Brodsky_____

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ✓  **No** ☐

Address: _1620 L Street NW, Suite 630_____

        _Washington, DC 20036_____

Phone Number: _202-797-8600_____    Fax Number: _202-232-7203_____

E-Mail Address: _abrodsky@publicjustice.net_____

                                                        rev. 12/19 AK

### APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 22-2454

Short Caption: Jane Doe v. Board of Regents of the University of Wisconsin

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Jane Doe

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Hutchinson Black and Cook LLC, Davis& Pledl, SC; Public Justice

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s John Clune          Date: 8/29/22

Attorney's Printed Name: John Clune

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     Yes ☐     No ☑

Address: 921 Walnut Street, Suite 200

Boulder, CO 80302

Phone Number: (303) 442-6514          Fax Number: (303) 442-6593

E-Mail Address: clune@hbcboulder.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-2454

Short Caption: Jane Doe v. Board of Regents of the University of Wisconsin

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Jane Doe

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Hutchinson Black and Cook LLC, Davis& Pledl, SC; Public Justice

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s Christopher Ford    Date: 8/29/22

Attorney's Printed Name:  Christopher Ford

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐    **No** ☑

Address:  921 Walnut Street, Suite 200

Boulder, CO 80302

Phone Number: (303) 442-6514    Fax Number: (303) 442-6593

E-Mail Address: ford@hbcboulder.com

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-2454

Short Caption: Doe v. Board of Regents of the University of Wisconsin System

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]        **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)        The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
 Jane Doe

(2)        The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
 Public Justice; Hutchinson Black and Cook, LLC; Davis & Pledl, SC

(3)        If the party, amicus or intervenor is a corporation:

    i)        Identify all its parent corporations, if any; and

    ii)        list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)        Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)        Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: /s Adele P. Kimmel        Date: 9/7/2022

Attorney's Printed Name:   Adele P. Kimmel

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** [ ]  **No** [✓]

Address:  1620 L Street NW, Suite 630

     Washington, DC 20036

Phone Number:  202-797-8600        Fax Number:  202-232-7203

E-Mail Address:  akimmel@publicjustice.net

                                                                                rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: __22-2454_____

Short Caption: __Jane Doe v Board of Regents of the University of Wisconsin_____

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Jane Doe

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Hutchinson Black & Cook LLC; Davis & Pledl, SC; Public Justice

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: __/s/ Robert Theine Pledl_____    Date: __08/31/2022_____

Attorney's Printed Name: __Robert Theine Pledl_____

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐    **No** ☑

Address: __1661 N Water Street - Suite 410_____

    __Milwaukee, WI  53202_____

Phone Number: __(414) 667-0390_____    Fax Number: _____

E-Mail Address: __rtp@davisandpledl.com_____

rev. 12/19 AK

Save As          Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-2454

Short Caption: Jane Doe v. Board of Regents of the University of Wisconsin

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   [ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
   Jane Doe

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
   Hutchinson Black and Cook LLC, Davis& Pledl, SC; Public Justice

(3)     If the party, amicus or intervenor is a corporation:

   i)          Identify all its parent corporations, if any; and
   N/A

   ii)         list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
   N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
   N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
   N/A

Attorney's Signature: /s Lucy Walker          Date: 8/29/22

Attorney's Printed Name:  Lucy Walker

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     **Yes** [ ]     **No** [✔]

Address:  921 Walnut Street, Suite 200

   Boulder, CO 80302

Phone Number: (303) 442-6514          Fax Number: (303) 442-6593

E-Mail Address: walker@hbcboulder.com

rev. 12/19 AK

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................ii

JURISDICTIONAL STATEMENT .........................................................1

INTRODUCTION ...............................................................................2

STATEMENT OF ISSUES ....................................................................4

STATEMENT OF THE CASE ...............................................................4

I.    Statutory Background ..............................................................4

II.   Factual Background ................................................................8

    A.    The Rapes ......................................................................8

    B.    The Investigation .........................................................10

    C.    Public and Donor Pressure, and a Quick Reversal...............12

    D.    Jane's Exclusion from and Denial of Educational
          Opportunities....................................................................20

III.  Procedural Background..........................................................22

SUMMARY OF ARGUMENT ..............................................................23

STANDARD OF REVIEW ...................................................................25

ARGUMENT .....................................................................................25

I.    A Jury Could Find Jane Experienced Sexual Harassment So
    Severe, Pervasive, and Objectively Offensive that She Was
    Deprived of Educational Opportunities and Benefits ..................26

    A.    A jury could find the harassment caused concrete, negative
          effects on Jane's access to education ....................................27

    B.    A jury could find Jane was subjected to a sustained hostile
          environment when she was forced to share a campus with
          Player 1 without meaningful protections.............................35

II.   A Jury Could Find the University Was Deliberately Indifferent to
    the Harassment Jane Suffered .....................................................40

CONCLUSION .................................................................................45

CERTIFICATE OF COMPLIANCE .......................................................48

i

## TABLE OF AUTHORITIES

**Cases**                                         **Page(s)**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................... 25

*Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*,
526 U.S. 629 (1999) ............................................................. *passim*

*Dey v. Colt Constr. & Dev. Co.*,
28 F.3d 1446 (7th Cir. 1994) ..................................................... 35

*Doe 12 v. Baylor Univ.*,
336 F. Supp. 3d 763 (W.D. Tex. 2018) ....................................... 28

*Doe ex rel. Doe v. Coventry Bd. of Educ.*,
630 F. Supp. 2d 226 (D. Conn. 2009) ......................................... 37

*Doe v. Erskine Coll.*,
No. Civ. A. 8:04-23001RBH, 2006 WL 1473853
(D.S.C. 2006) ............................................................................ 28

*Doe v. Fairfax Cnty. Sch. Bd.*,
1 F. 4th 257 (4th Cir. 2021) ................................................ *passim*

*Doe v. Galster*,
768 F.3d 611 (7th Cir. 2014) ............................................... 25, 26

*Doe v. Manor Coll.*,
479 F. Supp. 3d 151 (E.D. Pa. 2020) ......................................... 42

*Doe v. Purdue Univ.*,
928 F.3d 652 (7th Cir. 2019) ..................................................... 41

*Doe v. Sch. Dist. No. 1, Denver, Colo.*,
970 F.3d 1300 (10th Cir. 2020) ........................................... *passim*

*Donaldson v. Johnson & Johnson*,
37 F.4th 400 (7th Cir. 2022) ..................................................... 25

*Ellison v. Brady*,
   924 F.2d 872 (9th Cir. 1991) ................................................................ 36

*Farmer v. Kan. State Univ.*,
   918 F.3d 1094 (10th Cir. 2019) ........................................ 29, 37, 39, 45

*Ferris v. Delta Air Lines, Inc.*,
   277 F.3d 128 (2d Cir. 2001) ................................................................ 36

*Franklin v. Gwinnett Cnty. Pub. Schs.*,
   503 U.S. 60 (1992) ......................................................................... 7, 36

*Gabrielle M. v. Park Forest-Chi. Heights, Il. Sch. Dist. 163*,
   315 F.3d 817 (7th Cir. 2003) ................................................. 27, 28, 31

*Gebser v. Lago Vista Indep. Sch. Dist.*,
   524 U.S. 274 (1998) ............................................................................... 7

*Hendrichsen v. Ball State Univ.*,
   107 F. App'x 680 (7th Cir. 2004) ................................................... 26, 36

*Jackson v. Birmingham Bd. of Educ.*,
   544 U.S. 167 (2005) ........................................................................... 5, 7

*Jennings v. Univ. of N.C.*,
   482 F.3d 686 (4th Cir. 2007) ........................................ 28, 29, 30, 34

*Kinsman v. Fla. State Univ. Bd. of Trs.*,
   No. 4:15CV235, 2015 WL 11110848
   (N.D. Fla. Aug. 12, 2015) ................................................................... 37

*Lapka v. Chertoff*,
   517 F.3d 974 (7th Cir. 2008) .............................................................. 36

*McGinnis v. Muncie Cmty. Sch. Corp.*,
   No. 1:11-cv-1125, 2013 WL 2456067
   (S.D. Ind. June 5, 2013) ...................................................................... 37

*Menzia v. Austin Indep. Sch. Dist.*,
   47 F.4th 354 (5th Cir. 2022) .............................................................. 45

*N. Haven Bd. of Educ. v. Bell*,
　　456 U.S. 512 (1982) ........................................................................ 6

*Peltier v. Charter Day Sch., Inc.*,
　　37 F.4th 104 (4th Cir. 2022) ....................................................... 35

*Smith v. Metro. Sch. Dist. Perry Twp.*,
　　128 F.3d 1014 (7th Cir. 1997) ..................................................... 36

*Vance v. Spencer Cnty. Pub. Sch. Dist.*,
　　231 F.3d 253 (6th Cir. 2000) ....................................................... 44

*Wamer v. Univ. of Toledo*,
　　27 F.4th 461 (6th Cir. 2022) .................................................. 28, 39

*Williams v. Bd. of Regents of Univ. Sys. of Ga.*,
　　477 F.3d 1282 (11th Cir. 2007) ........................................ 35, 39, 45

*Zeno v. Pine Plains Cent. Sch. Dist.*,
　　702 F.3d 655 (2d Cir. 2012) ....................................................... 44

## Statutes and Regulations

20 U.S.C. § 1681 ............................................................................ 1, 3

20 U.S.C. § 1681(a) ................................................................ 4, 32, 45

20 U.S.C. § 1687 ................................................................................ 6

28 U.S.C. § 1291 ................................................................................ 1

28 U.S.C. § 1331 ................................................................................ 1

28 U.S.C. § 1343 ................................................................................ 1

34 C.F.R. § 106.30(a) (2020) ........................................................... 44

34 C.F.R. § 106.45(b)(8)(iii) (2020) ................................................ 42

Wis. Rev. Code Ann. § 940.225(2)(cm) (West 2018) ..................... 13

Wis. Rev. Code Ann. § 940.225(3) (West 2018) ............................ 13

iv

## Other Authorities

118 Cong. Rec. (1972) .............................................................. 5, 6

785B Wis. Admin. Reg. CR 20-062 (May 31, 2021),
    https://perma.cc/Y4QJ-SG44 ............................................. 20

Letter of Findings to Martha Minow from Joel J. Berner,
    Dep't of Educ. (Dec. 30, 2014),
    https://clearinghouse.net/doc/99593/ ................................. 42

U.S. Statement of Interest. *T.F. v. Kan. State Univ.*,
    No. 2:16-cv-02256 (D. Kan. July 1, 2016)
    https://www.justice.gov/crt/case-
    document/file/906097/download ....................................... 37

## JURISDICTIONAL STATEMENT

Jane Doe filed suit against the Board of Regents of the University of Wisconsin System ("the University") under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*. The district court had subject-matter jurisdiction under 28 U.S.C. § 1343 and 28 U.S.C. § 1331. The district court granted summary judgment to the University on all claims on July 19, 2022. A. 22.[1] Jane timely filed a notice of appeal on August 16, 2022. R. 203.[2] This Court has jurisdiction under 28 U.S.C. § 1291.

---

[1] Citations to the required short appendix bound with the brief are structured as "A." followed by the page number. Citations to the separate appendix are structured as "S.A." followed by the page number.

[2] Citations to district court documents, including the summary judgment record, are structured as "R." followed by the district court docket number and then the page number. Where the cited district court document is a transcript, the identified page number is that of the original transcript.

## INTRODUCTION

Because of sex discrimination, Jane Doe spent much of her time at the University of Wisconsin hiding in her room. She skipped classes and changed her coursework. She avoided University events and campus facilities like the student union. She went home to Chicago on weekends to avoid spending any more time at school than necessary.

As a freshman, Jane had been repeatedly raped by a classmate and star football player, "Player 1." When she reported, the University thoroughly investigated. After months of fact-finding and a live hearing, the University concluded that Player 1 had sexually assaulted Jane and another woman, and that his continued presence on campus would create a hostile environment for both of them.

But then major donors and football fans started to write in protest. After Player 1 was criminally prosecuted and acquitted of the rapes—using a higher standard of evidence and different definition of sexual assault—the University found itself under significant pressure to readmit him. The donor for whom the football team's building was named wanted Player 1 back on the field. So did his friends who had each given at least seven-figure donations to the University. And so did the many fans who

demanded, in public posts and private outreach, that the University re-admit Player 1.

The University acceded. It reversed its previous findings and read-mitted Player 1 without ever telling Jane it was thinking about doing so. Then, when Player 1 returned to campus, it refused to implement basic safety measures to keep him and Jane apart. She was on her own. As a result, Jane sacrificed her own education to protect herself. To avoid Player 1, she withdrew from campus life.

Under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, a school may be liable for its deliberate indifference to peer sexual harassment that causes a student educational injuries. When Jane brought suit against the University, a district court agreed that the University appeared to have readmitted Player 1 because of donor pres-sure—and that a jury could find its actions were clearly unreasonable. Yet the district court granted summary judgment to the University on the basis that, in its view, Jane's education had not been sufficiently al-tered by the sexual harassment to make out a claim.

That result cannot be reconciled with the law of the Supreme Court or this Court, or with Title IX's text. And it rested on an incomplete

accounting of just how much the sexual assaults and subsequent hostile environment limited her education. This Court should reverse and remand so that a jury can decide whether sex discrimination deprived Jane of the educational opportunities and benefits Title IX protects.

## STATEMENT OF ISSUES

I.  Could a jury find that Jane Doe was subjected to sexual harassment so severe, pervasive, and objectively offensive as to deprive her of access to educational opportunities and benefits?

II. Could a jury find the University was deliberately indifferent to the sexual harassment Jane Doe experienced?

## STATEMENT OF THE CASE

## I.    Statutory Background

Fifty years ago, President Nixon signed a law prohibiting sex discrimination in education. Title IX of the Education Amendments of 1972 provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). The civil rights statute

is "broadly written" with "a broad reach." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005).

With Title IX, Congress sought to "close th[e] loophole" found in the Civil Rights Act of 1965, which "does not apply to discrimination on the basis of sex." 118 Cong. Rec. 5807 (1972) (statement of Sen. Birch Bayh). Front of mind for Title IX's sponsors was discrimination that excluded women from academic and extracurricular opportunities offered by colleges and universities. Women faced discrimination in college admissions and financial aid. *Id*. at 5808-09 (fact sheet). Once on campus, women students were provided unequal facilities, excluded from prestigious student organizations, and "discouraged from serious academic or professional endeavor." *Id*. at 5811 (paper of Dr. Bernice Sandler). They were turned away from traditional male disciplines like "science, mathematics, business administrations—areas in which they could expect better positions and higher pay." *Id*. at 5813 (letter from the Nat'l Fed'n of Bus. & Pro. Women's Clubs, Inc.). "The more prestigious and better known the institution, the worse the status of women." *Id*. at 5810 (paper of Dr. Bernice Sandler).

Despite this discrimination, undergraduate women outperformed their male classmates academically. *Id.* at 5809 (fact sheet). Yet they were nonetheless excluded from graduate programs, "particularly professional schools," including in law and medicine. *Id.*; *see also id.* at 5812 (statement of Sen. J. Glenn Beall) (noting representation of women in graduate programs had decreased since 1930).

Sex discrimination in schools was particularly worrisome, and angering, "because education holds out the promise of equality and equal opportunity." *Id.* at 5809 (paper of Dr. Bernice Sandler). Title IX's promise was to be "a death blow at discrimination where it is most severely felt, where there is discrimination against women in having equal access to the kind of education they need." *Id.* (testimony of Sen. Bayh).

In 1987, Congress amended Title IX to clarify that no person could be excluded from, or denied the benefits of, *any* part of campus life. To that end, Congress specified that Title IX covers "*all* the operations of . . . a college, university, or other postsecondary institution, or a public system of higher education." 20 U.S.C. § 1687 (emphasis added).

Since Title IX's passage, courts have "accord[ed Title IX] a sweep as broad as its language." *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 521

6

(1982). For example, in a series of cases in the 1990s, the Supreme Court held that schools could be liable for failing to respond to sexual harassment. *See Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290-91 (1998); *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 75 (1992); *see also Jackson*, 544 U.S. at 174 (noting "a recipient's deliberate indifference to sexual harassment of a student by another student . . . squarely constitutes 'discrimination' 'on the basis of sex'").

Such harassment, the Court realized, could deprive students of educational benefits and opportunities. *Davis*, 526 U.S. at 650-51. Victims might, in very concrete ways, be excluded from a school's activities and facilities. *Id.* The harassment might also "so undermine[] and detract[] from the victims' educational experience" as to "effectively den[y them] equal access to an institution's resources and opportunities." *Id.* Since then, federal courts have recognized the many ways unremedied sexual harassment can stop students from pursuing their desired course of study, undermine their academic performance, exclude them from extra-curricular opportunities and campus facilities, and otherwise deprive them of educational opportunities and benefits, *see infra* pp. 28-29

7

(collecting cases)—exactly the inequities Congress sought to end with Title IX.

## II.   Factual Background

### A. The Rapes

Jane Doe enrolled at the University of Wisconsin – Madison in 2017. R. 98 at 6:9-11. She had taken college-level coursework in high school and performed well academically at the University. *Id.* at 7:10-11; R. 98-3 at 25; R. 156 ¶ 13.

On April 22, 2018, Jane and another female classmate ("Complainant 1") were repeatedly raped by a star University football player, "Player 1." S.A. 37-42; R. 103-6 at 5; R. 124 ¶ 351. During the early hours of the morning, Player 1 penetrated the women with his fingers and then his penis while they were unconscious or otherwise incapacitated by alcohol, and over Jane's express statements that she did not want to have sex. S.A. 35, 37-38, 48-49; R. 103-6 at 3, 5. When Player 1 tried to raise Jane's head, she fell to the bed. S.A. 37. Complainant 1 remembers that Jane's eyes were rolled back in her head and her body was limp. S.A. 29, 39; R. 103-6 at 5; R. 128-1 at 27-28.

Between rapes, Player 1—who was sober—enlisted his friend "Player 2" to help him take revealing photos of the victims. S.A. 19, 38, 50; R. 96 at 34:20-35:1; R. 113-9 at 29; R. 113-13 at 5-6. In the photos, one or both of the women were naked. S.A. 38. Complainant 1 was face down on the floor next to the bed. *Id.*; R. 113-9 at 29; R. 113-10 at 84 (11:19-22). Jane was unconscious, her face turned away from the camera. S.A. 38.

Immediately after the rapes, Complainant 1 told a friend what had happened, and he called the City of Madison Police. S.A. 35; R. 113-10 at 87 (14:10-13). A police officer brought Complainant 1 to the hospital for a forensic examination. S.A. 35; R. 103-8. Hospital personnel had to delay the procedure until she was sober enough to consent. S.A. 35. The examination documented multiple injuries consistent with nonconsensual penetration. S.A. 24, 50. At the hospital, police interviewed Complainant 1. R. 113-10 at 74-138. The following day, April 23, Jane also reported to the police and was interviewed by a detective. R. 98-47 at 24-25. As a result of the assaults, both she and Complainant 1 left the University before the end of the semester and finished their course work remotely. S.A. 27-28; R. 98-3 at 10.

## B. The Investigation

Both victims' parents reported the rapes to the University. S.A. 33; R. 124 ¶¶ 47, 59. After the two women provided additional details, administrators commenced a formal disciplinary inquiry. R. 124 ¶¶ 77-83.

First, the University conducted a four-month investigation, during which Player 1, Jane, and Complainant 1 were allowed to provide statements, present evidence and witnesses, and meet with investigators with the advisor of their choice. S.A. 33-34; R. 94-7 at 1, 6-7; R. 103-1 at 4 n.1; R. 124 ¶¶ 86-87, 90-97. Complainant 1's written and oral statements corroborated Jane's, and provided important details about events that occurred while Jane was unconscious. S.A. 34-37; R. 98-47 at 1-4. Administrators drafted a report detailing the evidence collected, which the University provided to Player 1, Jane, and Complainant 1 for their review and comment. S.A. 34; R. 94 at 117:6-10, 197:20-198:17. In response to additional information provided by parties and witnesses, those administrators revised their report before finalizing it. S.A. 34; R. 142 ¶¶ 87-97.

Based on that report and his independent review of the evidence, the University's Assistant Dean decided that the complaints should

proceed to a hearing. S.A. 15-22. Before the hearing, the University pro-
vided the parties all available evidence for their review. R. 103-2 at 3
(UWS 17.12(3)); R. 121 at 189:22-190:3.

On January 15, 2019, Jane, Complainant 1, Player 1, and their
counsel appeared before a disciplinary board for a live hearing with cross-
examination. S. A. 23; R. 113-7 at 8-9. The University had forbidden
Player 1 from contacting both women during the pendency of the inves-
tigation. R. 148 ¶ 9. Yet, when Player 1 entered the building where the
hearing would occur, he "began deliberately walking toward [Jane] in an
effort to intimidate her." R. 124 ¶ 181. Jane's attorney "had to step in
front of Player 1 to stop him from physically coming into contact with"
Jane. *Id.*; *see also* R. 98 at 151:9-14; R. 148 ¶ 7-8; R. 156 ¶ 9. Jane's advi-
sor reported the violation of the no-contact order to a representative of
the Dean's Student's Office present at the hearing. R. 148 ¶ 11.

After the hearing, the disciplinary board found by a preponderance
of the evidence that Player 1 was responsible for sexually assaulting both
Jane and Complainant 1. S. A. 27-30. The board found that not only had
Jane been too intoxicated to consent to sexual intercourse—"appear[ing]
limp with eyes rolled backwards when observed in [Player 1's]

bedroom"—but that she had told Player 1 she did not want to have sex. *Id.* at 28-29. The board also found that Player 1's continued presence on campus would create a hostile environment for Jane and Complainant 1 that would continue to interfere with their educations. *Id*. It noted that both victims had changed their academic schedules in the wake of the assaults. *Id* at 27-28.

Player 1 appealed the decision to the University's Chancellor and then its Board of Regents, both of which sustained the decision. R. 107-2 at 20; R. 113-7 at 3, 15-16. From the receipt of the complaint to the denial of the appeal, the University's investigation took thirteen months. *See* R. 107-2 at 1, 20; R. 124 ¶ 47.

### C. Public and Donor Pressure, and a Quick Reversal

After a separate law enforcement investigation, the Dane County District Attorney's Office charged Player 1 with two counts of felony sexual assault and a court found probable cause. R. 96 at 41:21-43:13; R. 124 ¶¶ 126, 135, 137. The case went to trial on July 29, 2019. R. 124 ¶ 243. A jury found Player 1 not guilty of sexually assaulting Jane under a "beyond a reasonable doubt" standard. R. 120-6; R. 142 ¶ 129. The elements of the charged crime differed from the elements of the school rule the

University found Player 1 had violated: the criminal code required the defendant to have knowledge that the victim was too intoxicated to consent, while the violated school rule did not. *Compare* Wis. Rev. Code Ann. § 940.225(2)(cm) (West 2018) *with* R. 103-1 at 15.[3]

On August 6, 2019, Player 1's attorneys filed a nearly 250-page Petition for Restoration of Rights with the Chancellor, seeking his readmission as a student, as well as a reversal of the underlying findings that he had sexually assaulted Jane and Complainant 1. *See generally* R. 113-10;

---

[3] Player 1 was acquitted of "[Seco]nd Deg[ree] Sex Assault-Intoxicated Victim" against Jane. R. 120-6. The crime is defined as such:

> Ha[ving] sexual contact or sexual intercourse with a person who is under the influence of an intoxicant to a degree which renders that person incapable of giving consent if the defendant has actual knowledge that the person is incapable of giving consent and the defendant has the purpose to have sexual contact or sexual intercourse with the person while the person is incapable of giving consent.

Wis. Rev. Code Ann. § 940.225(2)(cm) (West 2018). The University found Player 1 responsible for violating the part of its student code called "third degree sexual assault," but found him not responsible for "second degree sexual assault." R. 124 ¶¶ 205-206. A person violates the University's rule against third degree sexual assault if he or she has "[s]exual intercourse with a person without the consent of that person." R. 103-1 at 15. The University's rules against second and third degree sex assault mirrored the corresponding definitions under the criminal code. *Compare id.* at 14-15 *with* Wis. Rev. Code Ann. §§ 940.225(2), 940.225(3) (West 2018).

R. 113-11. The petition purported to contain "new evidence," R. 113-10 at 2, though all or nearly all had been in Player 1's possession since before the University's hearing, R. 96 at 37:21-38:10, 44:17-46:10, 51:18-58:18. In the days following the petition's filing, the University conducted multiple meetings about the petition with Player 1's counsel. R. 128-28 at 90:6-91:10; R. 142 ¶¶ 168-170. The University's general counsel, among other high-ranking University personnel, had at least three separate phone calls with Player 1's attorneys, and also met with them in person for an hour. R. 142 ¶¶ 169-170; R. 155 ¶¶ 265-266. Over the same period, Player 1's attorneys sent the general counsel supplemental information to support the pending petition. R. 142 ¶ 168.

Yet the University did not so much as inform Jane that the petition had been filed, despite its prior finding that Player 1's presence on campus would create a hostile environment for her. R. 128-3 ¶¶ 10-11; R. 148 ¶¶ 16-19. When Jane's attorney learned from media coverage that Player 1 had petitioned for readmission, the University told her "not to worry." R. 128-3 ¶¶ 10-11; R. 148 ¶¶ 16, 36. It did not tell her Player 1 was also seeking vacatur of the sexual assault finding. *See* R. 148 ¶ 19. It did not provide Jane a copy of the petition. R. 94 at 182:23-25. It did not tell her

Player 1 had submitted putatively "new" evidence, now under consideration by the University. *Id.* at 183:2-193:23; R. 124 ¶¶ 283-284; R. 148 ¶ 17. It did not give Jane a chance to review and respond to those materials. R. 148 ¶¶ 18, 20. The University never met with Jane or her attorney to discuss her position on the petition. *See* R. 94 at 183:2-193:23; R. 128-28 at 140:5-8. It never gave Jane the chance to be heard.

The University heard from many others, though. High-level University donors, football fans, and the football team demanded the University quickly readmit Player 1 so he could play in the fall football season. *E.g.*, R. 94 at 272:18-274:15; R. 124 ¶ 310. Within forty-eight hours of the filing of the petition, the University's Chancellor, Rebecca Blank, received letters from five donors who had each given seven-figure donations, or more, to the University. R. 94 at 270:8-274:15; R. 94-17; *see also* R. 94 at 274:16-21 (Blank testifying these five donors may have, combined, given over $100 million to the University). The donors made clear their desire for Chancellor Blank to readmit Player 1. R. 94-17. The donor who orchestrated the letter writing campaign was Ted Kellner, for whom Kellner Hall—the University building that houses the football program offices and facilities—is named. R. 94 at 42:22-43:23. The year prior to

Jane's assault, Mr. Kellner had separately pledged another $25 million to the University, which was to be paid over time and which Mr. Kellner could revoke. R. 94 at 272:4-15; R. 94-16. In his letter to Chancellor Blank, Mr. Kellner encouraged "Becky" to "fast track and readmit [Player 1] to our University in the next two weeks," when the college football season would start. R. 94-17 at 2.

The University heard from fans, too. The University tracked the hashtag #LetQTPlay—a reference to Player 1—as it circulated widely on social media, along with an image showing Player 1 on the football field with the words "Wisconsin Don't Delay, Let [Player 1] Play!" printed on the bottom. R. 94-29; R. 94-30 at 1-2; R. 142 ¶¶ 138-139. Many posts addressed themselves to the Chancellor's Twitter account so she would personally see their demands, and their sharp criticism. R. 94-29 at 2, 4; R. 94-30 at 1. Some calling for Player 1's reinstatement seemed to believe wrongly that the acquittal meant Jane and Complainant 1 had not, in fact, been raped. *E.g.*, R. 94-29 at 3-4; R. 128-48; R. 128-49; R. 128-50; R. 128-51; R. 128-52. They accused Jane and Complainant 1 of being co-conspirators in bringing "false felony charges." R. 128-49; R. 142 ¶ 140. They demanded to know whether the University would "punish[]" the

"girls who made false accusations." R. 128-52; R. 142 ¶ 140. Player 1's fans called Jane and Complainant 1 "sluts" and accused them of being "promiscuous." R. 98 at 158:23-159:8.

And the University heard from the football program. The entire team wrote to the Chancellor urging her to readmit Player 1. R. 94-14; R. 142 ¶ 145. Several dozen players participated in a press conference, orchestrated by Player 1's lawyers, that the Chancellor understood was designed to pressure the University. R. 94 at 309:8:18. And the University's head football coach "made a public statement that he would 'love' to have Player 1 back on the team, a statement that had . . . been proposed by [University] representatives." A. 5; *see also* R. 128-53.

The University understood its marching orders. During the pendency of the petition, the University's general counsel called the lead prosecutor who had tried Player 1's case for information about the trial. R. 96 at 11:3-9, 69:14-23. When the prosecutor encouraged him to order the trial transcript, the general counsel explained he did not have time to wait for its delivery given "the timing of the football season or football

practice starting soon." *Id.* at 70:8-13.[4] Chancellor Blank later testified the University could not wait for the transcripts "given the publicity this trial was getting." R. 94 at 243:13-244:19.

To inform her decision, the Chancellor solicited the views of the University's general counsel and its Vice President for University Relations, who was leading the University's "communication strategy" regarding Player 1's petition. R. 94 at 138:18-143:5. Both provided their opinion as to whether the University should readmit Player 1. *Id.* at 139:9-11, 142:17-143:5.

Only after she made her decision did the Chancellor talk to anyone who had been involved with the University's investigation. On August 14, only eight days after the petition's filing, Chancellor Blank phoned the University's Title IX coordinator to inform her that Player 1 would be readmitted. *Id.* at 144:1-8, 250:17-253:8; R. 94-15. The Title IX coordinator advised the Chancellor that the complainants should be given the opportunity to respond to Player 1's new arguments and "new" evidence. R.

---

[4] The record contains a post-it with notes the lead prosecutor and his colleague made during the call. His colleague asked: "Why can't they wait for t-scripts[?]." The lead prosecutor replied, "[f]ootball," underlined twice." R. 96 at 93:9-94:16.

121 at 232:6-19; R. 124 ¶ 280. Chancellor Blank refused. R. 124 ¶¶ 283-284; R. 176 ¶¶ 224-225.

Five days later—thirteen days after Player 1 filed his petition—the Chancellor vacated the University's findings that Player 1 was "responsible" for sexual assault and readmitted him. R. 113-13 at 7. This was the first and only time that Chancellor Blank had ever reversed such a finding. R. 94 at 75:18-80:20. Ted Kellner of Kellner Hall was on the Chancellor's short list of people to notify personally. R. 94-34 at 2.

The Chancellor sent Player 1 a letter about the University's decision. R. 113-13. There, she said the reversal was based on unspecified "newly supplied information." *Id.* at 4. She also explained that she had maintained the University's findings that Player 1 was responsible for "Sexual Harassment" of both women. *Id.* at 5. In doing so, the Chancellor noted that Player 1 had admitted to taking at least one nonconsensual photograph; that he had an extensive disciplinary record that included a physical assault of a female employee and another report of sexual harassment; that he had lied to the police about the photographing during the criminal investigation; and that he had lied to the University about his disciplinary record during his initial appeal of the hearing board's

decision. *Id.* at 5-7; *see also* R. 94 at 280:6-281:14. But Player 1 received no sanction. The Chancellor issued a "strong warning . . . that he conduct himself appropriately in the future." R. 113-13 at 7.[5]

### D. Jane's Exclusion from and Denial of Educational Opportunities

Two weeks after the University readmitted Player 1, Jane returned to the campus they now shared to begin the new semester. *Id.*; R. 156 ¶ 2. She was "terrified" of seeing Player 1. R. 148 ¶ 25. Jane feared he might hurt her again: he "had already raped [her]," had violated the no-contact order by physically intimidating her before the hearing, and was "likely now angry with [her]." R. 156 ¶ 9. She also feared that Player 2 or Player 1's other teammates would retaliate against her, now that the University had broadcasted that it no longer believed her. R. 98 at 140:21-23; R. 116 ¶ 14; R. 148 ¶ 23. These fears were only reinforced when, on Jane's first day back to school, she ran into Player 2 and panicked. R. 124 ¶ 64; R. 156 ¶¶ 9, 10. That "was a reminder that [she] could run into . . . these men anywhere." R. 156 ¶ 9.

---

[5] In 2021, the Wisconsin amended its state regulations to make clear that student complainants in University disciplinary matters must be notified of and allowed to reply to any petition for readmission. *See* 785B Wis. Admin. Reg. CR 20-062 (May 31, 2021), https://perma.cc/Y4QJ-SG44.

Jane and her counsel met with the University's Assistant Dean of Students and Director of Threat Intervention Services in hopes they would develop a safety plan to keep Player 1 and Jane apart. R. 148 ¶¶ 24-25. Jane's counsel told the University representatives that Jane "was not doing well, that she was not eating, and that she was terrified" of being on campus with Player 1. *Id.* ¶ 26. Her counsel also explained why Jane's fears were reasonable. *Id.* University officials were unmoved. *Id.* ¶¶ 27, 30. All they offered Jane was their advice to leave any area where she saw Player 1, and to call 911 if she needed assistance. *Id.* ¶¶ 25, 27, 32; R. 156 ¶¶ 4, 9. The University's message was clear: Jane "was on her own." R. 148 ¶ 32; *see also* R. 156 ¶ 9.

So Jane lived in fear whenever she was on campus. R. 156 ¶¶ 9, 12. To keep herself safe and avoid Player 1, she withdrew from University life. Jane skipped classes. *Id.* ¶ 5. She stopped using the student union and communal study spaces, and stayed away from other parts of campus where she thought she was likely to encounter Player 1. *Id.* ¶¶ 3-4, 7-9, 11. She no longer attended public events on campus. *Id.* ¶ 11. Her attendance at sorority events plummeted. R. 98 at 133:24-134:6. Whenever she saw a group of male athletes, Jane feared Player 1 might be among them,

and so immediately left the area. R. 156 ¶ 4. She took to calling her parents when she could not find a friend to walk with her through campus, believing that Player 1 (or his supporters) would be less likely to hurt her if she was talking to someone on the phone. R. 98-1 ¶ 12. Jane went home to Chicago most weekends to limit her time on campus. R. 156 ¶ 3.

After Player 1 returned to the University, Jane struggled with her coursework. *Id.* ¶ 12. She knew that, because of her constant fear of seeing Player 1, she would no longer be able to handle the advanced courses she had planned to take, and so switched to easier classes. *Id.* Jane had been on track to graduate in three years, given her advanced high school credits. *Id.* ¶ 13. But she was so anxious and fearful about sharing a campus with Player 1 that she knew she had to take fewer classes than she had planned. *Id.*; R. 100 at 180:9-21. Because she graduated later than planned, she had to delay starting law school. R. 156 ¶ 13.

## III.   Procedural Background

In 2020, Jane filed a lawsuit against the University. R. 1. Among other claims, Jane alleged that the University was liable under Title IX for its deliberate indifference to the sexual harassment she experienced,

leading to her deprivation of educational opportunities and benefits. *Id.* ¶¶ 151-161; *see also* R. 26 ¶¶ 140-150 (amended complaint).

The district court denied the University's motion to dismiss. S.A. 14. But, the following year, when the University and Jane both filed motions for summary judgment, it granted the University's. A. 22. The court recognized that a jury could find that the University's handling of Jane's report was clearly unreasonable, and that its decision to readmit Player 1 was motivated by public and donor pressure. A. 20. Yet it concluded that Jane had not provided evidence from which a jury could find she was deprived of educational opportunities, as required to state a Title IX claim. A. 21.

Jane noticed this appeal on August 16, 2022. R. 203.

## SUMMARY OF ARGUMENT

The University is not entitled to summary judgment on Jane's Title IX claim. Contrary to the district court's conclusion, a jury could find that Jane experienced sexual harassment so severe, pervasive, and objectively offensive as to deprive her of the University's opportunities and benefits. Jane presented evidence that, as a result of the harassment, she missed classes, changed her planned academic course of study, avoided key

University buildings like the student union and study facilities, and lost extracurricular and social opportunities. Those concrete and negative effects are sufficient to establish an educational injury. The district court's conclusion to the contrary was based on a misreading of the record and the law. The district court was right, however, to reject the University's argument that the course of harassment ended with the rapes and photographing. Jane was also subjected to a hostile environment caused by sharing a campus with Player 1 without meaningful protections.

The district court was also right that material disputes of fact remain as to whether the University's response to the sexual harassment Jane suffered was deliberately indifferent. A jury could find that the University readmitted Player 1 through a sham process meant to satisfy major donors and football fans, rather than to determine the truth of Jane's report. It then failed to implement any measures to keep Jane safe from Player 1, forcing her to sacrifice her own educational opportunities to avoid further harassment. A jury could conclude that, taken together, the University's actions were clearly unreasonable.

## STANDARD OF REVIEW

This Court reviews a "district court's grant of summary judgment de novo." *Donaldson v. Johnson & Johnson*, 37 F.4th 400, 405 (7th Cir. 2022). At this juncture, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Summary judgment is [only] appropriate when there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law." *Donaldson*, 37 F.4th at 406 (citations omitted). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248 (1986) (citation omitted).

## ARGUMENT

A recipient of federal funding may be liable in money damages under Title IX where it is "deliberately indifferent to sexual harassment, of which [it has] actual knowledge, and that harassment is so severe, pervasive, and objectively offensive that it . . . deprive[s] the victims of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650; *see also Doe v. Galster*, 768 F.3d 611, 617 (7th Cir. 2014) (same). The University does not dispute that it had actual

knowledge of the harassment, or that it receives federal funds. A. 10; R. 142 ¶ 6. At issue, then, is only whether a jury could find (1) that Jane was subjected to harassment sufficiently serious to interfere with her education and (2) that the University responded with deliberate indifference. The district court got the first question wrong and the second question right. The answer to both is yes.

## I.   A Jury Could Find Jane Experienced Sexual Harassment So Severe, Pervasive, and Objectively Offensive that She Was Deprived of Educational Opportunities and Benefits.

As noted above, for a plaintiff to establish a Title IX claim, the sexual harassment at issue must be "so severe, pervasive, and objectively offensive that it . . . deprive[s] the victims of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650. Whether a plaintiff can reach this threshold turns on (1) the nature of the harassment—that is, its severity, pervasiveness, and offensiveness—and (2) its impact on the victim's education. *See, e.g.*, *Galster*, 768 F.3d at 618-19; *Hendrichsen v. Ball State Univ.*, 107 F. App'x 680, 684 (7th Cir. 2004); *Doe v. Sch. Dist. No. 1, Denver, Colo.*, 970 F.3d 1300, 1311-12 (10th Cir. 2020). These inquiries are "particularly unsuited for summary judgment because [they are] quintessentially . . . question[s] of fact" and

"matters of degree" that are "best left to the jury." *Sch. Dist. No. 1*, 970 F.3d at 1311-12; *see also Gabrielle M. v. Park Forest-Chi. Heights, Il. Sch. Dist. 163*, 315 F.3d 817, 822 (7th Cir. 2003) (noting "[w]hether behavior is so severe, pervasive, and offensive as to create a cause of action under Title IX is a fact-specific inquiry").

The University's motion for summary judgment focused on the educational impact of the harassment on Jane, rather than its nature. R. 125 at 41-44. Indeed, in its opening brief below, the University never argued that the harassment was insufficiently severe, insufficiently pervasive, or insufficiently offensive. *See id.* The district court followed the University's lead, dismissing Jane's suit on the ground that she had not demonstrated the harassment sufficiently deprived her of educational opportunities and benefits. A. 21. In doing so, the district court misstated the law and overlooked significant evidence.

## A. A jury could find the harassment caused concrete, negative effects on Jane's access to education.

1. To establish an educational injury, a plaintiff need not have been excluded from her education entirely nor face an "overt, physical deprivation of access to school resources." *Davis*, 526 U.S. at 650-51. Instead, a student is denied equal access when the harassment "has a 'concrete,

negative effect' on [her] access to education." *Gabrielle M.*, 315 F.3d at 821 (quoting *Davis*, 526 U.S. at 654); *see also Jennings v. Univ. of N.C.*, 482 F.3d 686, 699 (4th Cir. 2007) (identifying manners of exclusion contemplated by *Davis*).

Examples of such negative effects include lost academic opportunities, for instance, missed classes, dropped courses, and delayed graduation. *See, e.g., Gabrielle M.*, 315 F.3d at 823 (explaining increased absenteeism is a form of educational injury); *Wamer v. Univ. of Toledo*, 27 F.4th 461, 471 (6th Cir. 2022) (holding student established educational deprivation when she changed her course of study to avoid further harassment), *petition for cert. filed*, No. 22-123 (Aug. 4, 2022); *Doe v. Fairfax Cnty. Sch. Bd.,* 1 F. 4th 257, 276 (4th Cir. 2021) (holding jury could find educational deprivation where plaintiff's attendance declined), *petition for cert. filed*, No 21-968 (Dec. 30, 2021); *Doe v. Erskine Coll.,* No. Civ. A. 8:04-23001RBH, 2006 WL 1473853, at *13 (D.S.C. 2006) (same, where plaintiff dropped a course); *Doe 12 v. Baylor Univ.,* 336 F. Supp. 3d 763, 779 (W.D. Tex. 2018) (holding that one of the plaintiffs alleged an educational deprivation where she had to delay graduation).

Exclusion from campus facilities is also a cognizable educational injury. *Farmer v. Kan. State Univ.,* 918 F.3d 1094, 1104-05 (10th Cir. 2019) (holding students were deprived of educational opportunities where they avoided campus library and other resources to avoid their rapists).

So is withdrawal from extracurricular activities. *Fairfax,* 1 F. 4th at 276 (holding jury could find educational deprivation where plaintiff "found it difficult to enjoy and fully participate in band activities"); *Farmer,* 918 F.3d at 1105 (same, where plaintiffs "withdr[e]w from activities [the university] offer[ed] its students"); *Jennings,* 482 F.3d at 699 (holding that the plaintiff's allegation that sexual harassment "negatively affected her ability to participate in the [university's] soccer program" created a triable issue of fact).

Moreover, missing out on socialization with classmates—"an important, perhaps essential, advantage of the school experience"—can constitute an educational deprivation. *Sch. Dist. No. 1,* 970 F.3d at 1313.

2. A jury could find that Jane experienced exactly these sorts of educational deprivations. Immediately after the rapes, she left campus, arranging to finish her course work remotely from her parents' house in Chicago instead of at the University. R. 98-3 at 1-10. And as explained

above, *see supra* pp. 20-22, after Player 1's return to the University, Jane was terrified that she might run into him on or near campus, and that he might hurt her again. R. 156 ¶¶ 4-5, 7, 9-11. As a result, she skipped classes. *Id.* ¶¶ 5, 11. She struggled to maintain her grades, and so she took fewer and easier classes. *Id.* ¶ 12. Because of her reduced course load, Jane graduated a semester later than she had planned and had to start law school a year later than anticipated. *Id.* ¶¶ 12-13. She avoided parts of campus, like common study areas, the student union, and the bookstore, where she thought she was likely to see Player 1. *Id.* ¶¶ 4, 9, 11. She attended fewer sorority events, and spent less time socializing. R. 98 at 148:2-3; R. 156 ¶ 3; R. 98-1 ¶ 4. When she could, she went home to Chicago on the weekends so she could avoid Player 1. R. 98-1 ¶ 4.

From these facts, a reasonable jury could find that the harassment Jane experienced "'so undermine[d] and detract[ed] from [her] educational experience' as to 'effectively den[y her] equal access to [the University's] resources and opportunities.'" *Jennings,* 482 F.3d at 699 (quoting *Davis,* 526 U.S. at 650-51.). Missing out on class, campus facilities, extracurricular activities, and socialization with classmates—all these impacts constitute "'concrete, negative effect[s]' on [Jane's] access to

education." *Gabrielle M.,* 315 F.3d at 821. Indeed, as the case law demonstrates, these are the very type of educational impacts that often result from severe and pervasive harassment, and which give rise to Title IX claims.

3. In granting the University's motion for summary judgment, the district court repeatedly said that Jane needed to demonstrate "severe impacts" on her education or a "severe" deprivation. A. 14-15; *see also* A. 16 (holding that Jane's "anxiety was [not] 'so severe, pervasive, and objectively offensive'" to give rise to a Title IX claim). But the law requires no such thing. It's the harassment, not the effects, that must be "severe, pervasive, and objectively offensive." *Davis,* 526 U.S. at 633. The educational impact must instead be "concrete" and "negative." *Gabrielle M.*, 315 F.3d at 823 (quoting *Davis*, 526 U.S. at 654).

This makes sense, because the reasons the Supreme Court adopted the "severe, pervasive, and objectively offensive" test for actionable sexual harassment do not apply to its assessment of educational deprivations. The Court was sensitive to the fact that children often misbehave and wanted to make clear Title IX does not require schools to address every instance of playground teasing. *Davis,* 526 U.S. at 651-52. Plus, in

the Court's judgment, only harassment that was "severe, pervasive, and objectively offensive" would be able to disrupt a student's education. *Id.* at 652. Nowhere, however, did the Court seek to limit Title IX to prohibit only the worst of the worst educational injuries. *See id.* at 651.

Indeed, the statutory text leaves no room for such a limitation. Title IX categorically forbids a school from "exclud[ing a person] from participation in," or "den[ying her] the benefits of," its programming "on the basis of sex." 20 U.S.C. § 1681(a). The statute, on its face, does not tolerate "moderate" exclusions and denials.

4. Regardless, a jury could find Jane did experience significant, even "severe," educational injuries. The district court overlooked key facts in holding that Jane's injuries were merely "emotional," and she had shown "no concrete examples of *specific* impacts on her . . . other than that she took affirmative steps to avoid places on campus where she might encounter Player 1." A. 14. In reaching this conclusion, the district court ignored Jane's evidence that she experienced other significant educational deprivations, including missed classes and campus events, a change in academic courses, decreased attendance at extracurricular

activities, and lost socialization when she left campus on weekends. *E.g.*, R. 98-1 ¶ 4; R. 156 ¶¶ 3-5, 11.

Besides, Jane's exclusion from University study spaces, the student union, the campus bookstore, and other parts of campus is enough to establish an educational deprivation. R. 156 ¶¶ 3-5, 11. As explained above, these are the type of "'concrete, negative effect[s]' on the victim's education" that may give rise to a Title IX claim. *See supra* pp. 29-31 (quoting *Gabrielle M.*, 315 F.3d at 821). Indeed, they are much like the example *Davis* provided as a prime illustration of a Title IX injury: "female students [excluded] from using a particular school resource," such as "a computer lab." *Davis*, 526 U.S. at 651. Consequently, a jury could find that Jane provided "concrete examples of specific impacts" on her education. A. 14 (emphasis removed).

5. The district court also wrongly used Jane's resiliency against her: it held that Jane had not demonstrated that the sexual harassment she experienced "detract[ed] from [her] educational experience . . . *especially* given that . . . [her] grades . . . never suffered measurably." A. 16 (emphasis added). As the district court itself acknowledged, "specific proof of

declining grades" is not a "prerequisite[] to create a disputed issue of fact" on this element. A. 15.

After all, there is more to school than grades. As the Tenth Circuit has explained, a "bright" student with a "4.0 average" may be denied educational benefits if she misses out on classroom instruction. *Sch. Dist. No. 1*, 970 F.3d at 1312. That is to say nothing of lost "socialization." *Id.* at 1313. Indeed, the Fourth Circuit has held that even a student whose grades have *improved* can show that sexual harassment has detracted from her educational experience. *Jennings*, 482 F.3d at 699-700.

Besides, in Jane's case, she was only able to keep up her grades by taking fewer and easier courses. R. 156 ¶ 12. Her academic record suffered—perhaps in ways the law schools she later applied to might notice—even if her GPA did not. In passing Title IX, Congress specifically sought to guarantee women's access to advanced course work. *See supra* pp. 5-6. It wanted women to be able to excel. *Id.*

Ultimately, a "narrow focus on [the victim's] ability to achieve academic success despite [the harassment] fails to address" the full scope of possible educational deprivations—including the unrealized "spectrum of success that [she] *might have achieved*" if she had not been subject to

discrimination. *Peltier v. Charter Day Sch., Inc.,* 37 F.4th 104, 135-36 (4th Cir. 2022) (Keenan, J. concurring). Courts "cannot excuse discrimination because its victims are resilient enough to persist in the face of . . . unequal treatment." *Id.* at 135*; see also Dey v. Colt Constr. & Dev. Co.,* 28 F.3d 1446, 1454 (7th Cir. 1994) (explaining that Title VII's protections extend to the worker "who possesses the dedication and fortitude to complete her assigned tasks even in the face of" sexual harassment).

## B. A jury could find Jane was subjected to a sustained hostile environment when she was forced to share a campus with Player 1 without meaningful protections.

The University was wrong, below, to insist that the only harassment at issue in the case is that which occurred the night of the assaults. *See* R. 125 at 41-42. The district court, to its credit, rejected that account in its opinion on the motion to dismiss, S.A. 9, and did not revisit its view on summary judgment, A. 14. To be sure, the rapes and photographs are a key part of the course of harassment to which Jane was subject. They, alone, are actionable. *See Williams v. Bd. of Regents of Univ. Sys. of Ga.,* 477 F.3d 1282, 1297-98 (11th Cir. 2007) (holding plaintiff repeatedly raped by classmates "in one room over two hours" was subjected to severe and pervasive harassment). But, for Jane, the sexual harassment did not

end there because she was forced to share a campus with Player 1 without meaningful protections.

As this Court and others have recognized, "[t]he continued presence of a rapist in the victim's workplace can render the workplace objectively hostile." *Lapka v. Chertoff*, 517 F.3d 974, 984 (7th Cir. 2008); *see also Ferris v. Delta Air Lines, Inc.*, 277 F.3d 128, 137 (2d Cir. 2001) (similar); *Ellison v. Brady*, 924 F.2d 872, 883 (9th Cir. 1991) (same). In *Lapka*, an Immigration and Naturalization Services employee was raped in her hotel room by a colleague while incapacitated by alcohol. 517 F.3d at 978-79. The following year, the victim saw her rapist's brother at her office. *Id.* at 979-80. She then learned her rapist—who ordinarily worked out of a different location—had visited on a day she was away from work. *Id.* at 980. This Court explained that those visits, understood "in the context of the sexual assault," could create a hostile environment because "the rapist's presence exacerbates and reinforces the severe fear and anxiety suffered by the victim." *Id.* at 983-84 (citations omitted).[6]

---

[6] The Supreme Court and this Court look to Title VII case law in interpreting Title IX, including for assistance determining whether harassment is actionable. *Franklin*, 503 U.S. at 75; *Ball State Univ.*, 107 F. App'x at 684; *Smith v. Metro. Sch. Dist. Perry Twp.*, 128 F.3d 1014, 1023 (7th Cir. 1997).

"So too, if not more so, in a school." *McGinnis v. Muncie Cmty. Sch. Corp.*, No. 1:11-cv-1125, 2013 WL 2456067, at *12 (S.D. Ind. June 5, 2013). Where a student is forced to share a school with the person who sexually assaulted her, and to do so without adequate protections, the presence of the rapist may itself constitute hostile environment harassment. *E.g.*, *Kinsman v. Fla. State Univ. Bd. of Trs.*, No. 4:15CV235, 2015 WL 11110848, at *4 (N.D. Fla. Aug. 12, 2015); *Doe ex rel. Doe v. Coventry Bd. of Educ.*, 630 F. Supp. 2d 226, 233 (D. Conn. 2009); *see also* U.S. Statement of Interest at 11-14, *T.F. v. Kan. State Univ.*, No. 2:16-cv-02256 (D. Kan. July 1, 2016), https://www.justice.gov/crt/case-document/file/906097/download (explaining how presence of the harasser may cause a hostile environment, and collecting cases); *cf. Farmer*, 918 F.3d at 1105 (recognizing the effects of a rape can permeate a student's educational experience beyond the event itself); *Fairfax*, 1 F.4th at 274 (similar).

The district court recognized this. S.A. 9. And, prior to litigation, so did the University. In his pre-hearing report, the Assistant Dean and Director of Student Life concluded the rapes "created an intimidating, offensive, and hostile learning environment such that [Jane] would feel

37

extremely uncomfortable sharing a campus with" Player 1, and "that another reasonable person in [Jane's] position would feel the same." *Id.* at 20. The University hearing panel then unanimously found that Player 1 had created a "hostile learning environment" for Jane and Complainant 1, and that their educations had already suffered as a result. *Id.* at 28-29. At her deposition, Chancellor Blank agreed that a rapist's presence on campus would create a hostile environment for the victim—and potentially other students, too. R. 94 at 267:4-7.

A jury could agree. And it could easily find that Jane faced a more severe hostile environment than that at issue in *Lapka*. There, the plaintiff worked for the same federal agency as her rapist and his brother, but at different locations, and never interacted with her rapist after the assault. Here, Jane shared a campus with Player 1 and Player 2, and Player 1 had tried to physically contact and intimidate her after the assaults. *See supra* pp. 11, 20.

If there could be any doubt as to whether, absent adequate protections, the presence of an assailant can cause a hostile environment for his victim, the resultant educational effects in this case and others confirm it. Unsurprisingly, when students face such a hostile environment

without adequate protection from their schools, they often sacrifice their own educations to stay safe. For example, in the closely analogous case *Farmer*, the plaintiffs alleged that, because of their school's inaction after their rapes, they reasonably feared seeing their assailants on campus. 918 F.3d at 1104-05. That fear "forced them to take very specific actions that deprived them of educational opportunities," such as missing classes, withdrawing from school activities, and staying home rather than enjoying campus facilities like study rooms and the student union. *Id.* at 1099-1101, 1105; *see also Wamer*, 27 F.4th at 471 (explaining how "an objectively reasonable fear of further harassment" can cause a student to forgo "an educational opportunity in order to avoid contact with the harasser"). Similarly, in *Williams*, a student-victim reasonably decided not to return to the University of Georgia after she was gang raped because the school "failed to take any precautions that would prevent future attacks." 477 F.3d at 1297. In *Fairfax*, a student removed herself from the band class she shared with her assailant because the school offered no other solution to keep her away from him. 1 F.4th at 276.

These plaintiffs' injuries—their exclusion from campus facilities, their loss of academic and extracurricular opportunities—echo Jane's.

*See supra* pp. 20-22 (describing Jane's educational deprivations). A jury could find that, combined, the sexual assault and subsequent hostile environment were so severe, pervasive, and objectively offensive as to deprive her of educational opportunities and benefits.

## II.    A Jury Could Find the University Was Deliberately Indifferent to the Harassment Jane Suffered.

As the district court correctly determined, a jury could find the University's response to Jane's reports of sexual harassment was deliberately indifferent. A funding recipient is deliberately indifferent "where [its] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. Here, a jury could find the University was clearly unreasonable to readmit Player 1 under public and donor pressure without warning to or input from Jane, and then refuse to implement measures to keep Jane safe when Player 1 returned to campus.

1. A jury could be shocked to hear how and why the University rushed a "truncated readmission process" to return Player 1 to campus. A. 11 (emphasis removed). The University's thorough, multistage investigation and adjudication of Jane and Complainant 1's sexual assault reports took thirteen months; its reversal took thirteen days. *See supra* pp.

12, 19. At every stage but the last, the University had rightly and "repeatedly emphasized" its "central principal . . . of allowing both sides of a dispute to be heard." A. 11. Yet the University shut Jane out of its consideration of Player 1's petition asking the school to vacate its sexual assault finding. *See supra* pp. 14-15. Jane had no chance to review or respond to the evidence selectively curated by Player 1's attorneys, and to explain why it was not new and did not undermine her account. R. 94 at 183:2-193:23.

A jury could reasonably conclude that the rapid, one-sided vacatur was the result of pressure on the University by fans and major donors who cared more about the football team's success than students' civil rights. A. 13. As the district court observed, "the suddenness of the reversal without any input from [Jane] appears to have been driven by . . . a desire to get an important player back on the football field in time for the opening of [the University's] football season." *Id.* (emphasis removed). Title IX does not permit such a one-sided sham "investigation" designed to satisfy public pressure, or protect a star student-athlete, rather than to discern the truth of an allegation. *See Doe v. Purdue Univ.*, 928 F.3d 652, 668-70 (7th Cir. 2019) (holding school's one-sided hearing, allegedly

designed in response to federal "pressure," could violate Title IX); *Fairfax*, 1 F.4th at 272-73 (holding jury could find school was deliberately indifferent when it conducted a biased investigation in order to protect "one of [its] star students"); *Doe v. Manor Coll.*, 479 F. Supp. 3d 151, 167 (E.D. Pa. 2020) (holding a sham investigation is evidence of deliberate indifference, and collecting similar cases).[7]

The University's inconsistent after-the-fact justifications, and lack thereof, only underscore the clear unreasonableness of its one-sided reversal. At the time, the Chancellor justified her decision as responsive to unspecified "new[]" evidence. R. 113-13 at 4. Later, at her deposition, she could not remember what specific information she had found persuasive, R. 113 ¶ 43, even after reviewing the petition, R. 94 at 14:6-22. A jury might infer, based on the Chancellor's inability to identify her evidence-based reasons in her deposition or at the time of the reinstatement, that they never existed at all.

---

[7] Unsurprisingly, the U.S. Department of Education has, across administrations, explained that school disciplinary appeals that permit respondents to submit new evidence while excluding complainants violate Title IX. *E.g.*, 34 C.F.R. § 106.45(b)(8)(iii) (2020); Letter of Findings to Martha Minow from Joel J. Berner, Dep't of Educ. 11 (Dec. 30, 2014), https://clearinghouse.net/doc/99593/.

Below, the University contended that the Chancellor was specifically persuaded by a "new" statement in which Complainant 1 told a detective Jane had said, between assaults, that Player 1 intended to have "sex" with her. R. 125 at 31. In doing so, the University selectively quoted the statement to leave out the very next line, in which Complainant 1 recalled Jane's "eyes were rolling to the back of her head" as she said this, and that Jane was otherwise nonresponsive—only underscoring that Jane was incapacitated. R. 113-10 at 85-86 (12:25-13:1). Moreover, this information was not "new": Player 1 had received it from prosecutors during the University's investigation, R. 96 at 37:21-38:10, 51:18-53:17; R. 113-9 at 22-23; R. 128-2 ¶ 4, and the University had considered substantially similar information in determining that Player 1 had assaulted Jane, a finding the Chancellor affirmed on appeal, S.A. 33; R. 113-7 at 3, 15-16; R. 128-1 at 3, 18, 28; R. 155-1 at 4. Besides, given that the Chancellor never mentioned this statement until a post-deposition declaration, R. 113 ¶ 45, a jury could conclude that the University had merely constructed a post hoc justification for a decision motivated, in fact, by public pressure. For good reason, then, the district court ignored the Chancellor's after-the-fact, self-serving explanation.

2. To make matters worse, when Player 1 returned to campus, the University refused to implement basic measures to keep him and Jane apart. Before the University had expelled Player 1, he had violated the "no-contact order" forbidding him from interacting with Jane. *See supra* p. 11. And the University had found that his very presence on campus would create a hostile environment for her. *See supra* p. 12. By its own account, the University had tools at its disposal to protect Jane while she had to share a campus with Player 1. It could, for example, have arranged her and Player 1's classes so they would not run into each other on campus. R. 116 ¶ 21. It could have offered "campus escort services" or "increased security and monitoring of certain areas of the campus." 34 C.F.R. § 106.30(a) (2020).

Instead, the University left Jane with nothing beyond the "no-contact order" it knew Player 1 had previously violated without consequence. *See supra* p. 11. Multiple appeals courts have recognized that a jury may conclude a school was deliberately indifferent when it failed to "try something else" knowing that its previous measure "had not sufficed." *Sch. Dist. No. 1*, 970 F.3d at 1314; *see also Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 671 (2d Cir. 2012) (similar); *Vance v. Spencer Cnty. Pub.*

*Sch. Dist.*, 231 F.3d 253, 262 (6th Cir. 2000) (similar); *Menzia v. Austin Indep. Sch. Dist.*, 47 F.4th 354, 363 (5th Cir. 2022) (similar).

Here, the University's inaction was all the more unreasonable because, without its protection, Jane had to withdraw from campus life and her desired course of study to avoid further harassment. *See supra* pp. 20-22; *see also, e.g.*, *Farmer*, 918 F.3d at 1109 (holding plaintiffs stated Title IX claim by pleading that school's failure to protect them from further encounters with "their unchecked assailants . . . caused [them] to stop participating in [] educational opportunities"); *Williams*, 477 F.3d at 1297 (similar). In short, the University's deliberate indifference "excluded [Jane] from participation in" and "denied [her] the benefits of" the University. 20 U.S.C. § 1681(a). That's a violation of Title IX.

## CONCLUSION

For the reasons explained above, the Court should reverse the judgment below and remand for further proceedings.

November 1, 2022                    Respectfully submitted,

/s/ *Alexandra Z. Brodsky*
Alexandra Z. Brodsky
Adele P. Kimmel
Mollie Berkowitz*
PUBLIC JUSTICE
1620 L Street NW
Suite 630
Washington, DC 20036
(202) 797-8600
abrodsky@publicjustice.net
akimmel@publicjustice.net
mberkowitz@publicjustice.net

John Clune
Christopher Ford
Lucy Walker
HUTCHINSON BLACK AND COOK, LLC
921 Walnut Street
Suite 200
Boulder, CO 80302
(303) 442-6514
clune@hbcboulder.com
ford@hbcboulder.com
walker@hbcboulder.com

Robert Theine Pledl
DAVIS & PLEDL S.C.
1433 N. Water Street
Suite 400
Milwaukee, WI 53202
(414) 488-1354
rtp@davisandpledl.com

*\* Admitted in New York. Practice in the District of Columbia supervised by D.C. bar members pursuant to D.C. App. R. 49(c)(8).*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Circuit Rule 32(c) because it contains 9,466 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32(b) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office 365 in 14-point Century Schoolbook font.

Dated: November 1, 2022         */s/ Alexandra Z. Brodsky*
                                Alexandra Z. Brodsky
                                *Counsel for Plaintiff-Appellant*

No. 22-2454

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

JANE DOE,
*Plaintiff-Appellant,*

v.

BOARD OF REGENTS OF THE
UNIVERSITY OF WISCONSIN SYSTEM,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the Western District of Wisconsin
Case No. 3:20-cv-856
The Honorable William M. Conley

## SHORT APPENDIX OF PLAINTIFF-APPELLANT JANE DOE

John Clune
Chris Ford
Lucy Walker
HUTCHINSON BLACK AND COOK, LLC
921 Walnut Street, Suite 200
Boulder, CO 80302
(303) 442-6514
clune@hbcboulder.com
ford@hbcboulder.com
walker@hbcboulder.com

Alexandra Z. Brodsky
Adele P. Kimmel
Mollie Berkowitz
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600
abrodsky@publicjustice.net
akimmel@publicjustice.net
mberkowitz@publicjustice.net

Counsel for Plaintiff-Appellant
*Additional Counsel on Inside Cover*

Robert Theine Pledl
DAVIS & PLEDL S.C.
1433 N. Water Street, Suite 400
Milwaukee, WI 53202
(414) 488-1354
rtp@davisandpledl.com

## CERTIFICATE OF COMPLIANCE

This short appendix complies with the content requirements of Federal Rule of Appellate Procedure 30 and Circuit Rule 30 because it contains the opinion and order under review. Together, this short appendix and the attached separate appendix contain all the materials required by Circuit Rules 30(a) and 30(b). This appendix also complies with the requirements of Federal Rule of Appellate Procedure 32(b).

Dated: November 1, 2022                 */s/ Alexandra Z. Brodsky*
                                        Alexandra Z. Brodsky
                                        *Counsel for Plaintiff-Appellant*

i

# CIRCUIT RULE 30(B) SHORT APPENDIX
# OF PLAINTIFF-APPELLANT JANE DOE

## Table of Contents

**PAGES**

Docket 200, Opinion and Order Granting Defendant's
Motion for Summary Judgment (07/19/2022)..............................A. 1

Docket 201, Judgment (07/20/2022) ...................................................A. 22

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JANE DOE,

                              Plaintiff,                         OPINION AND ORDER

    v.
                                                                20-cv-856-wmc

BOARD OF REGENTS,
THE UNIVERSITY OF
WISCONSIN.

                              Defendants.

---

Plaintiff Jane Doe was a freshman at University of Wisconsin- Madison ("UW") when she reported to the Madison Police Department that she had been sexually assaulted by a UW football player ("Player 1") at an off-campus apartment on April 21, 2018.  In addition, Doe's father contemporaneously contacted the UW Dean of Students Office ("DoSO") to report the assault.  Within days of that report, the UW suspended Player 1 from the football team and ordered he have no contract with Doe.  After a Title IX investigation in the fall of 2018, the UW further determined there was evidence substantiating Doe's report of non-consensual sex and harassment, resulting in a recommendation that Player 1 be expelled from the UW altogether.  Following a formal administrative hearing in early 2019, the UW then expelled Player 1.

However, in early August of 2019, a Dane County jury found Player 1 not guilty of criminal sexual assault, and less than three weeks later, then-UW Chancellor Rebecca Blank vacated the administrative finding of sexual assault as well and granted his petition for reinstatement without seeking any input from Doe or her counsel.  Plaintiff Jane Doe

filed this lawsuit against the Board of Regents for the University of Wisconsin, alleging that these actions violated Title IX in the treatment of her claim of sexual assault.[1]

Now before the court are the parties' cross motions for summary judgment. While sympathetic to plaintiff's hurt and distrust about the UW's sudden about-face, particularly after rebuffing requests by plaintiff's counsel to be able to respond to Player 1's petition, the court will grant defendants' motion for summary judgment because she has articulated no viable legal grounds for judicial relief under the circumstances.

UNDISPUTED FACTS

Two members of the UW football team, Player 1 and Player 2, were present in the apartment at the time of the reported sexual assault, as were two other women, one of whom also reported an assault stemming from the same events that evening. After receiving her father's report of the assault, the DoSO promptly contacted Doe directly to discuss what resources and accommodations were available to her through the UW. In particular, Kate Dougherty, a member of the DoSO staff, helped Doe reach out to her professors on April 24, 2018, in order to receive academic accommodations. The next day, April 25, Title IX Coordinator Lauren Hasselbacher followed up with Doe to offer further assistance.

By April 27, 2018, the UW had also suspended Player 1 from the UW football team, and Hasselbacher notified Doe of this fact on April 30, 2018. On May 1, the UW

---

[1] The court previously dismissed Doe's claim of a violation of the of the Due Process Clause because she did not plead a property interest in her education sufficient for a due process claim.  (Dkt. #47.)

next issued a directive that Players 1 and 2 were to have no contact with Doe or the other complainant, and on May 29, Hasselbacher opened a formal, Title IX investigation into the underlying charges by mailing "Notices of Charge" to the two, accused football players. Hasselbacher then investigated the assault over the period from May 30 to October 9, 2018. Both accusers and the two players had their own attorney representation, and while Hasselbacher conducted several interviews, Player 1 and Player 2 declined to be interviewed, no doubt because at the same time, Player 1 was being investigated by local law enforcement with regard to possible criminal charges. For that reason, Hasselbacher was unable to review certain pieces of evidence from the criminal investigation, including some surveillance videos, as the Madison Police Department would not disclose them to Hasselbacher. The parties dispute whether Player 1 had access to those videos at this point, but agree that Hasselbacher did not review them before concluding her investigation.

On October 30, 2018, the UW made a Title IX determination finding Player 1 responsible for second- and third-degree sexual assault. Specifically, Assistant Dean of Student Life Ervin Cox wrote in the determination that "Complainant 1 witnessed [Doe] tell [Player 1] she was 'too tired,' which reflects a lack of consent, and then [Player 1] proceed[ed] to have sexual intercourse with [Doe] anyway." (Pl.'s Rep. to Def.'s Resp. to Pl.'s PFOF (dkt. #171) ¶ 104.) The determination also found Player 1 had sexually harassed Doe. Cox further wrote in his determination letter that Player 1's conduct created a hostile learning environment for Doe, such that she would feel uncomfortable sharing a campus with Player 1, and therefore, found his expulsion from the UW was appropriate.

3

A. 003

Before being formally expelled, Player 1 was entitled to a hearing on this disciplinary determination under UW procedures, and though he tried to delay the hearing until after his criminal trial, that hearing was held on January 15, 2019.  During the hearing, Player 1 and his lawyer were allowed to cross examine witnesses, although all questions were filtered through the Hearing Committee.  Player 1 was also given the opportunity to testify but declined to do so.  On January 28, 2019, the Hearing Committee found Player 1 responsible for third-degree sexual assault and harassment and upheld his expulsion.  Player 1 appealed that decision, but Chancellor Blank also upheld it on March 13, 2019, based on the hearing record.  Player 1 subsequently appealed his expulsion to defendants UW Board of Regents, which denied his final appeal on June 7, 2019.

In July 2019, Player 1 was tried on criminal charges stemming from his interaction with Doe, after which the jury found him not guilty on August 2, 2019.  The jury's verdict was obviously reached under the heightened standard of "beyond a reasonable doubt," as opposed to the Title IX determination made under a "preponderance of the evidence" standard.  Nevertheless, Player 1 submitted a Petition for Restoration of Rights to UW on August 6, 2019 ("the petition"), asking to have his Title IX finding of responsibility vacated and be readmitted to the UW.  Under Wisconsin Administrative Code § UWS 17.18, UW Chancellor Blank was responsible for deciding whether to grant the petition.  Although Blank was on vacation in Hawaii from August 6 to August 16, 2019, she reviewed the petition and other materials filtered through the UW General Counsel's Office, before making her decision on Player 1's readmittance.

After the criminal trial, there was significant public support for Player 1, including a hashtag which UW monitored.  Members of the public also emailed Chancellor Blank in support of Player 1.  In addition, UW Football coach Paul Chryst made a public statement that he would "love" to have Player 1 back on the team, a statement that had apparently been proposed by UW representatives based on talking points Chryst had drafted before his statement to the press.  Members of the UW football team also appeared at a press conference with Player 1 and wrote letters to Blank in support of his readmission.  Soon after Player 1's petition, Chancellor Rebecca Blank similarly received letters written by five major UW donors in support of Player 1's readmission.[2]  A personal letter from one major donor to the UW specifically urged "Becky" to "fast-track and readmit [Player 1] to our university in the next two weeks."  (Pl.'s Rep. to Def.'s Resp. to Pl.'s PFOF (dkt. #171) ¶ 164.)[3]  And Player 1 was readmitted within two weeks.

After submitting his petition, Player 1's legal team further met directly with UW General Legal Counsel Ray Taffora for at least an hour, had several follow up calls with Taffora, and provided supplemental evidence to UW in support of his petition.  In contrast, when Doe's counsel, Amy Bogost, found out about Player 1's petition through media

---

[2] As with other, major Division I football programs, UW's program generates millions of dollars of excess revenues for the UW, most of which is used to cover the expenses of other, non-revenue sports.  In addition, the Chancellor and other UW Department heads try to attend UW football home games, during which they network with donors, board members, and other important alumni to promote the UW and its educational programs.  Also emphasized by plaintiff is the fact that football coach Paul Chryst's compensation is substantially greater than the Chancellor herself, although this, too, is hardly unique to the UW.

[3] In fact, the record in this case reflects that, among other large contributions to the UW sports programs, this donor, Ted Kellner, had pledged $25 million dollars toward the UW's $3 billion comprehensive fundraising campaign in the year just before Player 1's expulsion.

5

coverage and reached out to Attorney Nancy Lynch in the UW-Madison Office of Legal Affairs, she was simply told the UW had not finished reviewing the petition. Similarly, Taffora did not contact Doe or her attorney.

In her review, UW's Chancellor also did not reach out to Doe or ask her to respond to the petition. In particular, Doe and her counsel were never notified that the Chancellor was even considering a reversal of the UW's original findings. With his petition, Player 1 provided certain video evidence and police reports that UW had not previously seen, some of which Blank did review along with the petition, although just those videos that UW General Counsel Taffora thought she needed to review to make her decision. Taffora had also reached out to the prosecutor in Player 1's criminal case to inquire about getting the trial transcripts. The prosecutor, Matthew Brown, understood from this call that Taffora needed the transcripts on an expedited basis because the football season was beginning. Ultimately, however, the UW never ordered transcripts from the criminal trial, nor asked Doe's counsel about her view of any new evidence introduced at trial.

Under § 17.18, Chancellor Blank was required to make her readmission decision "in consultation" with the Title IX coordinator, although it appears that she may have already decided how she would rule on the petition before calling Hasselbacher to discuss it. During their discussion, Hasselbacher recommended that the Chancellor "provide complainants an opportunity to respond to the petition," which she believed would be more consistent with the rest of the UW's Title IX process. (Pl.'s Rep. to Def.'s Resp. to Pl.'s PFOF (dkt. #171) ¶¶ 222-223.) Blank did not follow this recommendation, however, choosing instead to make her ruling on the petition without Doe or her attorney being

given any opportunity to review and respond to the petition or to any of the so-called "new" evidence.  In explaining that decision later, Blank stated that she treated the petition "like an appeal," despite the fact that she considered new evidence and additional input from only one side of the dispute.

On August 19, 2019, following her consultation with Title IX Coordinator Hasselbacher, Chancellor Blank officially granted Player 1's Petition for Restoration of Rights.  Specifically, based on the new evidence, Blank thought that it was reasonable for Player 1 to assume he had consent from Doe.  In her tenure, Blank had reviewed 10 petitions for restoration of rights, including at least one other petition involving sexual harassment or abuse.  Of those 10 petitions, Blank only reversed the findings against Player 1.  As a result, the UW's finding of sexual assault was vacated and Player 1's expulsion was converted into a suspension.  However, the finding of sexual harassment *and* Player 1's May 1, 2018, no-contact directive remained in effect.

## OPINION

Summary judgment must be granted against a party who fails to make a showing sufficient to establish the existence of an essential element and on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If there is any genuine issue as to any material fact on an essential element, however, the court cannot grant summary judgment.  *Id*.  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted).  Finally, "[t]he evidence of the

A. 007

non-movant is to be believed, and all justifiable inferences are to be drawn in [that party's] favor." *Id*. at 255.

Title IX mandates that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C.A. § 1681. As a preliminary matter, the parties generally discuss Doe's Title IX claims under an "erroneous outcome" or "deliberate indifference" standard. However, the Seventh Circuit has not adopted separate standards for those claims; instead, the court has explicitly disclaimed such distinctions:

> We see no need to superimpose doctrinal tests on the statute. All of these categories simply describe ways in which a plaintiff might show that sex was a motivating factor in a university's decision to discipline a student. We prefer to ask the question more directly: do the alleged facts, if true, raise a plausible inference that the university discriminated against [the plaintiff] 'on the basis of sex'?

*Doe v. Purdue Univ*., 928 F.3d 652, 667–68 (7th Cir. 2019). The Seventh Circuit reaffirmed this approach in a later opinion, emphasizing "that tests or categories labeled 'erroneous outcome' or 'selective enforcement' or 'deliberate indifference' or 'archaic assumptions' need not be considered because at bottom they all ask the same question." *Doe v. Columbia Coll. Chicago*, 933 F.3d 849, 854–55 (7th Cir. 2019). The *Columbia* court reiterated that question is "whether 'the alleged facts, if true, raise a plausible inference that the university discriminated ... 'on the basis of sex'?" *Id*. (*citing Purdue*, 928 F.3d at 668-69).

The Seventh Circuit itself discusses two different Title IX standards that broadly encompass plaintiff's principal claims here. In particular, having largely eschewed other

doctrinal tests, the Seventh Circuit now reviews Title IX claims under a "direct" and "indirect" rubric. *Jauquet v. Green Bay Area Cath. Educ., Inc.*, 996 F.3d 802, 807 (7th Cir. 2021), sometimes also referred to as "discrimination" and "sexual harassment" claims, *Columbia Coll.*, 933 F.3d at 854. Even in *Jauquet* and *Columbia*, however, the Seventh Circuit describe identical elements for those claims, albeit using different nomenclature.

Accordingly, however one might refer to Doe's claims of discrimination on the basis of sex, the question at summary judgment is whether plaintiff has advanced sufficient proof that the UW violated Title IX by rushing the readmission process forward without giving Doe a chance to participate in any way, leading to a decision to vacate its original finding of sexual assault and readmit Player 1. Hewing to the language in *Jauquet*, the court will examine plaintiff's evidence in support of that claim under "indirect" and "direct" methoda of proof.

## I.    **Indirect Discrimination**

For the indirect discrimination (sometimes referred to in the past by one part of its three elements, "deliberate indifference") claim, "[t]he Supreme Court has set a high bar for plaintiffs seeking to hold schools and school officials liable for student-on-student harassment." *Doe v. Galster*, 768 F.3d 611, 617 (7th Cir. 2014). The Court has "conclude[d] that funding recipients are properly held liable in damages only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis Next*

*Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999).  Said another way, plaintiff can prove indirect discrimination by proving:  (1) "the school or school officials must have had actual knowledge of sex-based harassment"; (2) "the harassment must have been 'so severe, persuasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school'"; and (3) "the school must have been deliberately indifferent to the harassment." *Jauquet*, 996 F. 3d at 808 (quoting *Davis*, 526 U.S. at 650) (other citations omitted).

Here, defendants concede actual knowledge of sexual harassment, having never vacated that finding, but argue that Doe offers insufficient evidence for a reasonable jury to find deliberate indifference to sexual harassment *or* deprivation of access, warranting summary judgment in its favor.  While the court agrees with defendants as to the latter under current case law, it cannot as to the former.  To begin, after promptly suspending Player 1 from the football team and instituting a no-contact directive, the UW engaged in a fulsome process of investigation, formal hearing and ruling, which took more than a year to complete counting appeals, *and* found in plaintiff's *favor* at each step along the way. During all of this time, Player 1 was suspended from playing or practicing with the football team, and at least for the Spring semester of 2019, from even attending school.  To ensure flexibility on behalf of administrators, "funding recipients are deemed 'deliberately indifferent' to acts of student-on-student harassment *only* where the recipient's response to the harassment or lack thereof is *clearly unreasonable* in light of the known circumstances." *Davis*, 526 U.S. at 648 (emphasis added).  Even with the UW Chancellor's precipitous grant of Player 1's petition for reinstatement to the football team and to campus life more

than a year later, therefore, defendants argue that no reasonable jury could find the UW's response was clearly unreasonable in light of all known circumstances.

If the court were only considering the outcome (a suspension for a year and expulsion for six months), the court might agree that the UW's response was not "clearly unreasonable." Indeed, "even if the school's response to the harassment was not as fulsome as a parent would want for her child, '[a] negligent response is not unreasonable, and therefore will not subject a school to liability [under Title IX].'" *Jauquet*, 996 F.3d at 809 (quoting *Johnson*, 972 F.3d at 911–12.) Given the Supreme Court's direction that "courts should refrain from second-guessing the disciplinary decisions made by school administrators," plaintiff has not shown sufficient evidence to find UW's actions in reinstating Player 1 was *clearly* unreasonable. *Davis*, 526 U.S. at 648.

However, the heart of Doe's argument now is that the UW's refusal to let Doe participate in the *truncated readmission process* amounts by itself to deliberate indifference to Doe's sex-based harassment, as it went against the UW's own central principle in Title IX cases of allowing both sides of a dispute to be heard. Indeed, the UW had repeatedly emphasized this driving principal throughout its Title IX investigation and proceedings leading up to Player 1's expulsion the previous Spring. Defendants' best response to this argument centers on the language of Wisconsin Administrative Code § UWS 17.18, which only required the Chancellor to consult with the Title IX Coordinator before making a decision. Specifically, § 17.18 states as follows:

> A respondent who has been expelled may petition for the right
> to apply for readmission. The petition shall be in writing and
> directed to the chief administrative officer of the institution
> from which the respondent was suspended or expelled or from

11

A. 011

> a different University of Wisconsin institution to which the respondent seeks admission. The chief administrative officer shall make the readmission decision. In cases of sexual misconduct, the readmission decision shall be made in consultation with the Title IX Coordinator and reasonable attempts shall be made to notify the complainant of any change to the disciplinary outcome.

Wis. Admin. Code UWS § 17.18.  As defendants emphasize repeatedly, *nothing* in this text requires that the chief administrative officer (here, the UW Chancellor) notify the complainant *before* making her decision to reinstate Player 1, only that the officer must notify her if a change has been made.  Additionally, *nothing* in the code specifically requires that the complainant be given the chance to respond to new evidence.  Of course, because *at least* "sexual misconduct" *was* involved, the code requires that the reinstatement decision be made "in consultation with" the Title IX coordinator.  Even then, however, there is no indication as to what that consultation should entail nor the extent to which the chief administrative officer should consider, much less follow, any input from the Title IX coordinator, including as here advocating for giving the plaintiff an opportunity to be heard before deciding whether reinstatement is appropriate.

As the court previously advised in its denial of defendants' motion to dismiss, however, a Title IX claim does not turn on proving "that the UW failed to follow its own procedures in overturning its prior decision and readmitting Player 1." *Doe v. Bd. of Regents of Univ. of Wisconsin*, No. 20-CV-856-WMC, 2021 WL 5114371, at *4 (W.D. Wis. Nov. 3, 2021).  Here, since nothing in the UW's own procedures for ordering Player 1's reinstatement *required* the school to involve complainants like Doe in the readmission process, the Chancellor followed the UW's administrative code for readmission to the

letter.  Still, having emphasized the importance of and actually hearing from each party at every other stage of the disciplinary process, the suddenness of the reversal without any input from plaintiff *appears* to have been driven by at best a desire to avoid any arguable liability for having suspended and expelled Player 1 in response to his acquittal on criminal sexual assault charges less than two weeks before, *or* at worst, a desire to get an important player back on the football field in time for the opening of UW's football season.

While poor optics are not actionable under Title IX, the UW's haste in reversing field without even considering input from plaintiff may be enough for a reasonable trier of fact to find the UW acted with deliberate indifference to Doe's having suffered from sexual harassment *and* what may still have been civilly actionable, sexual assault.  In fact, this was not just a case of reinstatement, but of reinstatement following the Chancellor's formally *vacating* an administrative finding that Doe *had been* sexually assaulted under a "preponderance of the evidence" standard.  While the UW's finding that Doe had been sexually harassed still stands, one cannot but credit the likely sting of that vacatur to Doe, particularly having just participated in a jury trial resulting in Player 1 being found not guilty of sexual assault under a higher criminal standard of "beyond a reasonable doubt." Whether the ultimate ruling would have been the same, to impose it without allowing plaintiff the chance to respond to evidence filtered by one side must have felt like a betrayal.[4]

---

[4] The court is *not* finding that the UW Chancellor acted with deliberate indifference to Doe's claim of sexual assault -- indeed, she may well have taken that into consideration when trying to properly balance the interests of Doe, Player 1 and the UW -- just that a reasonable jury *could* find under the circumstances that she acted with deliberate indifference to the administrative finding that Doe has been sexually assaulted.

Even if Player 1's unseemly rapid reinstatement were found to amount to deliberate indifference to Player 1's sexual misconduct, however, Doe has not proffered any proof that her harassment was "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650. As a preliminary matter, the court emphasized at the motion to dismiss stage that the harassment necessary to satisfy this prong of her Title IX claim is not met by her understandable sense of betrayal in the process the UW adopted to reinstate Player 1, but rather the hostile environment Doe had to endure in pursuing her education. *Doe*, No. 20-CV-856-WMC, 2021 WL 5114371, at *4. In response, Doe *claims* that she was deprived of educational opportunities due to her fear on campus, and the hostile environment to which she was exposed, once Player 1 was reinstated as a student. However, she offers no concrete examples of *specific* impacts on her or examples of harassment, other than that she took affirmative steps to avoid places on campus where she might encounter Player 1.

In contrast, examples of sufficiently severe impacts on education "may include dropping grades, becoming homebound or hospitalized due to harassment, or physical violence." *Gabrielle M. v. Park Forest-Chicago Heights, IL. Sch. Dist. 163*, 315 F.3d 817, 823 (7th Cir. 2003) (internal citations omitted). In fairness, plaintiff need not "show *physical exclusion* to demonstrate that [she has] been deprived by the actions of another student or students of an educational opportunity on the basis of sex." *Davis*, 526 U.S. at 629. (emphasis added). Here, Doe argues her emotional reaction to Player 1's reinstatement alone is sufficient to constitute severe deprivation, citing other federal circuits that have

found going to school with a sexual harasser may deprive a student of educational opportunities.  *See Hayut v. State Univ. of New York*, 352 F.3d 733, 748 (2d Cir. 2003) ("Hayut also testified that she felt humiliation and emotional distress, did not want to attend classes, and was unable to sleep. That is enough to render this issue one for the trier of fact"); *see also Doe ex rel. Doe v. Derby Bd. of Educ.*, 451 F. Supp. 2d 438, 444 (D. Conn. 2006) ("even absent actual post-assault harassment by [the accused], the fact that he and plaintiff attended school together could be found to constitute pervasive, severe, and objectively offensive harassment").  To date at least, the Seventh Circuit has in contrast actively disclaimed such broad bases for liability.  Instead, the Seventh Circuit has suggested that emotional harm *alone* is not enough, finding it dispositive that "[a]lthough [the victim] was diagnosed with some psychological problems, the record shows that her grades remained steady and her absenteeism from school did not increase." *Gabrielle*, 315 F.3d at 823.

While perhaps specific proof of declining grades or absenteeism are not prerequisites to create a disputed issue of fact as to severe impacts on Doe's education, something more than a general sense of unfairness or discomfort is, especially considering that Player 1 was off campus for the better part of a year, and *never* interacted with Doe again after her report of a sexual assault, either before or after his reinstatement on campus, whether because of his or her efforts to avoid that from happening.  (Def.'s Rep. to Pl.'s Opp'n to Def.'s PFOF (dkt. #165) ¶ 335.)  Even at the original Title IX hearing, Player 1 saw Doe, but was not allowed to speak to her.  (Pl.'s Rep. to Def.'s Opp'n to Pl.'s PFOF (dkt. #171) ¶ 113.)  Doe also admits that she never even *saw* Player 1 on campus after that hearing.  (Def.'s Rep. to

Pl.'s Opp'n to Def.'s PFOF (dkt. #165) ¶¶ 335-39.)   In terms of emotional harm, Doe continued to study at UW, participated in several student groups and successfully graduated college with a good GPA in under four years.   (Def.'s Rep. to Pl.'s Opp'n to Def.'s PFOF (dkt. #165) ¶¶ 353-55.)

This court is particularly sympathetic to Doe's argument that she achieved all of these milestones *in spite of* her suffering through a sexual assault and harassment, as well as its inordinately long aftermath that still has not ended, rather than because she was unaffected.   Even so, there is *no* support in Seventh Circuit caselaw for a reasonable jury to find that her general anxiety was "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience" that it amounted to a Title IX violation, especially given that:   Doe's grades and attendance never suffered measurably; and Player 1 was kicked off campus for at least a semester, then only allowed back under restrictions for one semester.[5]   *Davis*, 526 U.S. at 651 (1999).   Perhaps somewhat ironically, Doe's success in school may well have been a product of exceptional personal fortitude to overcome the ordeal that Player 1 (and even the UW) caused, but because plaintiff has not carried her burden of proof that it materially undermined and detracted from her educational experience as required under Title IX, summary judgment for defendants on a claim of indirect discrimination is warranted.

---

[5]   Although Player 1 was reinstated briefly, the facts are that he left campus for good and turned pro immediately after the football season that fall.   (Def.'s Rep. to Pl.'s Opp'n to Def.'s PFOF (dkt. #165) ¶ 349.)

## II.    Direct Discrimination

A direct discrimination (sometimes referred to as "erroneous outcome") claim "requires a plaintiff allege (1) the educational institution received federal funding, (2) plaintiff was excluded from participation in or denied the benefits of an educational program, and (3) the educational institution in question discriminated against plaintiff based on gender." *Columbia Coll.*, 933 F.3d at 854.  Here, plaintiff has not provided sufficient evidence to support either the second or third prongs of a direct discrimination claim, warranting summary judgment on behalf of defendants on this claim as well.

As an initial matter, plaintiff is again unable to show that she was excluded from the benefits of her educational program for the reasons already discussed.  Generally, this second element is established by an alleged *perpetrator* later bringing a direct discrimination claim after being unfairly suspended or expelled.  *Id*.  Perhaps because the claimed adverse educational effects on Doe were more subtle than suspension or expulsion suffered by Player 1, this prong is specifically disputed by defendants.  Notably, the language for this prong with respect to direct discrimination claims is slightly different than the commensurate requirement for indirect discrimination claims.  *Compare id.* (requiring that Doe be "excluded from participation in or denied the benefits of an educational program") *with Davis*, 526 U.S. at 650 (requiring that the harassment "deprive the victims of access to the educational opportunities or benefits provided by the school").  However, the difference in language is minor, and the Seventh Circuit has not articulated any meaningful difference between the two standards in theory or practice.

17

A. 017

To the contrary, for a direct discrimination claim, as with indirect discrimination claims, the Seventh Circuit has emphasized that plaintiff's "complaint does not specify what program or benefit Student A was not able to access . . . [i]n fact, the complaint repeatedly emphasizes that Student A is an honor roll student and does not suggest her academic status changed as a result of the practices and policies alleged." *Jauquet*, 996 F.3d at 810.  Thus, the Seventh Circuit has been similarly unwilling to find that a student was barred from educational opportunities without some kind of concrete proof of harm, such as dropping grades or increased absenteeism, with respect to both direct and indirect discrimination claims.  Without such evidence, Doe has not shown that she was denied any benefits of UW's educational programs.

Finally, although a closer question than being denied an educational benefit, plaintiff's assertion that she was discriminated against during the reinstatement process "based on gender" is tenuous on the record before the court on summary judgment.  To show discrimination, "[a] plaintiff cannot rely on . . . generalized information alone; [s]he must combine it with facts creating an inference that, in [her] specific case, the institution treated [her] differently because of [her] sex." *Johnson v. Marian Univ.*, 829 F. App'x 731, 732 (7th Cir. 2020).  Doe's main claim is that because Player 1 was a successful football player on an all-male team, the UW was incentivized to treat Doe's claim differently. There is some support for this argument, including that football appears to have played a role in Player 1's petition for readmission being handled so quickly, if not in its outcome. However, defendants identify at least two strong arguments against Doe's assertion of bias: (1) the UW did not seem to favor Player 1, and in fact, found him liable despite his

18

A. 018

importance to the football team until a jury acquitted him of the criminal charges; and (2) the UW had a clear, non-discriminatory reason to readmit Player 1.

Plaintiff rightly emphasizes throughout her briefing that UW found Player 1 liable both at his original hearing *and* upheld that decision twice upon appeal, but that is a double-edged sword for Doe.  (Pl.'s Op. Br. (dkt. #127) 8.)  Indeed, the UW persuasively argues that Doe's direct discrimination claim is wholly undermined where the university found Player 1 liable of both sexual assault and harassment, expelled him, *and* upheld that decision on two appeals.  (Pl.'s Rep. to Def.'s Opp'n to Pl.'s PFOF (dkt. #171) ¶ 127.)  Only after his criminal acquittal, at which the introduction of *new*, arguably exculpatory evidence was considered, did the school reconsider; and even then, while reinstating him, the UW did *not* vacate the finding against him of sexual harassment or restrictions on his having *any* interaction with the plaintiff.  (Pl.'s Rep. to Def.'s Opp'n to Pl.'s PFOF (dkt. #171) ¶ 130.)  Were the school biased in favor of males, or at least male football players, a reasonable trier of fact might expect the administration would *not* have acted as firmly and decisively to punish Player 1 as they did here initially.  If anything, a reasonable trier of fact would seem compelled to find that the UW was predisposed to rule against Player 1 permanently, given that he was immediately suspended and then expelled.  If Player 1's status as a male football player were truly a motivating factor, the UW might have found him not liable, or at least decided on a punishment of suspension rather than expulsion. These facts suggest, therefore, that Player 1's sports acumen, as a proxy for his gender, was not a motivating factor in UW's decision-making.

Moreover, the UW had a clear, non-discriminatory reason to reevaluate its original position:  Player 1's criminal acquittal was preceded by the submission of new evidence to the jury, including surveillance videos documenting her interactions with Player 1 that arguably suggested Doe *may* have been less intoxicated or tired than previously thought (and therefore, more capable of consenting to sex).  With Player 1 being acquitted by a jury just days before petitioning for readmission, the Chancellor at least had reason to reconsider the UW's earlier decision to expel Player 1 consistent with its own regulations.  (Pl.'s Rep. to Def.'s Opp'n to Pl.'s PFOF (dkt. #171) ¶¶ 129-30.)  In fairness to Doe, nothing in Seventh Circuit caselaw suggests that gender bias needs to be the *sole* motivating factor for a school's action to exclude a student from participating in or the benefiting from an educational program.  However, Player 1's acquittal and new evidence is an obvious reason for UW to reconsider its earlier ruling for Doe across the board, such that ascribing the Chancellor's reconsideration to gender bias begs credulity on this record.  If anything, to credit Doe's argument, a trier of fact would have to make broad leaps in logic and ignore the reasonable explanations that UW provided.

Specifically, rather than the Chancellor being swayed by new evidence and a criminal acquittal -- or the less laudatory, but no more actionable, goal of pleasing wealthy donors and football fans -- the jury would have to find that she had been partially motivated by Player 1's gender in the face of the school's contrary, consistent actions, including the Chancellor's own, original denial of his appeal from the expulsion order.  Doe has not provided the kind of evidence that would make this finding more than rank speculation, while UW has given legally sufficient explanations for each action.

Regardless, Doe has not met her burden to prove adverse educational effects caused by Player 1's reinstatement as required for both direct and indirect discrimination claims under Title IX, her motion for summary judgment must be denied.  Additionally, because defendants moved for summary judgment on the same arguments, and neither party successfully raised any genuine disputes of material fact, but rather disputed the proper application of Seventh Circuit case law, defendants' motion for summary judgment will be granted.

## ORDER

IT IS ORDERED that:

1)  Plaintiff's motion for summary judgment (dkt. #126) is DENIED.

2)  Defendants' motion for summary judgment (dkt. #101) is GRANTED.

Entered this 19th day of July, 2022.

BY THE COURT:

__/s_____
WILLIAM M. CONLEY
District Judge

21

A. 021

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JANE DOE,

     Plaintiff,

     v.

Case No.  20-cv-856-wmc

BOARD OF REGENTS, THE
UNIVERSITY OF WISCONSIN, and
REBECCA BLANK, as an individual,

     Defendants.

## JUDGMENT IN A CIVIL CASE

IT IS ORDERED AND ADJUDGED that judgment is entered in favor of

defendants Board of Regents, the University of Wisconsin, and Rebecca Blank

against plaintiff Jane Doe dismissing this case.

| | |
|---|---|
| s/ R. Swanson, Deputy Clerk | 7/20/2022 |
| Joel Turner, Clerk of Court | Date |