No. 22-2454

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

JANE DOE
*Plaintiff-Appellant,*

v.

BOARD OF REGENTS OF THE
UNIVERSITY OF WISCONSIN SYSTEM,
*Defendant-Appellee.*

---

On Appeal from the United States District Court
for the Western District of Wisconsin
No. 3:20-cv-856
Hon. William M. Conley

---

## BRIEF OF RAINN (RAPE, ABUSE AND INCEST NATIONAL NETWORK) AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF-APPELLANT SEEKING REVERSAL

KAUFMAN LIEB LEBOWITZ &
FRICK LLP

David A. Lebowitz
Alyssa Isidoridy
18 E. 48th Street, Suite 802
New York, New York 10017
Tel: (212) 660-2332
dlebowitz@kllf-law.com
aisidoridy@kllf-law.com

*Counsel for Amicus Curiae*

# DISCLOSURE STATEMENT

No amicus has a parent corporation, and no publicly held company has a 10% or greater ownership interest in any amicus.

No party's counsel authored this brief in whole or in part. No party, party's counsel, or other person contributed money that was intended to fund preparation or submission of this brief.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................... iii

STATEMENT OF AMICUS CURIAE ..................................................... 1

INTRODUCTION ................................................................................. 2

ARGUMENT ........................................................................................ 4

   I.    THE DISTRICT COURT'S DECISION CONTRAVENES THE
        LEGISLATIVE PURPOSE OF TITLE IX ................................... 4

  II.   THE DISTRICT COURT'S DECISION FAILS TO RECOGNIZE
        THE FULL RANGE OF EFFECTS OF SEXUAL VIOLENCE
        ON SURVIVORS' EDUCATIONAL OPPORTUNITIES ............. 9

    A.   The Inability to Participate in Extracurricular Activities,
        Socialization, and Ideas Exchange Stifles Education and
        Career Opportunities ........................................................... 11

      1.   When Forced to Take Self-Protective Measures, Survivors
          are Prevented from Accessing Activities That Enhance
          University Life and Contribute to Job Prospects ........ 11

      2.   Student-Survivors Are Robbed of the Value of Universities
          as Fora for Information Exchange and Collaboration. 16

    B.   Institutional Failure to Implement Reasonable Safeguards for
        Survivors Exacerbates the Negative Impacts of Sexual
        Violence ............................................................................... 20

 III.   THE DISTRICT COURT'S DECISION PUNISHES
        SURVIVORS FOR THEIR RESILIENCY ................................ 24

CONCLUSION ..................................................................................... 29

# TABLE OF AUTHORITIES

## Cases

*Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.,* 526 U.S. 629
(1999) ..................................................................................8, 9

*Doe 1 v. Baylor Univ.,* 240 F. Supp. 3d 646 (W.D. Tex. 2017) ...............10

*Doe ex rel. Doe v. Brighton School District 27J*, No. 19 Civ. 0950, 2020
WL 886193 (D. Colo. Feb. 24, 2020) ....................................................10

*Doe v. Sch. Dist. No. 1, Denver, Colorado*, 970 F.3d 1300 (10th Cir.
2020)..................................................................................................27

*Farmer v. Kansas State Univ.*, 918 F.3d 1094 (10th Cir. 2019) .............20

*Gabrielle M. v. Park Forest-Chicago Heights, IL. Sch. Dist. 163*, 315 F.
3d 817 (7th Cir. 2003) ...................................................................27, 28

*Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998) .............4, 28

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993) .....................................28

*Jane Doe v. Board of Regents, UW,* No. 20 Civ. 856, 2022 WL 2817839
(W.D. Wis. July 19, 2022). ............................................................2, 25

*Jennings v. Univ. of N. Carolina*, 482 F.3d 686 (4th Cir. 2007)............27

*North Haven Bd. of Educ. v. Bell*, 456 U.S. 512 (1982) .......................... 8

*Regents of Univ. of California v. Bakke*, 438 U.S. 265 (1978) ...............17

*Sweezy v. State of N.H. by Wyman*, 354 U.S. 234 (1957).......................16

## Statutes

20 U.S.C. § 1681(2)(B)............................................................................ 6

20 U.S.C. § 1681(a) ................................................................................ 5

20 U.S.C. § 1687.................................................................................... 6

42 U.S.C. § 2000d ................................................................. 6

42 U.S.C. § 2000e-17 ............................................................ 5

Wis. Stat. § 36.01(2) ............................................................12

## **Other Authorities**

117 Cong. Rec. 30404 ........................................................... 6

117 Cong. Rec. 30406 ........................................................... 7

118 Cong. Rec. 5806-07 ........................................................ 8

118 Cong. Rec. 5808 ............................................................. 8

118 Cong. Rec. 5811 ............................................................. 8

Alexander Astin, WHAT MATTERS IN COLLEGE? FOUR CRITICAL YEARS
    REVISITED (1993) .............................................................15

Anonymous, *On Assault Narratives*, YALE DAILY NEWS (Feb. 1, 2012)..11

Catherine Hill and Elena Silva, DRAWING THE LINE: SEXUAL
    HARASSMENT ON CAMPUS (2005)..........................................12

Cecilia Mengo and Beverly Black, *Violence Victimization on a College
    Campus: Impact on GPA and School Dropout*, 18(2) J. OF COLLEGE
    STUDENT RETENTION: RESEARCH, THEORY & PRACTICE 234 (2015) ......24

David Cantor, et al., *Report on the AAU Campus Climate Survey on
    Sexual Assault and Misconduct* (Revised January 17, 2020)........23, 24

Derek C. Bok, HIGHER LEARNING (1986).................................18

Erica van Roosmalen & Susan A. McDaniel, *Sexual Harassment in
    Academia: A Hazard to Women's Health*, 28 WOMEN & HEALTH 33
    (1998) ...........................................................................10

John D. Foubert, and L. U. Grainger, *Effects of Involvement in Clubs
    and Organizations on the Psychosocial Development of First-Year and
    Senior College Students*, 43 NASPA J. 166 (2006)...............................21

Judith L. Herman, *Complex PTSD: A syndrome in survivors of prolonged and repeated trauma*, 5 J. OF TRAUMATIC STRESS 377 (1992) ...................................................................................24

Karen L. Webber, et al., *Does involvement really matter? Indicators of college student success and satisfaction*, 54 J. OF COLL. STUDENT DEV. 591 (2013)................................................. 15, 17, 21

Lilia M. Cortina et al., *Sexual Harassment and Assault: Chilling the Climate for Women in Academia*, 22 PSYCHOLOGY OF WOMEN QUARTERLY 419 (1998) ........................................................10

Lori Haskell et al., *The Impact of Trauma on Adult Sexual Assault Victims,* Justice Canada (2019) .....................................30, 31

Luisa H. Pinto and D.C. Ramalheira, *Perceived Employability of Business Graduates: The Effect of Academic Performance and Extracurricular Activities*, 99 J. OF VOCATIONAL BEHAVIOR 165 (2017) ...................................................................................16

Marisela Huerta et al., *Sex and Power in the Academy: Modeling Sexual Harassment in the Lives of College Women*, 32(5) PERSONALITY AND SOCIAL PSYCHOLOGY BULLETIN, 616 (2006)...........................................25

Mary Stuart, et al., *The Impact of Engagement with Extracurricular Activities on the Student Experience and Graduate Outcomes for Widening Participation Populations*, 12(3) ACTIVE LEARNING IN HIGHER EDUC. 203 (2011)....................................................16

Patricia L. Fanflik, *Victim Responses to Sexual Assault: Counterintuitive or Simply Adaptive?* (2007) ......................................28

Paul C. Sweeney, *Abuse Misuse & Abrogation of the Use of Legislative History: Title IX & Peer Sexual Harassment,* 66 UMKC L. REV. 41 (1997) ...............................................................................6, 7

Sarah Nesbitt et al., *The Cost of Reporting: Perpetrator Retaliation, Institutional Betrayal, and Student Survivor Pushout* (2021) 25, 26, 27

Shouping Hu and Gregory C. Wolniak, *College Student Engagement and Early Career Earnings: Difference by Gender, Race/Ethnicity, and Academic Preparation*, 36 REV. OF HIGHER EDUC. 211 (Winter 2013)..................................................................................17

Tongshan Chang, et al., "Getting Engaged: Does it Work?" The University of California Office of the President, 40th CAIR Annual Conference (Nov. 4-6, 2015) ...............................................16

University of Wisconsin Bursar's Office, *Segregated Fees* .....................13

University of Wisconsin, Chancellor Blank, *Creating the New Normal: Returning to Campus* (March 25, 2021) .............................................20

William G. Bowen, *Admissions and the Relevance of Race*, Princeton Alumni Weekly 7 (Sept. 26, 1977) ........................................................19

## STATEMENT OF AMICUS CURIAE

Rape, Abuse and Incest National Network (RAINN) respectfully submits this amicus brief in support of Plaintiff-Appellant. RAINN is the nation's largest anti-sexual violence organization, whose purpose is to provide services to victims of sexual violence and advocate for improvements to the criminal justice system's response to sexual violence. RAINN founded and operates the National Sexual Assault Hotline, and in its more than 25 years of operation has helped more than 3.5 million survivors of sexual assault and their loved ones. RAINN is a leader in public education on sexual violence, provides consulting services to various industries on best practices for prevention of and response to sexual assault/harassment, and advocates on the state and federal levels to improve legislation on sexual violence. It has a strong interest in the outcome of this case and believes its expertise in this field may be of assistance to the Court.

## INTRODUCTION

Like many other survivors of sexual violence given inadequate institutional protections, Plaintiff-Appellant Jane Doe was forced to protect herself. When faced with severe sexual harassment at colleges and universities, student-survivors like Doe frequently see no other option but to withdraw from campus life: they may take on a lighter course load, spend more time in their rooms, withdraw from extracurricular activities, and avoid university buildings that could expose them to perpetrators. These negative impacts deprive survivors of the educational opportunities that Title IX of the Education Amendments of 1972 was designed to protect.

In dismissing Doe's claims, the district court adopted a cramped and inaccurate view of the impacts of sexual harassment on college campuses. Because, by the district court's telling, Doe's "grades and attendance never suffered measurably," the court refused to recognize that the debilitating harassment she suffered caused anything more than "a general sense of unfairness and discomfort." *Jane Doe v. Board of Regents, UW,* No. 20 Civ. 856, 2022 WL 2817839, at *7 (W.D. Wis. July 19, 2022). The district court's myopic focus on attendance and

grade-related impacts flouted Title IX's purpose—as evidenced by its legislative history and reinforced through decades of jurisprudence—as a broad and sweeping remedy against sex discrimination in all aspects of campus life.

The district court's decision, if upheld, would shrink Title IX's remedial scope, rendering many of the educational harms caused by an unchecked hostile environment incognizable. That outcome would severely undermine the law's fundamental purpose: guaranteeing equal education access. By design, colleges and universities provide educational opportunities beyond the classroom in the form of extracurricular activities, programs, and groups that help students develop relationships and skills to advance their academic and career goals. They offer spaces designed to encourage collaboration and debate in service of intellectual curiosity and personal growth. These benefits are supported by empirical studies and baked into any fulsome understanding of the value of higher education.

An affirmance would also reinforce the flawed and harmful notion that there is one "correct" way to behave in response to sexual harassment. By foreclosing Title IX claims from survivors who

demonstrate resiliency along certain metrics (such as grades) but still experience very real harms, the district court's rationale conveys to survivors that they are unworthy of protection from sexual harassment unless that harassment demonstrably impedes a specific type of functioning or nearly all functioning. This view must be rejected and the district court's decision reversed.

## ARGUMENT

### I.    THE DISTRICT COURT'S DECISION CONTRAVENES THE LEGISLATIVE PURPOSE OF TITLE IX

The plain language and legislative history of Title IX of the Education Amendments of 1972 illustrate that Congress intended the amendment to have broad application in service of its key legislative purpose: to ensure all individuals equal access in educational opportunities, regardless of sex. It was enacted to "provide individual citizens effective protection against" sex discrimination in educational settings. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998) (internal quotation marks omitted). The district court's decision, which diminishes the application of Title IX to only those cases in which a survivor's experience of sexual harassment manifests in narrow and specific outcomes, contravenes Congress' legislative intent.

The text of Title IX states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Beginning with Title IX's first introduction into the Senate as the Women's Equality Act of 1971, the writings and public comments of its drafter, Senator Birch E. Bayh, Jr. of Indiana, emphasized that the bill was designed as a broad and sweeping guarantee of equality regardless of sex. In a statement to the Senate in 1971, Senator Bayh explained that the bill was designed to "narrow the gap between our obligations and our performance[s] by giving to women the benefit[s] of the major civil rights legislation of the last decade."[1] In the previous decade, Congress had passed legislation prohibiting workplace discrimination on the basis of race, color, religion, sex or national origin,[2] and legislation prohibiting discrimination on the basis of race, color, or national origin for any program or activity receiving federal

---

[1] 117 Cong. Rec. 30404 (June 29, 1971) (Statement of Senator Birch Bayh).

[2] *See* Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-17.

financial assistance,[3] but education discrimination on the basis of sex had remained a pervasive problem.[4]

In this context, the legislation's inclusion of language covering "any program or activity" was added to ensure the law had far-reaching effect. When asked about the scope of the words "any program or activity," Senator Bayh responded: "What we are trying to do is provide equal access for women and men students to the educational process *and the extracurricular activities in a school*." 117 Cong. Rec. 30406 (Statement of Sen. Bayh) (emphasis added). Accordingly, "any program or activity" is defined as "all of the operations of . . . a local educational agency . . . or other school system." 20 U.S.C. § 1681(2)(B). Later, that definition would be further broadened with the 1987 passage of the Civil Rights Restoration Act, which provides that all of a university's programs and activities must comply with Title IX if any part of that institution receives federal funds. 20 U.S.C. § 1687.

---

[3] *See* Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.

[4] Paul C. Sweeney, *Abuse Misuse & Abrogation of the Use of Legislative History: Title IX & Peer Sexual Harassment,* 66 UMKC L. REV. 41, 50 (1997).

The bill appeared again before the Senate upon reconsideration in 1972, following the passage of a similar bill in the House.[5] At that time, Senator Bayh provided data on the prevalence of sex discrimination in higher education as context for the need for a "strong and comprehensive" protective measure: Senator Bayh's remarks highlighted and condemned systematic discrimination against women in college admissions, scholarships, and access to equal facilities.[6]

Early proponents of Title IX recognized the unique importance of education as a tool for independence and societal advancement through job security. Senator Bayh characterized discrimination in education as "doubly destructive" because of its effects on access to jobs and financial security.[7] Title IX was crafted with the express purpose of providing women not only access to schools and classrooms, but also the opportunity to develop "skills they want, and to apply those skills with the knowledge that they will have a fair chance to secure the jobs of

---

[5] Sweeney, *supra*, at 61.

[6] 118 Cong. Rec. 5806-07 (remarks of Sen. Bayh); 118 Cong. Rec. 5811 (paper of Dr. Bernice Sandler).

[7] 118 Cong. Rec. 5806-07 (Statement of Sen. Bayh).

their choice with equal pay for equal work."[8] To the extent that discrimination in educational opportunities outside of the classroom impacts a student's ability to access those skills and jobs, Title IX was passed to ensure equal access to them.

Since Title IX was passed, the Supreme Court has repeatedly emphasized that it must be accorded "a sweep as broad as its language" to be given "the scope its origins dictate." *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 521 (1982). The Court has made clear that Title IX protects access to school resources outside of the classroom. *See Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.,* 526 U.S. 629, 650–51 (1999). In holding that a school may be held liable for deliberate indifference to peer-to-peer sexual harassment, the Court specifically described a situation in which threats from a harasser prevent a female peer from using "a particular school resource—an athletic field or a computer lab, for instance." *Id*. The Court opined that a school "district's knowing refusal to take any action in response to such behavior would fly in the face of Title IX's core principles, and such

---

[8] 118 Cong. Rec. 5808 (Statement of Sen. Bayh).

deliberate indifference may appropriately be subject to claims for monetary damages." *Id.* at 651. In other words, a school may be held liable under Title IX if it is deliberately indifferent to harassment that prevents a student from accessing campus resources, including libraries, student unions, or common study areas.[9]

## II. THE DISTRICT COURT'S DECISION FAILS TO RECOGNIZE THE FULL RANGE OF EFFECTS OF SEXUAL VIOLENCE ON SURVIVORS' EDUCATIONAL OPPORTUNITIES

University students who experience sexual harassment on college campuses and are left without institutional protections are often forced to alter their behavior to avoid specific buildings and locations on campus for fear of exposure to their harassers.[10] Encountering one's rapist or assailant can be a terrifying ordeal for a survivor, who may reasonably fear further harassment, regardless of whether it actually

---

[9] Plaintiff-Appellant specifically identified each of these as resources she was prevented from accessing because of the harassment she faced. R. 148 ¶¶ 3-4, 7-9.

[10] *See, e.g.*, Lilia M. Cortina et al., *Sexual Harassment and Assault: Chilling the Climate for Women in Academia*, 22 PSYCHOLOGY OF WOMEN QUARTERLY 419, 436 (1998); *See also* Erica van Roosmalen & Susan A. McDaniel, *Sexual Harassment in Academia: A Hazard to Women's Health*, 28 WOMEN & HEALTH 33, 44 (1998).

occurs. Such encounters may cause severe mental and physical health impairments such as panic attacks,[11] hives,[12] and nausea.[13] To ensure their own safety and self-protection, student-survivors may participate in fewer campus activities and forgo accessing university buildings and resources.[14] In ignoring the reality that these activities and resources are fundamental components of university life, the district court failed to grasp the profound consequences of unchecked sexual harassment that Title IX was designed to address.

---

[11] *See, e.g.*, *Doe 1 v. Baylor Univ.,* 240 F. Supp. 3d 646, 656 (W.D. Tex. 2017) (noting a student who faced her assailant on campus after an alleged rape suffered severe "mental health impairments, including panic attacks").

[12] *See, e.g.*, *Doe ex rel. Doe v. Brighton School District 27J*, No. 19 Civ. 0950, 2020 WL 886193, at *7 (D. Colo. Feb. 24, 2020) (describing that a student's subsequent encounters with her alleged rapist and his friends caused her severe stress and break-outs of hives).

[13] Anonymous, *On Assault Narratives*, YALE DAILY NEWS (Feb. 1, 2012), https://yaledailynews.com/blog/2012/02/01/anonymous-on-assault-narratives/ (describing a victim's "dizzying nausea" when "running into [her] assailant" at campus parties).

[14] Catherine Hill and Elena Silva, DRAWING THE LINE: SEXUAL HARASSMENT ON CAMPUS (2005).

**A.    The Inability to Participate in Extracurricular Activities, Socialization, and Ideas Exchange Stifles Education and Career Opportunities**

> **1.    When Forced to Take Self-Protective Measures, Survivors are Prevented from Accessing Activities That Enhance University Life and Contribute to Job Prospects**

Universities like the University of Wisconsin ("UW") that invest heavily in extracurricular activities recognize the vital role those offerings play in the holistic experience of higher education. Involvement in extracurricular groups and activities has been shown empirically to benefit students in both their educational attainment and future career opportunities. When students are prevented from accessing these resources because of sexual harassment, they are robbed of fundamental educational opportunities.

Like most other public and private colleges and universities, UW imposes mandatory fees on its students to fund "student services, activities, programs and facilities that support the mission of the University of Wisconsin System institutions[.]"[15] In 2000, the Supreme

_____

[15] University of Wisconsin Bursar's Office, *Segregated Fees*, https://bursar.wisc.edu/tuition-and-fees/tuition-rates/segregated-fees (last visited Nov. 7, 2022).

Court granted *certiorari* to decide whether UW's imposition of
mandatory segregated fees violated the First Amendment rights of
students who objected to the activities of certain of the groups funded
by those fees. *Bd. of Regents of Univ. of Wisconsin Sys. v. Southworth*,
529 U.S. 217 (2000). In support of its argument that the activities
funded by such fees are indispensable to its core purpose, UW argued
that programs supported by such fees "'enhance the educational
experience' of its students by 'promot[ing] extracurricular activities,'
'stimulating advocacy and debate on diverse points of view,' enabling
'participa[tion] in political activity,' 'promot[ing] student participa[tion]
in campus administrative activity,' and providing 'opportunities to
develop social skills,' all consistent with the University's mission." *Id.* at
223.

As a public corporation of the State of Wisconsin, UW's mission is
defined by statute: "to develop human resources, to discover and
disseminate knowledge, to extend knowledge and its application beyond
the boundaries of its campuses and to serve and stimulate society by
developing in students heightened intellectual, cultural and humane
sensitivities . . . and a sense of purpose." *Id*. at 221 (quoting Wis. Stat. §

36.01(2) (1993–1994)). Title IX's nondiscrimination principle guarantees equal access to all of these diverse forms of educational enrichment—not just the classroom.

Empirical evidence reinforces the benefits students derive from access to the full range of campus resources. Studies have shown that active participation in curricular and cocurricular activities enables students to make friends, orient themselves to campus, build relationships with faculty members, and gain critical thinking skills.[16] A 2013 study found that students who participated more frequently in student life initiatives—including research projects, extracurricular student groups, and activities—earned higher grades and found their university experience more fulfilling.[17] The number of hours per week spent participating in student organizations has also shown statistically significant correlations with interpersonal skills and leadership and

---

[16] Karen L. Webber, et al., *Does involvement really matter? Indicators of college student success and satisfaction*, 54 J. OF COLL. STUDENT DEV. 591, 591 (2013).

[17] *Id.*

public speaking abilities.[18]  Participation in on-campus activities and student groups also provides students with greater abilities to secure and succeed in employment after college. Research has shown that engagement in student activities has a positive relationship with post-graduate earnings.[19] Extracurricular activities allow students to highlight traits that can help distinguish themselves in the job market.[20] They also provide avenues for expression of personal qualities that employers use to assess "cultural fit" with the company and make inferences concerning communication and collaboration skills.[21]

In the Title IX context, it is also noteworthy that some outcomes related to student activity participation disproportionately benefit

---

[18] Alexander Astin, WHAT MATTERS IN COLLEGE? FOUR CRITICAL YEARS REVISITED (1993).

[19] Tongshan Chang, et al., "Getting Engaged: Does it Work?" The University of California Office of the President, 40th CAIR Annual Conference (Nov. 4-6, 2015).

[20] Luisa H. Pinto and D.C. Ramalheira, *Perceived Employability of Business Graduates: The Effect of Academic Performance and Extracurricular Activities*, 99 J. OF VOCATIONAL BEHAVIOR 165 (2017).

[21] Mary Stuart, et al., *The Impact of Engagement with Extracurricular Activities on the Student Experience and Graduate Outcomes for Widening Participation Populations*, 12(3) ACTIVE LEARNING IN HIGHER EDUC. 203, 203 (2011).

women. For example, one study concluded that "hands-on experience in a research laboratory persuaded many women to become scientists."[22] Another showed that, when compared with men, women disproportionately experience greater benefits on early career earnings from social engagement in college.[23]

Ensuring access to student programs and activities is thus about more than simply offering students productive ways to pass their time outside of class. Such access has tangible impacts on the value of a university education and future career opportunities available to students. Courts must incorporate this understanding of the concrete opportunities and benefits provided by extracurricular activities into any analysis of educational access under Title IX.

_____

[22] *See* Webber, et al., *supra*, at 593.

[23] Shouping Hu and Gregory C. Wolniak, *College Student Engagement and Early Career Earnings: Difference by Gender, Race/Ethnicity, and Academic Preparation*, 36 REV. OF HIGHER EDUC. 211 (Winter 2013).

2.    **In a Hostile Learning Environment, Survivors Are Robbed of the Value of Universities as Fora for Information Exchange and Collaboration**

Colleges and universities provide unique value as venues for dialogue, debate, and collaboration among students and faculty. They deliver sustained opportunities for socialization and the exchange of ideas, and in this way serve as settings that foster the vibrancy of intellectual life. Participation in office hours, guest lectures, research projects, and study groups has been shown to benefit personal growth and development among students. When student-survivors are forced to curtail their involvement in these fora, they are prevented from accessing material benefits of a university education.

"The contemporary college or university does not concentrate only on formal education; it assumes the larger responsibility of promoting human development in all its forms."[24] A university provides an "atmosphere which is most conducive to speculation, experiment and creation." *Sweezy v. State of N.H. by Wyman*, 354 U.S. 234, 263 (1957). This atmosphere is made possible only by access to physical spaces that

_____

[24] Derek C. Bok, HIGHER LEARNING 51-52 (1986).

16

enable collaboration, the building of relationships, and the exchange of ideas: student union buildings, libraries, common study spaces, and offices of professors and teaching assistants. Universities have built these spaces with the understanding that "a great deal of learning occurs informally." *Regents of Univ. of California v. Bakke*, 438 U.S. 265, 313 n.48 (1978) (quoting William G. Bowen, *Admissions and the Relevance of Race*, Princeton Alumni Weekly 7, 9 (Sept. 26, 1977)).

Recent closures of on-campus buildings at colleges and universities across the country as part of lockdowns precipitated by the COVID-19 pandemic brought into stark relief the importance of on-campus offerings in higher education. Like many university leaders, then-Chancellor of UW-Madison, Rebecca Blank, acknowledged the importance of face-to-face interactions to the project of higher education in explaining the decision to re-open in-person instruction. In a March 2021 message, Chancellor Blank described the centrality of in-person interactions to the holistic learning environment at UW:

> We are a community that thrives on the connections between people who converse, learn, and discover together, in person. It is the connections and interactions that make UW–Madison a great university and that bring

students here for a high-quality residential learning experience.

Students make friends with people from entirely different backgrounds; students interact with top faculty in the classroom; faculty talk after a seminar and launch a new research project; and all of us create a campus culture through concerts, sporting events, Terrace evenings, visiting speakers, student organizations and a constant flow of visitors from around the world who come here to speak and to learn.

We've done the best we possibly can under the circumstances of the past year and technology has been a remarkable bridge in many respects. But face-to-face interactions are critical to building a campus community that advances our missions of scholarship, teaching and service.[25]

The numerous benefits of in-person activities Chancellor Blank identified are supported by studies on the values of higher education. Participation in undergraduate research and other creative projects can improve critical thinking and the ability to collaborate effectively with others.[26] Experience in undergraduate research is correlated with

---

[25] University of Wisconsin, Chancellor Blank, *Creating the New Normal: Returning to Campus* (March 25, 2021). https://chancellor.wisc.edu/blog/creating-the-new-normal-returning-to-campus/.

[26] *See* Webber, et al., *supra*, at 593 (citations omitted).

higher levels of graduate school enrollment.[27] Moreover, studies have shown that higher levels of interaction with peers can contribute to "interpersonal competence, cognitive complexity, and humanitarianism."[28]

But the connections described in Chancellor Blank's statement cannot happen when a student is forced to hide in their room or leave town for fear of encountering a harasser or assailant on campus. They are unavailable to a student-survivor who must avoid libraries, study halls, and dining areas in the absence of any meaningful action by a school to separate them from their assailant.

The district court's decision thus represents an incomplete understanding of the values, opportunities, and benefits inherent in university life. Universities aptly position themselves as sources of personal growth, development, and career opportunities beyond the strict confines of formal education. But a school cannot tout these values publicly while refusing to ensure equal access to such

_____

[27] *Id.* (citations omitted).

[28] John D. Foubert, and L. U. Grainger, *Effects of Involvement in Clubs and Organizations on the Psychosocial Development of First-Year and Senior College Students*, 43 NASPA J. 166, 169 (2006).

collaborative environments in the Title IX context. This Court should reject UW's effort to do so here.

## B.    Institutional Failure to Implement Reasonable Safeguards for Survivors Exacerbates the Negative Impacts of Sexual Violence

Student-survivors of sexual violence on college campuses suffer severe disruptions in their educational opportunities. In addition to restricted access to extracurricular and in-person activities, survivors face obstacles to completing coursework, graduating on-time, and maintaining their GPAs. An institution's failure to implement adequate measures to protect student-survivors contributes to these negative impacts. *See Wamer v. Univ. of Toledo*, 27 F.4th 461, 471 (6th Cir. 2022); *Farmer v. Kansas State Univ.*, 918 F.3d 1094, 1106 (10th Cir. 2019).

Sexual violence is stubbornly prevalent on college and university campuses. According to a 2019 study by the Association of American Universities, 26.4 percent of undergraduate women and 6.9 percent of undergraduate men reported nonconsensual sexual contact by physical

force or inability to consent.[29] Of the total students surveyed, 24.8 reported that sexual assault and misconduct was either "very" or "extremely" problematic at their school.[30]

The experience of sexual violence can have devastating emotional impacts on survivors. In the immediate aftermath of sexual violence, a survivor may experience shock, confusion, agitation, fear, and social withdrawal.[31] In the long term, these effects may develop into posttraumatic stress disorder, depression, acute fear, and suicidality.[32] There is no dispute that these wide-ranging impacts can lead to a variety of harms, from academic disengagement, including reduced

---

[29] David Cantor, et al., *Report on the AAU Campus Climate Survey on Sexual Assault and Misconduct*, at xl (Revised January 17, 2020), p. xl. https://www.aau.edu/sites/default/files/AAU-Files/Key-Issues/Campus-Safety/AAU-Campus-Climate-Survey-FINAL-10-20-17.pdf.

[30] *Id.* at xiii.

[31] Judith L. Herman, *Complex PTSD: A syndrome in survivors of prolonged and repeated trauma*, 5 J. OF TRAUMATIC STRESS 377, 382 (1992).

[32] Cecilia Mengo and Beverly Black, *Violence Victimization on a College Campus: Impact on GPA and School Dropout*, 18(2) J. OF COLLEGE STUDENT RETENTION: RESEARCH, THEORY & PRACTICE 234, 235 (2015).

participation in class and diminished involvement in extracurricular activities, to financial harms[33] and disordered eating.[34]

Student-survivors face ongoing threats of violence and harassment from their perpetrators and others. A 2021 report issued by Know Your IX, a survivor- and youth-led project of Advocates for Youth, detailed that, of student-survivors who reported to school administrators, 70 percent stated they experienced adverse impacts on their privacy and personal safety.[35] Safety concerns frequently arise when a school handles sensitive information carelessly, enabling the exposure of identifying information to the public.[36] Survivors who report also face retaliatory filings from their perpetrators and intrusive behavior from third parties—including private investigators, attorneys, and friends—to harass and intimidate them.[37] Nearly a quarter of

---

[33] Sarah Nesbitt et al., *The Cost of Reporting: Perpetrator Retaliation, Institutional Betrayal, and Student Survivor Pushout* 7-9 (2021).

[34] Marisela Huerta et al., *Sex and Power in the Academy: Modeling Sexual Harassment in the Lives of College Women*, 32(5) PERSONALITY AND SOCIAL PSYCHOLOGY BULLETIN, 616, 622 (2006).

[35] Nesbitt, *supra*, at 23.

[36] *Id.* at 24.

[37] *Id.* at 19-20.

survivors who reported to the school stated they faced the threat of a defamation lawsuit by their perpetrator or their perpetrator's attorney; one in five were warned about defamation lawsuits by their school.[38]

Inadequate institutional responses to sexual harassment lead to countless additional harms. When schools fail to implement protective measures, they exacerbate the problem by leaving survivors exposed to further harassment. This vulnerability deprives student-survivors of educational opportunities, regardless of whether additional acts of harassment occur.

In a survey of student-survivors of sexual violence, several described being diagnosed with posttraumatic stress disorder linked not just to the harms brought on by their perpetrators but also to their school's inadequate response.[39] Examples of such responses range from the incompetent—including procedural errors and prolonged delays—to the insidious—including institutional indifference, victim-blaming, and

---

[38] *Id.* at 21.

[39] *Id.* at 12.

threats of punishment for speaking out.[40] As this case demonstrates, schools may also betray survivors by overturning an assailant's expulsion without informing or obtaining input from a survivor. Each of these responses can have the effect of discouraging survivors and their peers from seeking help.

An affirmance here would enable colleges and universities to ignore more complaints of sexual harassment and minimize the effects of their own inadequate responses on survivors. In turn, it would embolden perpetrators to continue to harass and victimize survivors without fear of repercussion, so long as their victims are able to pass their classes. The devastating realities of sexual harassment experience require a more nuanced approach.

## III. THE DISTRICT COURT'S DECISION PUNISHES SURVIVORS FOR THEIR RESILIENCY

Survivors overcome great odds to persevere through a range of mental and physical reactions to the violation of their personhood. The district court's rationale below gives schools *carte blanche* to deploy

_____

[40] *Id.* at 14. Of survivors who reported to their schools, 15 percent stated that they faced or were threatened with punishment by their schools in connection with coming forward. *Id.* at 15.

some survivors' hard-fought persistence in some activities of daily life against them as evidence that their harassment is somehow less significant or that they are less worthy of protection. But there is no "correct" or "normal" way to survive sexual violence.[41] Limiting analysis of a survivor's experience to one or two arbitrary factors ignores the realities of sexual violence and conveys a message to survivors that any sign of resiliency may cost them the ability to vindicate their rights under Title IX.

The district court found a certain sense of irony in the fact that Doe's "exceptional personal fortitude" may have allowed her to maintain her class attendance and her GPA but ultimately prevented her from prevailing on her Title IX claim. *Doe*, 2022 WL 2817839, at *7. This finding overlooked significant evidence that Plaintiff-Appellant missed out on educational opportunities, both academic and non-academic, and failed to keep up her class attendance.[42] Despite the court's misread of

---

[41] Patricia L. Fanflik, *Victim Responses to Sexual Assault: Counterintuitive or Simply Adaptive?* 2 (2007).

[42] Although the district court correctly stated that "specific proof of declining grades or absenteeism are not prerequisites" to a Title IX deliberate indifference claim, it relied on the fact that her "grades and

the record, the message from the ruling is clear: so long as a survivor's courage and tenacity enable her to attend most classes while maintaining her GPA, she cannot show that she has been deprived of educational opportunities sufficient to warrant a remedy under Title IX.

This conclusion is not a regrettable irony. It is perverse. A survivor cannot be said to have suffered less severe harassment because she managed to pass her classes, just as a survivor cannot be said to have suffered a less significant rape because she made it to class the next day.

A complete recognition of the ways survivors process trauma and respond to perceived threats is essential to understanding why no two survivors have the same lived experiences. Sexual violence has a neurobiological effect on a survivor's brain and nervous system.[43] When the brain perceives a threat, its defense circuitry activates, releasing a

_____

attendance never suffered measurably." *Id.* It should be noted, however, that Doe testified that she missed classes and was forced to take on a smaller course load, thus delaying her graduation date, in addition to the host of other educational deprivations. R. 156 ¶ 13.

[43] Lori Haskell et al., *The Impact of Trauma on Adult Sexual Assault Victims,* Justice Canada, 5 (2019), https://www.justice.gc.ca/eng/rp-pr/jr/trauma/trauma_eng.pdf.

flood of stress chemicals that prevent the body from doing anything
unnecessary, including higher cognitive processing, to focus on the
threat at hand.[44] This defense circuitry impairs functioning of the
prefrontal cortex, which is responsible for executive function.[45] When
faced with a serious threat, a person may experience intense responses
such as hyperarousal or altered attention focus.[46] After an initial freeze,
the survivor's mind selects a response from among those built over time
by reflexes and habit.[47] In this way, a survivor's neurobiological trauma
response may make it more likely that they become hyper-focused on
one aspect of their lives—their grades, for example—just as it may
make it more difficult for them to return to everyday life.

When analyzing whether harassment is severe and pervasive,
courts must be informed by the reality that the effects of sexual violence
manifest in disparate ways among survivors. Several appellate courts
have recognized as much, rejecting the idea that a survivor's ability to

---

[44] *Id.*

[45] *Id.* at 14.

[46] *Id.*

[47] *Id.* at 15.

maintain her GPA precluded a finding of harassment severe enough to rise to the level of a Title IX violation.[48] Judge Rovner of this Court similarly recognized in her concurrence in *Gabrielle M. v. Park Forest-Chicago Heights, IL. Sch. Dist. 163* that the plaintiff's ability to maintain her grades was not dispositive of whether the harassment she experienced was cognizable under Title IX. 315 F.3d 817, 828 (7th Cir. 2003).[49]

Title IX was enacted to protect citizens from sex discrimination in educational settings. *Gebser*, 524 U.S. at 286. It is not limited in scope to grades or attendance, and it does not excuse deliberate indifference

---

[48] *See, e.g.*, *Doe v. Sch. Dist. No. 1, Denver, Colorado*, 970 F.3d 1300, 1312–13 (10th Cir. 2020) (holding that a "bright" student had stated a Title IX claim despite maintaining a perfect GPA and identifying "a body of thought that the socialization from attending school with peers is an important, perhaps essential, advantage of the school experience"); *Jennings v. Univ. of N. Carolina*, 482 F.3d 686, 706 (4th Cir. 2007) (en banc) (finding that a plaintiff had stated a Title IX violation even though her GPA increased).

[49] Although *Gabrielle M.* concerned claims brought by a five-year old kindergarten student and is therefore distinguishable in terms of both the opportunities the plaintiffs had and the way the survivors responded the harassment, Judge Rovner aptly analogized the concept of a hostile environment under Title IX to the Title VII context, wherein the relevant question "is not whether work has been impaired, but whether working conditions have been discriminatorily altered." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25 (1993)).

in cases where survivors display resiliency or mental fortitude along certain, limited metrics. In its decision, the district court ignored the other, significant impacts to Plaintiff Doe's education, and by doing so, incorrectly limited the protection of Title IX inherent in the statute, expressed in the legislative history, and confirmed by case law.

## CONCLUSION

For the foregoing reasons, *amicus* respectfully submits that the decision below should be reversed.

Dated:     November 8, 2022
           New York, New York

                              KAUFMAN LIEB LEBOWITZ
                              & FRICK LLP

                               /s/ Alyssa Isidoridy
                              David A. Lebowitz
                              Alyssa Isidoridy

                              18 E. 48th Street, Suite 802
                              New York, New York 10017
                              (212) 660-2332
                              dlebowitz@kllf-law.com
                              aisidoridy@kllf-law.com

                              *Attorneys for Amicus Curiae*

## CERTIFICATE OF COMPLIACE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

This document complies with the word limit of Circuit Rule 29 because, excluding the parts of the document exempted by FRAP 32(f), this document contains 5178 words. This document complies with the typeface requirements of FRAP 32(a)(5) and Circuit Rule 29(a)(4) and the typestyle requirements of FRAP 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office 365 in 14-point Century Schoolbook font.

/s/ Alyssa Isidoridy
Alyssa Isidoridy

Counsel for *Amicus Curiae*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 8, 2022, I caused the foregoing papers to be filed via the Court's CM/ECF system, and all counsel of record were thereby served through that system.

/s/ Alyssa Isidoridy
Alyssa Isidoridy

Counsel for *Amicus Curiae*
