No. 22-2454

———————

IN THE UNITED STATES COURT OF APPEALS

FOR THE SEVENTH CIRCUIT

JANE DOE,

      Plaintiff-Appellant,

  v.

BOARD OF REGENTS OF THE
UNIVERSITY OF WISCONSIN
SYSTEM,

      Defendant-Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN,
THE HONORABLE WILLIAM M. CONLEY, PRESIDING

**BRIEF OF DEFENDANT-APPELLEE**

JOSHUA L. KAUL
Attorney General of Wisconsin

Electronically signed by:

s/ Jon Whitney*
JON WHITNEY
Assistant Attorney General
State Bar No. 1128444

Attorneys for Defendant-Appellee

- i -

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-1001
(608) 294-2907 (Fax)
whitneyjj@doj.state.wi.us

*Counsel of Record*

# TABLE OF CONTENTS

Page

JURISDICTIONAL STATEMENT ...................................................1

INTRODUCTION ...............................................................................1

STATEMENT OF THE ISSUES .......................................................3

STATEMENT OF THE CASE ..........................................................4

    I.    Factual background. .......................................................4

        A.    The University of Wisconsin–Madison. ................4

        B.    The University's response to Plaintiff's sexual-misconduct allegation. .........................................5

            1.    The University offers immediate and sustained social and academic supports.....................5

            2.    The University conducts a non-academic misconduct investigation.............................................7

            3.    The University holds a non-academic misconduct hearing.........................................................9

            4.    The University expels Player 1. ............................... 10

            5.    The University receives new, material information casting significant doubt on its decision to expel Player 1. ................................... 11

            6.    The University informs Plaintiff of Player 1's Petition. .................................................... 13

            7.    Chancellor Blank follows the applicable procedure, weighs the evidence, and decides to reduce Player 1's discipline from an expulsion to a suspension, but maintain the no-contact order.................................. 13

8.    Plaintiff and Player 1 share a sizable campus for one semester in which they never hear from or see one another. ........................ 15

C.    Plaintiff's education. ......................................... 16

II.    Procedural background. ................................................ 17

SUMMARY OF ARGUMENT .......................................................... 18

STANDARD OF REVIEW ................................................................ 20

ARGUMENT ...................................................................................... 21

I.    Plaintiff's Title IX claim fails because the only instance of sexual harassment took place in a privately owned, off-campus apartment, not in an environment substantially controlled by the University. .................................................................... 23

A.    Sexual harassment consists of unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature. ........................................................... 24

B.    The only instance of sexual harassment Plaintiff experienced occurred in April 2018. ................... 27

C.    The sexual harassment happened outside an environment over which the University exercised substantial control and thus outside the limits of Title IX liability. ............................................ 29

II.    Plaintiff's Title IX claim fails because she did not experience pervasive sexual harassment. .................................... 33

III.   Plaintiff's Title IX claim fails because she did not introduce sufficient evidence that an instance of sexual harassment barred her access to and had a systemic effect on her education. .................................... 34

A.   Plaintiff did not provide the evidence required by the Supreme Court and the Seventh Circuit to support this element........................................ 35

B.   The admissible evidence Plaintiff says supports this element is evidence of the wrong thing and, in any case, lacks sufficient detail. .................. 37

C.   The cases cited by Plaintiff are all readily distinguishable.................................................. 40

IV.  Plaintiff's Title IX claim fails because the University's response to her sexual harassment was not so clearly unreasonable as to constitute an official decision to permit sex discrimination. ........................................ 41

A.   The University's response was immediate, vigorous, and sustained...................................... 42

B.   The University's response compares favorably to those this Court has found lawful. ............................... 47

C.   Plaintiff's second guessing of the University's response is not sufficient evidence of deliberate indifference.......................................................... 51

V.   Plaintiff's Title IX claim fails because she did not experience additional sexual harassment as a result of the University's response to the first and only incident of such harassment. ........................................ 56

VI.  Plaintiff has waived appellate review of her direct-discrimination claim. .................................................. 59

CONCLUSION................................................................ 60

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ................................................................ 20

*Blue v. Dist. of Columbia*,
   850 F. Supp. 2d 16 (D.D.C. 2012) ......................................... 57

*Cephus v. Blank*,
   21-cv-126-wmc, 2022 WL 17668793 (W.D. Wis. Dec. 14, 2022)............ 15–16

*C.S. v. Madison Metro. Sch. Dist.*,
   34 F.4th 536 (7th Cir. 2022) ........................................ 19, 41

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
   142 S.Ct. 1562 (2022) ............................................................. 1

*Davis v. Monroe Cnty. Bd. of Educ.*,
   526 U.S. 629 (1999) .......................................................1, *passim*

*Doe–2 v. McLean Cnty. Unit Dist. No. 5 Bd. of Dirs.*,
   593 F.3d 507 (7th Cir. 2010) ................................................ 23, 30

*Doe 12 v. Baylor Univ.*,
   336 F. Supp. 3d 763 (W.D. Tex. 2018)......................................... 40

*Doe v. Bd. of Regents*,
   20-cv-856-wmc, 2022 WL 2817839 (W.D. Wis. July 19, 2022)........18, *passim*

*Doe v. Columbia Coll. Chi.*,
   933 F.3d 849 (7th Cir. 2019) ................................................ 28, 55

*Doe v. Erskine Coll.*,
   No. Civ. A. 8:04-23001RBH, 2006 WL 1473853 (D.S.C. 2006) ................... 40

*Doe v. Fairfax Cnty. Sch. Bd.*,
   1 F.4th 257 (4th Cir. 2021) ..................................................... 39

*Doe v. Galster*,
    768 F.3d 611 (7th Cir. 2014) ................................................................. 50–53

*Doe v. Univ. of S. Ind.*,
    43 F.4th 784 (7th Cir. 2022) ................................................................. 19, 52

*Escue v. N. Okla. Coll.*,
    450 F.3d 1146 (10th Cir. 2006) ................................................................. 43

*Farmer v. Kan. State Univ.*,
    918 F.3d 1094 (10th Cir. 2019) ............................................................. 40–41

*FKFJ, Inc. v. Vill. of Worth*,
    11 F.4th 574 (7th Cir. 2021) ................................................................. 20–21

*Franklin v. Gwinnett Cnty. Pub. Schs.*,
    503 U.S. 60 (1992) ................................................................................... 25

*Gabrielle M. v. Park Forest-Chi. Heights, Ill. Sch. Dist. 163*,
    315 F.3d 817 (7th Cir. 2003) .........................................................35, *passim*

*Gordon v. Traverse City Area Pub.*,
    *Schs.*, 686 F. App'x 315 (6th Cir. 2017) ....................................................... 55

*Hawkins v. Sarasota Cnty. Sch. Bd.*,
    322 F.3d 1279 (11th Cir. 2003) ............................................................. 34–35

*Jauquet v. Green Bay Area Cath. Educ., Inc.*,
    996 F.3d 802 (7th Cir. 2021) .........................................................35, *passim*

*Johnson v. Ne. Sch. Corp.*,
    972 F.3d 905 (7th Cir. 2020) .........................................................42, *passim*

*K.T. v. Culver-Stockton Coll.*,
    865 F.3d 1054 (8th Cir. 2017) ............................................................. 34, 57

*Karasek v. Regents of Univ. of Cal.*,
    956 F.3d 1093 (9th Cir. 2020) ................................................................. 52

*Kollaritsch v. Mich. State Univ. Bd. of Trs.*,
    944 F.3d 613 (6th Cir. 2019) ........................................................... 34, 56–57

*Meritor Savings Bank, FSB v. Vinson*,
   477 U.S. 57 (1986) ...................................................................24, *passim*

*Nungesser v. Columbia Univ.*,
   244 F. Supp. 3d 345 (S.D.N.Y. 2017) ........................................... 39

*O'Shea v. Augustana Coll.*,
   20-cv-04243-SLD-JEH, 2022 WL 884255 (C.D. Ill. Mar. 24, 2022)............ 32

*Ostrander v. Duggan*,
   341 F.3d 745 (8th Cir. 2003) ......................................................... 30

*Owens v. Godinez*,
   860 F.3d 434 (7th Cir. 2017) ......................................................... 60

*Pahssen v. Merrill Cnty. Sch. Dist.*,
   668 F.3d 356 (6th Cir. 2012) ......................................................... 30

*Pennhurst State Sch. & Hosp. v. Halderman*,
   451 U.S. 1 (1981) ......................................................... 1–2, 20, 58

*Prasad v. George Wash. Univ.*,
   390 F. Supp. 3d 1 (D.D.C. 2019) ............................................. 43, 53

*Reese v. Jefferson Sch. Dist. No. 14J*,
   208 F.3d 736 (9th Cir. 2000) ......................................................... 57

*Rennie v. Dalton*,
   3 F.3d 1100 (7th Cir. 1993) ........................................................... 25

*Roe ex rel. Callahan v. Gustine Unified School District*,
   678 F. Supp. 2d 1008 (E.D. Cal. 2009) ......................................... 31

*Roe v. St. Louis Univ.*,
   746 F.3d 874 (8th Cir. 2014) ......................................................... 32

*Rost v. Steamboat Springs RE–2 Sch. Dist.*,
   511 F.3d 1114 (10th Cir. 2008) ..................................................... 31

*Samuelson v. Or. State Univ.*,
   162 F. Supp. 3d 1123 (D. Or. 2016) ............................................... 30

*Samuelson v. Or. State Univ.*,
　725 F. App'x 598 (9th Cir. 2018) ........................................................ 31

*Simpson v. University of Colorado Boulder*,
　500 F.3d 1170 (10th Cir. 2007) ................................................... 31–32

*Stockton v. Milwaukee Cnty.*,
　44 F.4th 605 (7th Cir. 2022) ............................................................. 58

*Weckhorst v. Kan. State Univ.*,
　241 F. Supp. 3d 1154 (D. Kan. 2017) ......................................... 30, 32

*Williams v. Bd. of Regents of Univ. Sys. of Ga.*,
　477 F.3d 1282 (11th Cir. 2007) ......................................................... 57

**Statutes**

20 U.S.C. § 1681(a) ............................................................................ 21, 57

42 U.S.C. § 1983 ...................................................................................... 18

775 Ill. Comp. Stat. 5/2-101(E) ............................................................. 25

Wis. Stat. § 111.32(13) ............................................................................ 25

**Regulations**

29 C.F.R. § 1604.11(a) ............................................................................. 25

34 C.F.R. § 106.30 .................................................................................... 26

Wis. Admin. Code § UWS 17.18 ....................................................... 11, 44

**Other Authorities**

Zachary Cormier,
　*Is Vulnerability Enough? Analyzing the Jurisdictional Divide on the*
　*Requirement for Post-Notice Harassment in Title IX Litigation*,
　29 Yale J.L. & Feminism 1 (2017) ................................................ 57–58

Fed. R. Civ. P. 56(a) ................................................................................ 20

Fed. R. Civ. P. 56(c) ................................................................................ 21

## JURISDICTIONAL STATEMENT

Plaintiff-Appellant Jane Doe's jurisdictional statement is complete and correct.

## INTRODUCTION

Plaintiff's case is a bid to expand the scope of liability under Title IX. Her argument is that an imagined procedural imperfection in the University of Wisconsin–Madison's monthslong response to an incident of sexual harassment is enough to prove illegality. Title IX should stretch to remedy the perceived shortcoming because, Plaintiff says, this would be consistent with the statute's origin story. But missing from Plaintiff's potted history of Title IX is the fact that it was passed pursuant to the Constitution's Spending Clause, meaning that the statute operates as a contract, authored by Congress, and offering federal funds to educational institutions in exchange for compliance with its terms. *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999).

Title IX's Spending Clause roots, far from historical trivia, imply that the statute's "legitimacy . . . rests not on [Congress's] sovereign authority to enact binding laws, but on whether the recipient voluntarily and knowingly accepts the terms of that contract." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S.Ct. 1562, 1570 (2022) (brackets and citation omitted). Knowing and voluntary acceptance of the deal requires that its terms be "unambiguous[]." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). This

"enable[s] [potential funding recipients] to exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* Consequences can include money damages, but these "are available only where recipients of federal funding had adequate notice that they could be liable for the conduct at issue." *Davis*, 526 U.S. at 640.

The Supreme Court in *Davis* held that funding recipients like the University could be liable, in "certain limited circumstances," for their response to student-on-student sexual harassment. *Id.* at 643. Those situations are restricted to when, among other things, (1) the recipient exercised substantial control over the environment where the sexual harassment took place; (2) the sexual harassment was pervasive; (3) the sexual harassment barred the complainant's access to an education; (4) the recipient's response to the sexual harassment was so clearly unreasonable as to constitute an official decision to permit sex discrimination; and (5) the recipient's response caused the complainant to experience further sexual harassment. *Id.* at 633, 644–53.

Plaintiff has failed to show that any of these elements are met here. The only instance of sexual harassment took place at a privately owned, off-campus apartment. Then, the University's immediate, vigorous, and sustained response to the incident ensured that Plaintiff maintained access to her

education and remained safe from any additional sexual harassment. This Court should affirm the decision below.

## STATEMENT OF THE ISSUES

1. Did the only instance of sexual harassment take place in an environment the University substantially controlled when it occurred in a privately owned, off-campus apartment?

2. Does the single instance of off-campus sexual harassment Plaintiff experienced amount to pervasive sexual harassment?

3. Did Plaintiff, who participated in extracurricular activities and graduated early with a high grade-point average, introduce sufficient evidence that the one instance of off-campus sexual harassment barred her access to and had a systemic effect on her education?

4. Was the University's immediate, vigorous, and sustained response to the sexual-harassment incident so clearly unreasonable as to constitute an official decision to permit sex discrimination?

5. Did Plaintiff experience additional sexual harassment as a result of the University's response to the first and only instance of such harassment? The Court should answer no to these questions and affirm.

## STATEMENT OF THE CASE

### I.     Factual background.

#### A.     The University of Wisconsin–Madison.

The University of Wisconsin–Madison is the flagship campus of the University of Wisconsin System of public universities and is governed by the System's Board of Regents. (Dkt. 165 ¶ 2.) The University has a student body of approximately 46,000 and employs around 22,000 faculty and staff. (Dkt. 165 ¶ 2.) The combined population of 68,000 would, if incorporated as such, make it the 9th largest city in Wisconsin. *See* (Dkt. 143:43 n.70); *Cities in Wisconsin by Population (2022)*, World Population Review, https://worldpopulationreview.com/states/cities/wisconsin (last visited Dec. 22, 2022). The University's physical footprint is comprised of 388 buildings on 936 acres near downtown Madison. *See* (Dkt. 143:43 n.69); *Academic Buildings,* Office of Admissions and Recruitment, https://admissions.wisc.edu/campus-virtual-tour/academic-buildings (last visited Dec. 19, 2022).

Chancellor Rebecca Blank was the chief executive of the University from 2013 to 2022, when she stepped down to become the president of Northwestern University. (Dkt. 112-1:1; 93 (Blank Dep. 13:7–17).) She was unable to assume that role after being diagnosed with a cancer. While at the University, Chancellor Blank headed a leadership team that included six vice chancellors,

a chief diversity officer, and her chief of staff. The director of athletics also reported to her. (Dkt. 165 ¶ 6.)

## B. The University's response to Plaintiff's sexual-misconduct allegation.

Plaintiff was a freshman at the University when, on April 24, 2018, her father called Kate Dougherty in the Dean of Students Office with an allegation of sexual misconduct. (Dkt. 165 ¶ 47; 171 ¶ 8.) The misconduct had allegedly occurred a few days earlier, late at night on April 21 or early morning on April 22. (Dkt. 165 ¶ 47.)

The report was that, after a night out at a local bar, Plaintiff and a friend ("Complainant 1") went back to the apartment of a fellow student and member of the University's football team ("Player 1"). (Dkt. 112-10:141–47; 102-9:1.) The apartment was in a privately owned complex called the Humbucker Apartments, located off the University's campus. (Dkt. 165 ¶ 52; 102-16:2.) Another fellow student and member of the football team ("Player 2") was also there. (Dkt. 165 ¶¶ 27–28; 102-9:2; 102-5:3; 102-16:2–3.) Plaintiff, her father alleged, had been sexually assaulted by Player 1 at the apartment. (Dkt. 165 ¶ 47; 104-3:1–2.)

## 1. The University offers immediate and sustained social and academic supports.

Upon receiving the report from Plaintiff's father, the University sprang into action. Dougherty contacted Plaintiff that day to tell her about the various

supports and accommodations available to her upon request, including help with living arrangements, transportation, and academic accommodations. (Dkt. 165 ¶ 51; 104-5.)

Plaintiff took her up on the academic accommodations. Still on April 24, Dougherty contacted each of Plaintiff's professors to facilitate a conversation between them and Plaintiff regarding academic accommodations. (Dkt. 165 ¶ 53.) Plaintiff ended up receiving such accommodations in each of her classes that semester. (Dkt. 165 ¶¶ 54–55.) Dougherty then made sure to facilitate similar accommodations at the beginning of every semester until Plaintiff graduated. (Dkt. 165 ¶¶ 51, 128, 139–40, 143–52, 175–76, 264, 333–34, 341–44; 104-1:12–100; 97 (Doe Dep. 13:4–20; 15–20).)

The University's Title IX Coordinator, Lauren Hasselbacher, also offered prompt and sustained support for Plaintiff. On April 25, Hasselbacher emailed Plaintiff to introduce herself and offer reporting options, protective measures, and support services. (Dkt. 165 ¶¶ 56–57.) On April 30, Hasselbacher emailed Plaintiff to tell her that the University had suspended Player 1 from the schools' football team, and to reiterate that Hasselbacher was available to answer any of Plaintiff's questions and provide her any assistance she needed. (Dkt. 165 ¶¶ 61–62.)

Hasselbacher also reminded Plaintiff of her reporting options and about the potential issuance of no-contact orders. (Dkt. 165 ¶ 62.) Plaintiff responded by

requested a no-contact order between her, Player 1, and Player 2. (Dkt. 165 ¶ 63.) Hasselbacher issued that order the very next day, prohibiting Player 1 any contact with Plaintiff and Complainant 1. (Dkt. 165 ¶ 64.)

### 2. The University conducts a non-academic misconduct investigation.

Hasselbacher, after asking for and receiving Plaintiff's blessing, opened an investigation into Plaintiff's allegations on May 29, 2018. (Dkt. 165 ¶¶ 78–83.) The investigation consisted of reviewing documents, interviewing witnesses, and watching surveillance footage. (Dkt. 165 ¶ 99.)

But without the coercive power of law enforcement, Hasselbacher was limited to the documents, witnesses, and footage on offer. She knew there were significant pieces of evidence that were unavailable to her due to the confidential nature of the Madison Police Department's parallel investigation into the incident. (Dkt. 165 ¶¶ 100–03.) These included the Department's reports and surveillance footage from Player 1's apartment building. (Dkt. 165 ¶¶ 100–03.)

The universe of available information shrunk further in late August 2018, when the Dane County District Attorney's Office filed criminal charges against Player 1. (Dkt. 165 ¶ 126.) As a result, Player 1 canceled his scheduled interview with Hasselbacher, and Player 1's attorneys demanded that the University delay its investigation. (Dkt. 165 ¶ 132.) Player 2 refused an

interview too. (Dkt. 165 ¶¶ 97, 100.) Plaintiff also held back information from Hasselbacher, declining to respond to Hasselbacher's requests for the forensic-nurse exam of Plaintiff done after the April 2018 incident. (Dkt. 165 ¶¶ 99–102.)

On September 5, while her investigation was ongoing, Hasselbacher received an email from Plaintiff's father that she and Player 2 had enrolled in the same music class. (Dkt. 165 ¶ 143.) Assistant Dean and Director of the Office of Student Conduct and Community Standards, Tonya Schmidt, was immediately dispatched to the lecture hall where the class was held. Schmidt positioned herself so as to prevent any contact between Plaintiff and Player 2 when class let out. (Dkt. 165 ¶ 143.) Hasselbacher emailed Plaintiff's attorney that day to apologize for the oversight and to assure Plaintiff that she was working on a solution. (Dkt. 165 ¶ 144, 147.) Hasselbacher called Player 2's attorney and emailed an employee in the athletics department, which led to Player 2 dropping the class. (Dkt. 165 ¶¶ 145–46, 149–52.)

Hasselbacher concluded her investigation on October 9, 2018, by providing a final investigative report to the University's Office of Student Conduct and Community Standards. (Dkt. 165 ¶ 170.) At that time, the University received notice that it had been sued by Player 1 in federal court to stop the University's disciplinary proceedings. (Dkt. 165 ¶ 173.) Despite the lawsuit, OSCCS assigned an assistant dean, Ervin Cox, to review Hasselbacher's report and

issue findings. (Dkt. 165 ¶ 174.) On October 30, 2018, relying on the information available to him at the time, Cox found Player 1 responsible for second- and third-degree sexual assault of Plaintiff and for sexually harassing her. (Dkt. 165 ¶ 178–79.)

### 3.   The University holds a non-academic misconduct hearing.

These findings went before the University's Nonacademic Misconduct Hearing Committee, which held a hearing on January 15, 2019. (Dkt. 165 ¶ 180.) Before the hearing started, Plaintiff saw Player 1 walking toward her. (Dkt. 165 ¶ 181.) No physical contact was made and no words were exchanged between the two. (Dkt. 97 (Doe Dep. 153: 14–23).) Plaintiff's counsel told Schmidt at the hearing that this had happened. (Dkt. 172 ¶ 24.) Schmidt, still at the hearing, went immediately to Player 1 to remind him of the no-contact order, letting him know that, if he saw Plaintiff, he needed to walk in the other direction and remove himself from the area. (Dkt. 172 ¶ 25.)

At the hearing, the Committee heard testimony from, among others, Plaintiff and Complainant 1. (Dkt. 165 ¶¶ 182–95, 198–203.) Player 1 was present, but did not testify in light of the pending criminal case against him. (Dkt. 165 ¶¶ 183, 186.) Based on the evidence it took and that was provided to it, the Committee issued a written decision, finding that Player 1 was not responsible for second-degree sexual assault, but responsible for it in the third

degree and for sexual harassment. (Dkt. 165 ¶¶ 204–06.) Also, by a vote of 2-to-1, the Committee decided that Player 1 should be expelled. (Dkt. 165 ¶ 207.)

### 4.    The University expels Player 1.

Player 1's lawyers, citing their client's impending criminal trial, immediately reached out to Chancellor Blank to delay the appeal process. (Dkt. 165 ¶¶ 210–13.) The University responded that it would proceed according to the applicable procedures and timelines provided in the Wisconsin Administrative Code, as it had up to that point. (Dkt. 165 ¶ 214.)

Player 1 timely appealed the Committee's decision on February 12, 2019, arguing that the University deprived him of due process by forcing him to choose between preserving his Fifth Amendment rights and putting on a full defense during the University's nonacademic-misconduct proceedings. (Dkt. 165 ¶¶ 218, 223.) Chancellor Blank denied Player 1's appeal on March 13, 2019, affirming the Committee's decision. (Dkt. 165 ¶ 224.) As a result, Player 1 was expelled effective March 16. (Dkt. 165 ¶ 229.) On June 7, the Board of Regents declined Player 1's request to review the Chancellor's decision. (Dkt. 165 ¶ 242.)

5. **The University receives new, material information casting significant doubt on its decision to expel Player 1.**

Player 1's sexual-assault trial began on July 29, 2019. (Dkt. 165 ¶ 243.) It ended on August 2 when, after deliberating for little more than a half hour, the jury found him not guilty on all counts. (Dkt. 165 ¶ 243, 245.) This prompted Dougherty to check in with Plaintiff to let her know Dougherty was thinking of her and remind Plaintiff to let Dougherty know if she needed anything. (Dkt. 165 ¶ 333–34.)

The acquittal also prompted Player 1 to request readmission to the University by filing a Petition for Restoration of Rights pursuant to Wisconsin Administrative Code § UWS 17.18. (Dkt. 165 ¶¶ 248–55.) This provision tasked Chancellor Blank with deciding whether to readmit Player 1, to consult with Hasselbacher before doing so, and to inform Plaintiff if there was any change to Player 1's discipline. That's what she did. (Dkt. 165 ¶ 248–55, 262, 274, 276–80, 283–306.)

As the decisionmaker, the Chancellor received a barrage of messages from University students, employees, alumni, donors, and members of the public urging her to grant or deny the Petition for various reasons. (Dkt. 165 ¶ 310.) Ted Kellner, a University donor, wrote the Chancellor a letter where he opined that denying Player 1's Petition would "send a terrible message to the

[University's] minority applicants" and "would greatly reduce" the University's "ability to recruit students of color." (Dkt. 128-56:2.)

Attached to Player 1's Petition was evidence from his criminal trial that had thus far been unavailable to the University. (Dkt. 165 ¶¶ 255–56, 260, 285, 288–91, 294.) Notable to the Chancellor was newly supplied surveillance footage that showed Player 1, Player 2, Complainant 1, and Plaintiff at a local bar and then arriving at Player 1's apartment off campus, where the sexual misconduct took place. (Dkt. 165 ¶ 255–56, 288–94.) The new evidence also included the Madison Police Department's investigatory reports. (Dkt. 165 ¶ 260, 288.)

The Chancellor found especially significant a transcription in these reports of Complainant 1's interview with a Madison Police Department detective. (Dkt. 165 ¶ 294.) Conducted not long after the April 2018 incident, the interview included Complainant 1 telling the detective that, while she and Plaintiff were at Player 1's apartment, Complainant 1 told Plaintiff, "[W]e're leaving, we're going home . . . ." Complaint 1 then said that "[Player 1] was like no, like come back in 20 minutes. And I [Complainant 1] was like what do you need 20 minutes for. And [Plaintiff] was like[,] sex." This exchange was corroborated by a statement Player 1 had given the Madison Police, telling law enforcement that Plaintiff had told Complainant 1, "Give us 20 minutes. We are about to have sex." (Dkt. 165 ¶ 294.)

12

### 6. The University informs Plaintiff of Player 1's Petition.

While Chancellor Blank reviewed this new material, a member of the University's legal staff notified Plaintiff's counsel that the University had received and was reviewing the Petition. (Dkt. 165 ¶ 263; 147-3:3–4; 119-1:3.) Plaintiff's counsel did not respond with a request to participate in the process. (Dkt. 147-3:1–2; 165 ¶ 268.) And indeed, at her deposition in this case, Plaintiff admitted that she could not think of anything she would have submitted to the Chancellor during the Petition process, except possibly an Instagram message she received from an unknown woman living in Georgia. (Dkt. 165 ¶ 308.)

### 7. Chancellor Blank follows the applicable procedure, weighs the evidence, and decides to reduce Player 1's discipline from an expulsion to a suspension, but maintain the no-contact order.

The Chancellor discussed the Petition with Hasselbacher prior to making her decision. (Dkt. 165 ¶¶ 276–80.) Hasselbacher conveyed her preference to Chancellor Blank that Plaintiff and Complainant 1 have an opportunity to respond to the Petition. (Dkt. 165 ¶¶ 281–82.) The Chancellor decided against doing so because such a response wasn't contemplated by the applicable section of the Wisconsin Administrative Code. (Dkt. 165 ¶¶ 283–84.) She was also keen to treat like cases alike: In 2017, she received the only other petition for restoration of rights from a student who had been expelled from the University for nonacademic misconduct. (Dkt. 165 ¶¶ 363–69; 172 ¶¶ 26–29.) In that case,

the Chancellor did not solicit a response from the complainant before issuing a decision. (Dkt. 172 ¶¶ 26–29.)

On August 19, 2019, after a thorough review of the newly submitted evidence as well as the evidence that had been before her when she had upheld Player 1's expulsion, Chancellor Blank issued her decision on the Petition. (Dkt. 165 ¶¶ 299–300, 303–04.) She wrote that the state of the evidence at that point "f[ell] short of the preponderance of the evidence standard required to find [Player 1] responsible for sexual assault." (Dkt. 165 ¶¶ 295, 304; 112-12:4.) The evidence did show, however, that Player 1 had sexually harassed Plaintiff by enlisting Player 2 to take her picture without consent. Chancellor Blank, therefore, kept in place the sexual-harassment finding. (Dkt. 165 ¶¶ 296–97.)

These conclusions led the Chancellor to reduce Player 1's discipline from expulsion to a five-month suspension that he had been serving since he was dismissed from the University in March 2019. (Dkt. 165 ¶ 297.) Along with the mandated time away from the University, the suspension Player 1 served also cost him a semester worth of class credits. (Dkt. 165 ¶ 297.) Chancellor Blank also decided to maintain the no-contact order that had been in effect since soon after the incident. (Dkt. 165 ¶ 300.) The order remained in place until Plaintiff's graduation in December 2020. (Dkt. 165 ¶ 300.) As required by the Wisconsin Administrative Code, Plaintiff and Complainant 1 were notified of Chancellor Blank's decision the day it issued. (Dkt. 165 ¶¶ 305–06.)

### 8.   Plaintiff and Player 1 share a sizable campus for one semester in which they never hear from or see one another.

Following Player 1's readmission, Plaintiff and Player 1 were two of the 68,000 people on the University's campus for one semester. (Dkt. 165 ¶ 3.) Early in the semester, the University's legal department set up a meeting with Plaintiff, her lawyers, and two members of the University's Police Department. (Dkt. 165 ¶ 321.) Plaintiff expressed concerns at the meeting about the potential to run into football players on campus. (Dkt. 165 ¶ 324–25.)

Chris Cole, the director of the Department's threat intervention services, was sympathetic to Plaintiff's discomfort. (Dkt. 165 ¶ 326.) However, he didn't think the general uneasiness Plaintiff expressed constituted an actionable threat to her safety. (Dkt. 165 ¶ 326–28, 344.) Cole nevertheless reminded Plaintiff of the University's Safe Walk program that she could use to ensure safe travel around campus. (Dkt. 165 ¶ 326–28, 344.) He also asked that Plaintiff contact him if circumstances changed as the school year progressed. (Dkt. 165 ¶ 327.)

Plaintiff never saw or heard from Player 1 that semester or ever again. (Dkt. 165 ¶ 335–36, 339–40.) At the end of this fall 2019 semester, Player 1 dropped out to pursue a career in football and his own Title IX lawsuit against the University. (Dkt. 165 ¶ 348–51); *Cephus v. Blank*, 21-cv-126-wmc, 2022 WL

17668793, at * 1 (W.D. Wis. Dec. 14, 2022) (denying University's motion to dismiss).

### C.     Plaintiff's education.

Plaintiff matriculated at the University in the fall of 2017 and graduated after the 2020 fall semester with a bachelor's degree in political science. (Dkt. 165 ¶ 353; 97-3:10–12; 97 (Doe Dep. 6:9–24).) She took between 15 and 13 credits each semester, except for her last one, when she took 9. (Dkt. 97-3:10–12; 97 (Doe Dep. 9:6–11); 165 ¶ 356.) She dropped one class that she had signed up to take in the fall of 2019, but this was because she was able to get into another class for which she had been waitlisted. (Dkt. 165 ¶ 356; 97 (Doe Dep. 157:17–158:10); 97-3:11.)

Plaintiff graduated a semester earlier than is typical of undergraduates, and she did so with a near-perfect 3.826 grade-point average. (Dkt. 165 ¶¶ 253–54.) Her lowest grade (a B-) came in a microeconomics course she completed her first semester. (Dkt. 172 ¶ 35; 97-3:10.)

Plaintiff participated in various extracurricular activities throughout her time at the University. She joined a sorority her freshman year and a legal fraternity her sophomore year. (Dkt. 165 ¶¶ 140–41, 357; 97 (Doe Dep. 79:3–18, 130:1–133:18, 140:24–25).) She was active in these organizations until she graduated. (Dkt. 165 ¶¶ 140–41, 357; 97 (Doe Dep. 79:3–18, 130:1–133:18, 140:24–25).) She participated in her sorority's rush activities in

fall 2019, at the beginning of her sophomore year. (Dkt. 97 (Doe Dep. 75:17–79:2, 140:24–25).) She also lived at her sorority house during her sophomore year with over 30 other women. (Dkt. 165 ¶ 141; 97 (Doe Dep. 79:3–12).)

Plaintiff attended meetings of her legal fraternity once a month in spring semester 2019, once every two months in fall semester 2019, and once a month spring semester 2020. (Dkt. 165 ¶ 357; 97 (Doe Dep. 130:23–131:6).) She started attending University hockey games during her sophomore year. (Dkt. 97 (Doe Dep. 141:20–25).) She also made a habit of studying at the University library once or twice a week throughout her studies. (Dkt. 97 (Doe Dep. 135:1–15).)

Plaintiff's exceptional academic record and set of extracurriculars ultimately allowed her to successfully apply for admission to the Loyola University of Chicago School of Law, where she is now a student. (Dkt. 165 ¶ 355; 97 (Doe Dep. 10:13–19).)

## II.    Procedural background.

Plaintiff filed this suit on September 15, 2020 (Dkt. 1) and amended her complaint in December of that year (Dkt. 26). The amended complaint had three claims: an indirect-discrimination (i.e., deliberate-indifference) claim against the University under Title IX; a direct-discrimination (i.e., erroneous-outcome) claim against the University under Title IX; and a Fourteenth

Amendment due-process claim under 42 U.S.C. § 1983 against Chancellor Blank. (Dkt. 26:23–27.)

The district court dismissed the due-process claim on Chancellor Blank's motion in an opinion issued November 3, 2021. (Dkt. 47.) The two remaining Title IX claims went to summary judgment, where both parties filed cross-motions. (Dkt. 50; 101; 126.) On July 19, 2022, the district court granted the University's summary-judgment motion, and denied Plaintiff's, as to both Title IX claims. *Doe v. Bd. of Regents*, --- F. Supp. 3d ----, 20-cv-856-wmc, 2022 WL 2817839, at *9 (W.D. Wis. July 19, 2022) The district court found that Plaintiff's claims were based on "rank speculation" and "broad leaps in logic," that her assertions "beg[ ] credulity," and that "the Seventh Circuit has . . . actively disclaimed such broad bases for liability" on which Plaintiff relies. *Id.* at *6–9.

Plaintiff filed her notice of appeal on August 16, 2022. (Dkt. 203.) In her statement of issues and subsequent brief, she argues only for overturning the district court's decision as to Plaintiff's indirect-discrimination claim. (Appellant's Br. 4, 23–24.)

## SUMMARY OF ARGUMENT

The Seventh Circuit recently "emphasize[d] . . . that the federal district and appellate courts do not provide third and fourth forums—after [a] university committee's hearing and the administrative appeal—to decide what actually

happened" between two students. *Doe v. Univ. of S. Ind.*, 43 F.4th 784, 792 (7th Cir. 2022). Instead, to get to a jury on her indirect-discrimination claim under Title IX, Plaintiff must prove at least five things for which there is no or insufficient record evidence.

First, she must show that the sexual harassment she experienced happened in an environment substantially controlled by the University. *Davis*, 526 U.S. at 644–45. But the undisputed evidence is that the sexual harassment in this case took place in a privately owned, off-campus apartment.

Second, Plaintiff must demonstrate that the sexual harassment she experienced was pervasive. *Id.* at 650. But the undisputed evidence contains just one instance where Plaintiff was sexually harassed.

Third, Plaintiff must establish that the instance of sexual harassment barred her access to an education. *Id.* at 633. But the undisputed evidence is that she remained an excellent student engaged in several extracurriculars.

Fourth, Plaintiff must be able to convince a reasonable jury that the University's response to Player 1's sexual harassment was so clearly unreasonable "as to constitute an official decision to permit discrimination." *C.S. v. Madison Metro. Sch. Dist.*, 34 F.4th 536, 543 (7th Cir. 2022) (en banc) (citation omitted). But the undisputed evidence is of an extensive response that prevented additional sexual harassment.

Finally, Plaintiff must point to at least one instance of sexual harassment caused by the University's response. *Davis*, 526 U.S. at 644. But the undisputed evidence is she can't do that either.

The problems with Plaintiff's Title IX claim, therefore, are many. Highlighting these deficiencies is not to defend Player 1's actions, though. Indeed, the University punished him for his misconduct. The University's argument, and what the district court found, is that the evidence here doesn't fit the "certain limited circumstances," *Davis*, 526 U.S. at 643, where Title IX has "unambiguously" provided for liability, *Pennhurst*, 451 U.S. at 17. Even if imperfect, the University's response was not unlawful.

Because Plaintiff's indirect-discrimination claim fails, and because she has waived appellate review of her direct-discrimination claim by making no argument against its dismissal, this Court should affirm.

## STANDARD OF REVIEW

The decision by the district court to grant the University summary judgment is reviewed de novo. *FKFJ, Inc. v. Vill. of Worth*, 11 F.4th 574, 584 (7th Cir. 2021). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis omitted). The dispute must be such that, if resolved in the opposing party's favor, a reasonable jury could return a verdict for that party. *FKFJ*, 11 F.4th at 584.

When making this determination, this Court gives the opposing party the benefit of all reasonable inferences, but not "every conceivable inference": The opposing party "must present more than mere speculation or conjecture" to create a genuine issue of material fact. *Id.* at 585 (citation omitted). And when the opposing party "fails to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial Rule 56(c) mandates entry of summary judgment against that party because a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* (citation omitted).

## ARGUMENT

Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). In *Davis*, the Supreme Court found that recipients of federal-education funding can be held liable in private suits for their response to student-on-student sexual harassment. 526 U.S. at 643. Cognizant of Title IX's Spending Clause provenance, and the consequent

"requirement that the recipient have notice of Title IX's prohibitions to be liable for damages," the Court "cabin[ed] the range of misconduct that the statute proscribes" to "certain limited circumstances." *Id.* at 643–44.

*Davis* outlined the elements of a successful indirect-discrimination claim as follows: First, the defendant must be a recipient of federal-education funds. *Id.* at 633. Second, the plaintiff must be subjected to discrimination in the form of sexual harassment. *Id.* at 639. Third, the defendant must receive actual notice of the sexual harassment. *Id.* at 647. Fourth, the defendant must have exercised substantial control over the individual who sexually harassed plaintiff. *Id.* at 644–45.

Fifth, the defendant must have exercised substantial control over the environment where the sexual harassment took place. *Id.* at 644–45. Sixth, the sexual harassment must be severe, pervasive, and objectively offensive. *Id.* at 650. Seventh, the sexual harassment must have barred plaintiff's access to and had a systemic effect on her education. *Id.* at 633, 652–53. Eighth, the defendant must have been deliberately indifferent to the sexual harassment. *Id.* at 648. And finally, the defendant's deliberate indifferent must have caused plaintiff to experience at least one instance of sexual harassment. *Id.* at 644.

Plaintiff lacks sufficient evidence to support element five through nine. The district court correctly held that Plaintiff failed to meet the seventh element,

but each of Plaintiff's failures on its own provides sufficient basis to affirm the judgment below.

## I. Plaintiff's Title IX claim fails because the only instance of sexual harassment took place in a privately owned, off-campus apartment, not in an environment substantially controlled by the University.

*Davis* held that only student-on-student sexual harassment that occurred "under the operations of a funding recipient" could be the basis of a Title IX indirect-discrimination claim. *Id.* at 645. Not only must the educational institution have "substantial control over the harasser," it must also have "substantial control" over "the environment in which the harassment occurs." *Id.* at 644–45.

This Court has said that the control-over-environment "element is essential for Title IX liability," and one that courts are "constrained to follow" given "the specific limitations that the [Supreme] Court has placed on Title IX's implied private remedy." *Doe–2 v. McLean Cnty. Unit Dist. No. 5 Bd. of Dirs.*, 593 F.3d 507, 512–13 (7th Cir. 2010) (affirming motion to dismiss Title IX claim for lack of school's control over location where elementary schoolteacher sexually abused students).

The only sexual harassment—or sexual conduct of any kind—in the summary-judgment record took place at Player 1's privately owned, off-campus apartment. (Dkt. 165 ¶ 52; 102-16:2.) This is where Plaintiff, Complainant 1,

Player 1, and Player 2 went after a night out at a local bar. (Dkt. 102-5:3; 102-9:1–2; 112-10:141–47; 102-16:2–3; 165 ¶¶ 27–28.) Their presence at the apartment was unrelated to a school-related purpose or activity. (Dkt. 102-5:3; 102-9:1–2; 112-10:141–47; 102-16:2–3; 165 ¶¶ 27–28.) Without control over the environment where the sexual harassment took place, the University cannot be held liable for violating Title IX.

### A. Sexual harassment consists of unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature.

A successful indirect-discrimination claim under Title IX must include evidence that the funding recipient had actual knowledge of student-on-student sexual harassment. *Davis*, 526 U.S. at 648. Title IX doesn't define sexual harassment. And *Davis* doesn't either, instead providing an example of it—"male students physically threaten their female peers every day, successfully preventing the female students from using a particular school resource"—and saying that whether it exists will depend on the "constellation of surrounding circumstances, expectations, and relationships," such as "the ages of the harasser and the victim and the number of individuals involved." *Id.* 650–51 (citation omitted).

The Court, however, approvingly cited to *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986), in its discussion of sexual harassment. *Id.* at 650–51. This echoed the Court's citation to *Meritor* in its discussion of

sexual harassment in *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 75 (1992), another Title IX case. The Court in *Meritor* sets out a clear definition of sexual harassment: "[U]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature." *Meritor*, 477 U.S. at 65 (quoting 29 C.F.R. § 1604.11(a)); *cf. Rennie v. Dalton*, 3 F.3d 1100, 1107 (7th Cir. 1993) ("Isolated and/or trivial remarks of a sexual nature do not satisfy the definition of sexual harassment . . . ." (alteration and citation omitted)).

Because *Meritor* is a Title VII case, the Court was defining sexual harassment with the workplace, not schoolhouse, in mind. But the University submits that the "constellation of surrounding circumstances, expectations, and relationships" on its campus full of adult students, faculty, and staff is not materially different than those at an employer where too adults come together to work toward shared goals. *Davis*, 526 U.S. at 651 (citation omitted). And, indeed, something like *Meritor*'s definition has been adopted in various contexts. State antidiscrimination laws, for example, give similar glosses. *See, e.g.*, Wis. Stat. § 111.32(13) ("Sexual harassment" means unwelcome sexual advances, unwelcome requests for sexual favors, unwelcome physical contact of a sexual nature or unwelcome verbal or physical conduct of a sexual nature."); 775 Ill. Comp. Stat. 5/2-101(E) ("'Sexual harassment' means any

unwelcome sexual advances or requests for sexual favors or any conduct of a sexual nature . . . .").

Likewise, the United States Department of Education's Office for Civil Rights, at all times relevant to this suit, defined sexual harassment as "unwelcome conduct of a sexual nature," including "unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature." U.S. Dep't of Educ., *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students by School Employees, Other Students, or Third Parties* (https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf, Jan. 19, 2001, at 2). The Office for Civil Rights has since promulgated a narrower definition, which includes "conduct on the basis of sex" that is "[u]nwelcome" and "determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity." 34 C.F.R. § 106.30.

*Meritor*'s definition of sexual harassment has thus been adopted, with slight variations, in various contexts. The University contends that this consensus— along with the fact that at least two Title IX cases at the Supreme Court have relied on *Meritor* in their discussion of sexual harassment—make its definition—"unwelcome sexual advances, requests for sexual favors, and other

verbal or physical conduct of a sexual nature"—a sound place to ground an analysis of student-on-student sexual harassment here. 477 U.S. at 65.

## B. The only instance of sexual harassment Plaintiff experienced occurred in April 2018.

It is undisputed that the only instance of sexual harassment happened at Player 1's privately owned, off-campus apartment on the night of April 21 or early morning of April 22, 2018. (Dkt. 165 ¶¶ 47, 52; 102-16:2.)

Plaintiff saw Player 2 in a lecture hall after that, on the first day of a music class in September 2018. (Dkt. 165 ¶ 143.) But there is no evidence that Plaintiff and Player 2 interacted at all during that class period, and upon learning that they were in the same classroom, the University rushed an employee to stand outside of it to prevent any contact between the two. (Dkt. 165 ¶ 143.) The University then reached out to Player 2's representative, which led to Player 2 dropping the class before its next session. (Dkt. 165 ¶¶ 145–46, 149–52.) No "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature" here. *Meritor*, 477 U.S. at 65.

The only time Plaintiff saw Player 1 post-incident was at the University's nonacademic misconduct hearing on January 15, 2019. (Dkt. 165 ¶¶ 180, 182–83, 335–36, 339–40.) Of course, all the interested parties—including Player 1—attended the hearing in person. (Dkt. 165 ¶¶ 182–83.) At some point

before the hearing started, Plaintiff saw Player 1 walking toward her. (Dkt. 165 ¶ 181; 172 ¶¶ 24–25.) An assistant district attorney testified that Plaintiff's attorney later told him that she thought Player 1 had walked toward Plaintiff at the hearing to intimidate Plaintiff. (Dkt. 165 ¶ 181.) *Cf. Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 857 (7th Cir. 2019) (holding behavior that included [1] the Title IX plaintiff being "punched by someone who believed he had raped [a fellow student]; [2] a social media post stat[ing] 'boy[s] like [plaintiff] are the reason #IneedFeminism'; and [3] two social media posts refer[ing] to [plaintiff] as a 'rapist' and one as a 'predator'" did not contain sexual harassment). This is inadmissible hearsay, but even if Plaintiff's counsel correctly read Player 1's intentions based on his stride, the incident she describes is void of anything approaching sexual harassment. *See id.* at 857.

Unable to find another instance of sexual harassment in the record, Plaintiff stops looking for it. Instead, she searches for an effect it can have, namely, creating a hostile environment. (Appellant's Br. 35–40.) *But see Meritor*, 477 U.S. at 66 (noting that sexual harassment can "create[ ] a hostile or abusive work environment"). Plaintiff claims that when Player 1 was readmitted to the University, his presence on campus caused a hostile environment for Plaintiff. (Appellant's Br. 37.) Even if true, and the University denies it is, a hostile environment caused by sexual harassment does not spontaneously generate

new incidents of sexual harassment. This Court should decline Plaintiff's invitation to substitute cause for effect. She should not be able to manufacture new instances of the former by pointing to the latter.

It is clear from the record, despite Plaintiff's misdirection, that any hostility that existed on campus after Player 1's Title IX disciplinary hearing did not precipitate new instances of sexual harassment. (Dkt. 165 ¶ 340.) Plaintiff and Player 1 overlapped for one semester at the University after the nonacademic misconduct hearing. (Dkt. 165 ¶¶ 348–49.) This was on a 936-acre campus, with a combined 68,000 students and staff. (Dkt. 165 ¶ 2; 143:43 n. 69); *Academic Buildings,* Office of Admissions and Recruitment, https://admissions.wisc.edu/campus-virtual-tour/academic-buildings (last visited Dec. 22, 2022). Sharing what amounts to a mid-sized city for a few months, they never saw or interacted with each other during this time. (Dkt. 165 ¶¶ 335–36, 339–40.) There was, a fortiori, no "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature" exchanged, *Meritor*, 477 U.S. at 65, and therefore no additional incidents of sexual harassment.

### C. The sexual harassment happened outside an environment over which the University exercised substantial control and thus outside the limits of Title IX liability.

An educational institution's response to sexual harassment is only susceptible to Title IX liability where the sexual harassment happens in an

environment over which the institution "exercises substantial control." *Davis*, 526 U.S. at 645; *Doe–2*, 593 F.3d at 512 ("This substantial control element is essential for Title IX liability . . . ."); *Weckhorst v. Kan. State Univ.*, 241 F. Supp. 3d 1154, 1170 (D. Kan. 2017), *aff'd*, 918 F.3d 1094 (10th Cir. 2019) ("[P]eer sexual assaults that occur off-campus, in private settings, and within contexts that have little or no connection to the funding recipient do not trigger Title IX liability.").

The control-over-environment requirement is met if, as in *Davis*, the sexual harassment "occur[ed] during school hours and on school grounds." 526 U.S. at 646. Courts frequently dispose of Title IX cases for failing to satisfy this condition. *E.g.*, *Doe–2*, 593 F.3d at 512–13 (affirming dismissal of Title IX indirect-discrimination claim where elementary teacher sexually abused students off school grounds); *Pahssen v. Merrill Cnty. Sch. Dist.*, 668 F.3d 356, 365–66 (6th Cir. 2012) (affirming summary judgment for defendant on Title IX indirect-discrimination claim because "[w]hen conduct occurs at a school in another district or off school grounds entirely, the school district has control over neither the harasser, nor the context"); *Ostrander v. Duggan*, 341 F.3d 745, 750–51 (8th Cir. 2003) (same where the "record [was] clear [that the university] did not own, possess, or control the . . . premises" where the alleged sexual assault occurred*); Samuelson v. Or. State Univ.*, 162 F. Supp. 3d 1123, 1131–32 (D. Or. 2016) (dismissing deliberate-indifference claim where rape

occurred at "an off-campus party at an apartment that simply happened to be located in the same city as the university [defendant]") *aff'd*, 725 F. App'x 598, 599 (9th Cir. 2018) ("[Plaintiff] has failed to allege how [university] exercised any control over the environment of her sexual assault . . . .").

The control-over-environment requirement can also be met if the sexual harassment occurs at an off-campus location, but only when the students involved are there for a school-related purpose or activity. *E.g.*, *Rost v. Steamboat Springs RE–2 Sch. Dist.*, 511 F.3d 1114, 1121 n.1 (10th Cir. 2008) ("We do not suggest that harassment occurring off school grounds cannot as a matter of law create liability under Title IX. *Davis* suggests that there must be some nexus between the out-of-school conduct and the school."); *see also Davis*, 526 U.S. at 646 (citing with approval a Seventh Circuit case that held a school could be liable when the sexual harassment took "place while the students are involved in school activities or otherwise under the supervision of school employees").

Examples of this situation include where the alleged sexual harassment occurred at a school-sponsored football camp held off campus, *Roe ex rel. Callahan v. Gustine Unified School District*, 678 F. Supp. 2d 1008, 1025 (E.D. Cal. 2009); or at an off-campus apartment as part of "an officially sanctioned but unsupervised effort to show [student-athlete] recruits a 'good time' . . . that . . . encourage[d] young men to engage in opprobrious acts,"

31

*Simpson v. University of Colorado Boulder*, 500 F.3d 1170, 1175–77 (10th Cir. 2007); or at an off-campus fraternity that was used for student-housing, that was described on the university defendant's website as a "University Organization[]," and whose director was a university instructor, *Weckhorst*, 241 F. Supp. 3d at 1167. *Accord Roe v. St. Louis Univ.*, 746 F.3d 874, 884 (8th Cir. 2014) (affirming summary judgment on Title IX indirect-discrimination claim for lack of "evidence that the University had control over the student conduct at the off campus party").

Here, the lone instance of sexual harassment occurred at Player 1's apartment. This apartment was in a privately owned complex called the Humbucker Apartments, not on the University's campus. (Dkt. 165 ¶ 52; 102-16:2.) And no one at Player 1's apartment the night and early morning of April 21 and 22, 2018 was there for school-related purposes. (Dkt. 112-10:141–147; 102-9:1.) They went there after a night out at a local bar. (Dkt. 112-10:141–147; 102-9:1.) *Cf. O'Shea v. Augustana Coll.*, Case No. 4:20-cv-04243-SLD-JEH, 2022 WL 884255, at *5 (C.D. Ill. Mar. 24, 2022) (dismissing deliberate-indifference claim based on alleged sexual assault at off-campus bar because plaintiff did "not allege that [university defendant] was sponsoring an event there or otherwise exercised any control over the bar"). Which is to say, the environment in which the sexual harassment took place

was not one "wherein the [University] exercise[d] substantial control," *Davis*, 526 U.S. at 645.

Without substantial control over that environment, the University cannot be held liable under Title IX for its response to the sexual harassment Plaintiff experienced there. Plaintiff's indirect-discrimination claim should end here.

## II. Plaintiff's Title IX claim fails because she did not experience pervasive sexual harassment.

Plaintiff, to prove her Title IX claim, "must establish sexual harassment . . . that is . . . severe, pervasive, and objectively offensive." *Id.* at 651. The *Davis* Court held that although one instance of peer harassment could meet the severity requirement, it would fail for lack of pervasiveness.[1] *Id.* at 652–53. "Congress," the Court wrote, would not "have thought such behavior sufficient to rise to this level in light of the inevitability of student misconduct and the amount of litigation that would be invited by entertaining claims of official indifference to a single instance of one-on-one peer harassment." *Id.* The Court held that a plaintiff's "ability to state a cognizable claim . . . depends . . . on the alleged persistence . . . of [her peer harasser]'s actions." *Id.*

[1] Dissenting in *Davis*, Justice Kennedy accused the majority of setting this standard too low, complaining that the only thing it accomplished was to "exclude the possibility that a single act of harassment perpetrated by one student on another can form the basis of an actionable claim." 526 U.S. at 677 (Kennedy, J., dissenting).

The lower federal courts have enforced this requirement. *E.g.*, *Kollaritsch v. Mich. State Univ. Bd. of Trs.*, 944 F.3d 613, 621 n.3 (6th Cir. 2019) ("*Davis* holds that a single incident cannot constitute pervasive harassment under Title IX."); *K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1059 (8th Cir. 2017) (holding that a single instance of sexual assault "does not plausibly allege pervasive discrimination as required to state a peer harassment claim"); *Hawkins v. Sarasota Cnty. Sch. Bd.*, 322 F.3d 1279, 1289 (11th Cir. 2003) (holding that "gender discrimination must be more widespread than a single instance of one-on-one peer harassment").

As established in the previous section, the record evidence in this case contains just one incident of sexual harassment. The Court in *Davis* and this Court have both held that Title IX liability does not lie in cases with only one such incident. This is the second reason Plaintiff's claim isn't suitable for a jury.

## III. Plaintiff's Title IX claim fails because she did not introduce sufficient evidence that an instance of sexual harassment barred her access to and had a systemic effect on her education.

The district court dismissed Plaintiff's case based on her inability to marshal sufficient evidence that Player 1's sexual harassment "effectively bar[red]" her from and had a "systemic effect" on her access "educational programs or activities." *Davis*, 526 U.S. at 633, 652–53.

*Davis* held that evidence of its plaintiff's falling grades was "necessary evidence" of the required "concrete, negative effect" on her education, but was also clear that "a mere decline in grades" was not enough "to survive a motion to dismiss." *Id.* at 652–54 (citation omitted); *see Hawkins*, 322 F.3d at 1289 (holding that "the effects of the harassment must touch the whole or entirety of an educational program or activity").

Besides declining grades, courts in this Circuit have pointed to "becoming homebound or hospitalized due to harassment" *Gabrielle M. v. Park Forest-Chi. Heights, Ill. Sch. Dist. 163*, 315 F.3d 817, 823 (7th Cir. 2003), and a change in "academic status," *Jauquet v. Green Bay Area Cath. Educ., Inc.*, 996 F.3d 802, 810 (7th Cir. 2021), as examples of the systemic effect necessary to a successful Title IX claim. Plaintiff did not provide evidence of any such effect on her education.

### A.  Plaintiff did not provide the evidence required by the Supreme Court and the Seventh Circuit to support this element.

Plaintiff hasn't even produced the necessary, though insufficient, decline in her grades. Neither her grades nor her credit hours showed any sign of dropping off after the sexual harassment she experienced on the night and early morning of April 21 and 22, 2018. (Dkt. 165 ¶ 353; 97-3:10–12; 97 (Doe Dep. 6:9–24).) Plaintiff graduated with a nearly perfect 3.826 grade-point average—her lowest grade, a B-, coming before the incident—and took

her bachelor's degree in political science a semester earlier than most students. (Dkt. 165 ¶¶ 253–54; 172 ¶ 35; 97-3:10.)

Plaintiff's involvement in extracurriculars, if anything, accelerated after April 2018. She had joined her sorority before then, but afterward, in her sophomore year, participated in its rush activities and lived in the sorority house with 30 other women. (Dkt. 165 ¶¶ 140–41, 357; 97 (Doe Dep. 75:17–79:2, 79:3–18, 130:1–133:18, 140:24–25).) She also joined a legal fraternity her sophomore year and participated in its meetings once or twice a month before the University went remote for the pandemic. Dkt. 165 ¶ 357; 97 (Doe Dep. 130:23–131:14).) Plaintiff also started going to University hockey games after Player 1 sexually harassed her. (Dkt. 97 (Doe Dep. 141:20–25).) The stellar academic and extracurricular resume she compiled as an undergraduate after the night at Player 1's apartment ultimately got her into Loyola University Chicago School of Law, where she is now a student. (Dkt. 165 ¶ 355; 97 (Doe Dep. 10:13–19).)

This undisputed evidence shows that she was not "effectively bar[red]" from access to the University's educational offerings. *Davis*, 526 U.S. at 633. This Court, for comparison, affirmed a motion to dismiss a Title IX claim where the assumed facts were that the plaintiff remained "an honor roll student" and there was nothing to "suggest her academic status changed" after the sexual harassment. *Jauquet*, 996 F.3d at 810; *see Gabrielle M.*, 315 F.3d at 823

36

(affirming summary judgment for the same reasons, even though plaintiff "was diagnosed with some psychological problems" after the sexual harassment).

### B. The admissible evidence Plaintiff says supports this element is evidence of the wrong thing and, in any case, lacks sufficient detail.

Plaintiff attempts to overcome her inability to provide the evidence precedent requires by pointing to vague, conclusory statements in a written declaration submitted after she was deposed. (Appellant's Br. 30.) In the declaration, Plaintiff claims that, as a result of Player 1 returning to campus after serving his suspension, she "missed class," "withdrew from a philosophy course," and "felt overwhelmed." (Dkt. 150 ¶¶ 5, 11.) She mentions that she avoided a "path that football players used" and places like the "library or student union." (Dkt. 150 ¶¶ 4, 11.) In discovery, Plaintiff noted that, after Player 1 was back on campus, she "stopped going out much and largely just tried to focus on [her] school and sorority commitments." (Dkt. 97-1:7.) She also testified that she "mostly went home to Chicago especially during football season." (Dkt. 97-1:7.)

The district court correctly concluded that this evidence falls short of demonstrating that the sexual harassment Plaintiff experienced effectively barred her from and had a systemic effect on her access to the University's educational programs or activities. *Bd. of Regents*, 2022 WL 2817839, at *6–7;

*see Gabrielle M.*, 315 F.3d at 823 (affirming summary judgment on Title IX claim where there was "no evidence that [plaintiff] was denied access to an education"). This is so first because some of the evidence contradicts her deposition testimony and is therefore inadmissible: Despite a contrary claim in her declaration, Plaintiff testified at her deposition that she withdrew from a philosophy course because she got off the waitlist for 500-level course in her major that she took instead. (Dkt. 165 ¶ 356; 97 (Doe Dep. 157:17–158:10); 97-3:11.) And, again contrary to her declaration, Plaintiff testified at her deposition that she studied at the library once or twice a week after Player 1 was readmitted. (Dkt. 97 (Doe Dep. 135:1–15).) Plaintiff mentions avoiding the University Book Store too, but this store is neither owned by the University nor located on its campus. (Dkt. 114 ¶ 5.)

Even were it admissible, this evidence doesn't support Plaintiff's claim because it's evidence of the wrong thing. *Davis* is clear that it's the peer sexual harassment that must "deprive the victims of access to the educational opportunities or benefits provided by the school." 526 U.S. at 650. Plaintiff, however, marshals evidence to show that Player 1's readmission to campus had these effects. (Appellant's Br. 30.) Plaintiff asserts that his mere presence— Plaintiff and Player 1 never saw each other the one semester he was back on campus—affected her education, not the sexual had happened a year and a half earlier. (Appellant's Br. 30.) This, as the Fourth Circuit discerned, is

"misguided" because "the main object of inquiry for this prong is the alleged sexual harassment, rather than the defendant's response thereto." *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 274–75 (4th Cir. 2021). "Indeed, the latter is relevant only to the issue of deliberate indifference." *Id.* This Court should reject Plaintiff's misguidance.

The third problem with Plaintiff's evidence is what the district court relied on, namely, that it's long on general assertion but short on "concrete examples of specific impacts on her or examples of harassment." *Bd. of Regents*, 2022 WL 2817839, at \*6–7. That is, Plaintiff's testimony provides no detail about, for example, how often she "missed class," what it meant that she "stopped going out much," and how many of the handful of home-football-game weekends she left campus. *Cf. Gabrielle M.*, 315 F.3d at 822 (affirming summary judgment because plaintiff did "not present details of when, where, or how often . . . alleged conduct occurred").

This lack of specificity is especially glaring "given that," as the district court wrote, "[Plaintiff]'s grades and attendance never suffered measurably; and Player 1 was kicked off campus for at least a semester, then only allowed back under restrictions for one semester." *Bd. of Regents*, 2022 WL 2817839, at \*7; *accord Nungesser v. Columbia Univ.*, 244 F. Supp. 3d 345, 369 (S.D.N.Y. 2017) (finding no denial of educational opportunities where even though plaintiff was "reasonably fearful to access the campus resources of the dining hall, athletic

center, libraries as well as the center for career education," he did not allege that this "substantially affected his GPA as a whole or his ability to graduate"). Player 1's sexual harassment did not deny Plaintiff her education.

### C. The cases cited by Plaintiff are all readily distinguishable.

Plaintiff cites out-of-circuit cases for the position that she has enough evidence on this element to survive summary judgment. (Appellant's Br. 28–29.) But these cases are easy to distinguish. *See e.g.*, *Farmer v. Kan. State Univ.*, 918 F.3d 1094 (10th Cir. 2019); *Doe 12 v. Baylor Univ.*, 336 F. Supp. 3d 763, 770–72 (W.D. Tex. 2018) (finding sufficiently systemic effect where plaintiffs alleged substantial drop in grades, lost scholarships, and academic probation); *Doe v. Erskine Coll.*, No. Civ. A. 8:04-23001RBH, 2006 WL 1473853, at *7 (D.S.C. 2006) (same, where plaintiff "allege[d] that her grades suffered and that she thus became ineligible for several scholarships").

In *Farmer*, for example, one of the plaintiffs alleged that her "grades plummeted and she lost her academic scholarship." 918 F.3d at 1101 (citation omitted). She also "exhibited symptoms of post-traumatic stress disorder, [had] nightmares, . . . distanced herself from family and friends, and . . . decreased her involvement in her sorority and philanthropy and . . . turned down leadership opportunities." *Id.* (citation omitted). The other *Farmer* plaintiff alleged that she "struggled in school, secluded herself from friends, withdrew from [university] activities in which she had previously taken a leadership role,

fell into a deep depression, slept excessively, and engaged in self-destructive behaviors such as excessive drinking and slitting her wrist." *Id.* at 1099–1100.

Fortunately, what happened in this case wasn't nearly as drastic. Plaintiff alleges, essentially, that she modified some of her routines out of a subjective fear of running into Player 1 on a sizable campus. This does not amount to an "effective[ ] bar[ ]" that had a "systemic effect" on her access to "educational programs or activities." *Davis*, 526 U.S. at 633, 652–53. If the Court must reach the issue, it should follow the district court and affirm on this basis.

## IV. Plaintiff's Title IX claim fails because the University's response to her sexual harassment was not so clearly unreasonable as to constitute an official decision to permit sex discrimination.

The fourth defect in Plaintiff's case is her lack of sufficient evidence to prove the University's response to Player 1's sexual harassment was deliberately indifferent. This Circuit recently reiterated that, "[o]wing to Title IX's roots in the Spending Clause, a school['s] . . . response will suffice to avoid institutional liability so long as it is not so unreasonable, under all the circumstances, as to constitute an official decision to permit discrimination." *C.S. v. Madison Metro. Sch. Dist.*, 34 F.4th 536, 543 (7th Cir. 2022) (en banc) (citation omitted). The Court made clear that "[t]he response does not have to be perfect or even successful." *Id.* This is a "high bar," a "demanding standard," *Jauquet*, 996 F.3d at 808–09 (citation omitted), and one that is "difficult to meet," *C.S.*, 34 F.4th. at 540. Deliberate indifference means, in essence, that "the school learned of a

41

problem and did nothing." *Johnson v. Ne. Sch. Corp.*, 972 F.3d 905, 912 (7th Cir. 2020) (citation omitted). That's not the case here.

## A. The University's response was immediate, vigorous, and sustained.

This brief's Statement of the Case, though many pages long, contains a mere summary of the University's response to Plaintiff's sexual-misconduct allegation. A full account isn't necessary here, either. A few highlights will suffice to demonstrate that this response was not an official decision to permit discrimination.

Such as the University's student-support specialist Catherine Dougherty reaching out to Plaintiff the very day Dougherty received the allegation that Plaintiff had been the victim of sexual misconduct. (Dkt. 165 ¶¶ 51–52.) During that call, Dougherty explained the various supports and accommodations available to Plaintiff at her request. (Dkt. 165 ¶¶ 51–52.) When Plaintiff took Dougherty up on her offer of academic accommodations, Dougherty contacted Plaintiff's professors to help facilitate those. (Dkt. 165 ¶ 53.) And the University offered Plaintiff academic accommodations in every course she enrolled in from then until she graduated. (Dkt. 165 ¶¶ 51, 128, 139–40, 143–52, 175–76, 264, 333–34, 341–44; 104-1:12–100; 97 (Doe Dep. 13:4–20; 15–20).)

Dougherty remained in regular contact with and made herself available to Plaintiff and her representatives throughout the University's investigation into Plaintiff's allegation against Player 1, as well as afterward. So did the University's Title IX coordinator, Lauren Hasselbacher, who first reached out to Plaintiff the day after the University received her allegation. (Dkt. 165 ¶¶ 56–57.) Hasselbacher instituted a no-contact order between Plaintiff and Player 1 less than a week later. (Dkt. 165 ¶¶ 62–65.) And this no-contact order remained in place until Plaintiff's graduation from the University. (Dkt. 165 ¶ 300.)

The no-contact order was a success: Plaintiff saw Player 1 only one time thereafter, which was at the nonacademic misconduct hearing, where they were both expected to appear. (Dkt. 165 ¶¶ 180, 182–83, 335–36, 339–40); *see Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1155 (10th Cir. 2006) (holding that there was no deliberate-indifference, "[s]ignificantly" because victim did not allege additional sexual harassment following school's response). The University's response to this alleged violation of the no-contact order was swift and direct. Its Assistant Dean of Students and Director of the Office of Student Conduct and Community Standards immediately warned Player 1 to heed the no-contact directive between him and Doe. (Dkt. 138 ¶¶ 7–8; 172 ¶¶ 24–25.) Other courts have found similar responses sufficient. *See, e.g., Prasad v. George Wash. Univ.*, 390 F. Supp. 3d 1, 28 (D.D.C. 2019) (finding no

deliberate indifference where university employee warned assailant to stop violating a no-contact directive, and "there was no reason for [university employee] to assume that his warning to [assailant] would go unheeded"). Player 1 was never in Plaintiff's vicinity again.

The University initially expelled Player 1 after finding him responsible for sexual harassment and third-degree sexual assault. (Dkt. 165 ¶¶ 205–207, 227–229, 242.) The sexual-assault finding was later rescinded and Player 1's discipline downgraded to an approximately five-month suspension. (Dkt. 165 ¶ 297.) This change was not "clearly unreasonable in light of the known circumstances" because the circumstances had changed. *Davis*, 526 U.S. at 648.

In particular, Player 1 had submitted a Petition for Restoration of Rights pursuant to Wisconsin Administrative Code § UWS 17.18. (Dkt. 165 ¶¶ 248–55.) The Petition included evidence from Player 1's criminal trial— where he had been acquitted of sexual assault in thirty-five minutes—to which the University did not previously have access. (Dkt. 165 ¶¶ 243, 245, 255–56, 260, 285, 288–294; Dkt. 110-3.) As the one tasked with ruling on Player 1's Petition, Chancellor Rebecca Blank reviewed the new evidence, along with the evidence received during the initial Title IX investigation, and concluded that the new evidence significantly undermined her earlier decision to uphold

Player 1's sexual-assault finding and expulsion. (Dkt. 165 ¶¶ 299–300, 303–04.)

This evidence included statements to police from key witnesses who had not provided statements during the University's nonacademic misconduct investigation, as well as statements taken from Plaintiff and her friend (Complainant 1) by police that showed they had provided different and less information to the University during its investigation. (Dkt. 165 ¶¶ 260, 288, 294; 1129; 102-9; 102-5:3–5; 112-10:74–127, 131–38.)

Especially relevant—and newly received with Player 1's Petition—was a police report that transcribed an interview Player 1 had given a Madison Police Department detective shortly after the events of April 21 and 22, 2018. (Dkt. 165 ¶ 294; 112-9:37–43.) In that interview, Player 1 told the detective that Plaintiff had said to Complainant 1 during the alleged misconduct, "Give us [Plaintiff and Player 1] 20 minutes. We are about to have sex." (Dkt. 165 ¶ 294; 112-9:39.) This was significant because it corroborated what Complainant 1 had told police in an interview given around the same time, where she said something "like [Plaintiff] we're leaving, we're going home, or something, and [Player 1] was like no, like come back in 20 minutes. And I was like what do you need 20 minutes for. And [Plaintiff] was like[,] sex." (Dkt. 165 ¶ 294; 112-10:85.) Complainant 1's interview was also new to the University. (Dkt. 165 ¶ 294.)

In the face of this material alteration to the nonacademic-misconduct record, Chancellor Blank concluded that "the evidence f[ell] short of the preponderance of the evidence standard required to find the Petitioner responsible for sexual assault." (Dkt. 165 ¶¶ 295, 304; 112-12:4.) This led to her decision to rescind the sexual-assault finding and downgrade Player 1's expulsion to an approximately five-month suspension. (Dkt. 165 ¶ 297.) The Chancellor, however, maintained a finding that Player 1 was responsible for sexual harassment, and, out of an abundance of caution, kept the no-contact order in place between Plaintiff and Player 1. (Dkt. 165 ¶ 296–97, 300.) Following Player 1's readmission, the University also provided a sit-down meeting with Director of Threat Intervention Services, Chris Cole, so that Plaintiff and her lawyer could discuss any safety concerns. (Dkt. 165 ¶ 321.)

The district court rightly found that this response by the University was "prompt[ ]" and "fulsome," and that "the Chancellor followed the UW's administrative code for readmission to the letter." *Bd. of Regents*, 2022 WL 2817839, at \*5. A reasonable jury could not find the University's response to be so clearly unreasonable as to constitute an official decision to permit sex discrimination.

## B.    The University's response compares favorably to those this Court has found lawful.

This Court's recent caselaw provides a yardstick with which to measure the University's response. *See Johnson*, 972 F.3d at 912–15, *Jauquet*, 996 F.3d at 808–09. In *Johnson*, for example, a high school was made aware that one of its students had been accused of raping two of his classmates, including the plaintiff. 972 F.3d at 908–10. The school neither expelled nor suspended the accused student. The school's principal considered modifying the accused's schedule so that he and plaintiff would no longer share their morning classes, but ultimately did not because he didn't want to "negatively impact [the accused's] track to graduate on time." *Id.* at 913 (citation omitted). As a result, plaintiff saw the accused student "every day at school." *Id.* at 914.

The principal issued a no-contact order between plaintiff and the accused. *Id.* at 913. He also conducted investigations into the incidents that were ultimately inconclusive as a result of relevant witnesses' unwillingness to fully cooperate. *Id.* After these investigations concluded, the plaintiff alleged that the accused intentionally violated the no-contact order twice. *Id.* at 914–15. The school did not respond with any additional safety measures or further discipline. *Id.* And the plaintiff eventually withdrew from the school. *Id.* at 910.

On these facts, this Court held that the high school had not been deliberately indifferent and affirmed summary judgment for defendants on

plaintiff's Title IX claim. *Id.* at 915. The Court noted that the school's response was missing certain reasonable steps, but reminded the parties that a "negligent response is not unreasonable, and therefore will not subject a school to liability." *Id.* at 912.

Like the high school in *Johnson*, the University in this case issued a no-contact order and conducted an investigation that was hindered by certain witnesses' refusing to participate. (Dkt. 165 ¶¶ 64, 96–97, 99–103, 300.) But the University did much more than that. It suspended Player 1 for over five months and offered Plaintiff a plethora of supports, including academic accommodations. (Dkt. 165 ¶¶ 51, 128, 139–40, 143–52, 175–76, 264, 297, 300, 333–34, 341–47; 104-1:12–100; 97 (Doe Dep. 13:4–20; 15–20).) Moreover, unlike in *Johnson* where the plaintiff saw her assailant every day at school, Plaintiff never saw Player 1 again after he was warned to mind the no-contact order at his disciplinary hearing. (Dkt. 165 ¶¶ 335-36, 339-40; 138 ¶¶ 7-8; 172 ¶¶ 24-25.) In short, the school here responded with greater force to a day-to-day situation less volatile than the one in *Johnson*, putting the University firmly on the right side of the law.

Another relevant comparator is the response this Court held was lawful in *Jauquet*, 996 F.3d at 808–809. The plaintiff there was the alleged victim of "vile and offensive" sexual harassment that caused her "serious emotional distress." *Id.* at 805–06. Her school responded by "coach[ing]" the accused "into

48

giving a 'rote' apology" and suspending him for three days. *Id.* at 806. The school also sent an email "explaining that the school would not tolerate bullying." *Id.* When plaintiff's mother threatened to pull plaintiff from the school, a school official "responded by forwarding the necessary transfer paperwork." *Id.*

Despite plaintiff's family urging the school to do more to protect their daughter, the school did not offer her victim services "because [she] did not appear to need them." *Id.* The school also criticized plaintiff's mother for "coach[ing] her daughter to be more emotional." *Id.* Plaintiff sued under Title IX, alleging that this response to her perpetrator's "cruel and vicious" campaign was deliberately indifferent. *Id.* at 805–06.

The Seventh Circuit affirmed the district court's dismissal, holding that the three-day suspension, several meetings with plaintiff, an offer to change the location of her seat in the classroom she shared with the accused, and facilitation of the accused's apology was enough to show that the school's was not a deliberately indifferent response. *Id.* at 808–09. The Court acknowledged that plaintiff found the school's disciplinary and preventative measures woefully inadequate. *Id.* But this was no reason to reverse, the Court said, because "Title IX liability does not give victims license to demand particular remedial actions from the school." *Id.* at 809. The school's actions in *Jauquet* showed that "[t]his [was] not a situation where the school learned of a problem

and did nothing." *Id.* (citation omitted). That was enough for it to avoid liability.

As it did when juxtaposed with the response in *Johnson*, the University's response here stands head and shoulders above the one in *Jauquet*. The University's response included myriad supportive, preventative, and disciplinary measures absent in *Jauquet*. It also avoided the victim-blaming. (Dkt. 165 ¶¶ 53, 303, 321, 333, 341-44.) And where the school officials in *Jauquet* responded to plaintiff's frustration by emailing transfer paperwork, the University's personnel reached out time and again to ensure Plaintiff had what she needed to excel where she was. (Dkt. 165 ¶¶ 51, 128, 139–40, 143–52, 175–76, 264, 333–34, 341–47; 104-1:12–100; 97 (Doe Dep. 13:4–20; 15–20).)

To *Johnson* and *Jauquet*, the University could add discussion of numerous Title IX cases where the school's response to peer sexual harassment fell well short of the University's, but where courts nevertheless held there was no deliberate indifference. *E.g.*, *Gabrielle M.*, 315 F.3d at 821, 825 (seeing no deliberate indifference where accused continued to have contact with and harass plaintiff four months after school attempted to separate them); *Doe v. Galster*, 768 F.3d 611, 614, 619–21 (7th Cir. 2014) (same where response included violations of a no-contact order and denial of plaintiff's request to

transfer schools after being "subjected to multiple incidents of physical violence that merited police attention").

Deliberate indifference is a "high bar" and a "demanding standard.". *Jauquet*, 996 F.3d at 808–09 (citation omitted). Title IX suits are not the place to "second guess a school's disciplinary decisions," even ones in the cases discussed above that are open to serious criticism. *Johnson*, 972 F.3d at 912. The University's response here is far more fulsome than those, and is nowhere near being so clearly unreasonable as to constitute an official decision to permit sex discrimination.

### C.     Plaintiff's second guessing of the University's response is not sufficient evidence of deliberate indifference.

Plaintiff contends that a few alleged shortcomings of the University's response demonstrate deliberate indifference. (Appellant's Br. 40–44.) First, she argues that Chancellor Blank should've taken more time to reach her decision on Player 1's Petition, that 13 days wasn't enough. (Appellant's Br. 40.) However, there is nothing in the law that equates decisiveness with deliberate indifference. *See Galster*, 768 F.3d at 620–21 (holding that school's investigation into peer sexual harassment—"completed within twelve days"— was not deliberately indifferent).

Second, Plaintiff complains that she wasn't asked by Chancellor Blank to respond to Player 1's Petition. (Appellant's Br. 41.) This, too, is not evidence of

deliberate indifference. The Chancellor's decisionmaking process followed what was required by state law and that which she had used in deciding similar petitions. (Dkt. 165 ¶¶ 283–84, 363–69; 172 ¶¶ 26–29); *cf. Univ. of S. Ind.*, 43 F.4th at 797 ("The university did not act with an anti-male bias against John by enforcing a generally applicable policy that also applied to Jane.").

Moreover, a supposed lack of communication with or involvement of a complainant, while perhaps not ideal in certain circumstances, does not amount to deliberate indifference. The school in *Galster*, for instance, didn't keep the plaintiff informed about the disciplinary process involving her alleged harassers. 768 F.3d at 621. The result was that she left the school district before knowing the results of that process. *Id.* At 616, 621. This Court found that, "although [plaintiff]'s family understandably would have liked to know what was happening in the [accuseds]' expulsion hearings," plaintiff's lack of knowledge of or involvement with these hearings did not indicate the school's response was clearly unreasonable. *Id.* At 621; *accord Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1109 (9th Cir. 2020) ("Keeping a victim of sexual assault largely in the dark about the investigation of her assailant and the ultimate sanctions imposed is . . . inappropriate, but . . . not deliberately indifferent.").

Third, Plaintiff criticizes the University for not implementing a safety plan for her when Player 1 returned to campus after serving his suspension. (Appellant's Br. 44.) Plaintiff avers that the University was required to do so because Player 1 had allegedly violated the no-contact order months prior at the University's nonacademic misconduct hearing. (Appellant's Br. 44.) This critique forgets that the University responded immediately to the alleged violation when, at the hearing, its Assistant Dean and Director of the Office of Student Conduct and Community Standards reminded Player 1 to obey the no-contact order. (Dkt. 138 ¶¶ 7–8; 172 ¶¶ 24–25); *see Prasad*, 390 F. Supp. at 28 (finding no deliberate indifference where university employee warned assailant to stop violating a no-contact order, and "there was no reason for [university employee] to assume that his warning to [assailant] would go unheeded"). Plus, cases like *Johnson* teach that an alleged violation of a no-contact order followed, as here, with a reasonable response is not evidence of deliberate indifference. *Johnson*, 972 F.3d at 914; *see also Galster*, 768 F.3d at 621 ("The school was not required by federal law to give Doe a formal safety plan.").

The fourth of Plaintiff's misgivings isn't particular action or inaction by the University, but rather what Plaintiff suspects were the University's motives. (Appellant's Br. 40–41.) Specifically, she speculates that Chancellor Blank's decision on Player 1's Petition was improperly influenced by football fans and

University donors. (Appellant's Br. 40–41.) The district court also worried about this, basing its conclusion in Plaintiff's favor as to this element on the University's alleged "desire to avoid any arguable liability" or "to get an important player back on the football field." *Bd. of Regents*, 2022 WL 2817839, at *6. *But see Gabrielle M.*, 315 F.3d at 825 ("[T]he school may take into consideration administrative burdens or the disruption of other students' or their teachers' schedules in determining an appropriate response.").

Plaintiff's argument, and the district court's conclusion, misunderstand the legal analysis. The question at this stage is whether the University's "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. The test looks to the response itself, not guessed-at motivations. In other words, whatever its motivation, a response cannot be the basis of Title IX liability if it's not deliberately indifferent.

True, Title IX makes a particular motive off limits, namely, one based on a student's sex. *Jauquet*, 996 F.3d at 809–11. But this is an element of a direct-discrimination claim under Title IX. *Id.* Plaintiff had a one of these but the district court found that "ascribing the Chancellor's reconsideration to gender bias begs credulity," and granted the University summary judgment. *Bd. of Regents*, 2022 WL 2817839, at *8. Plaintiff has not appealed that decision,

choosing to focus on her indirect-discrimination claim instead. The University's motivations are therefore neither here nor there at this point.

Another problem with Plaintiff's argument is that is it unjustifiably ignores much the University's response to Player 1's sexual harassment. Plaintiff admits that the University acted reasonably during its monthslong response leading up to Player 1 filing his Petition. (Appellant's Br. 40.) But then she asks the Court to disregard all that and focus solely on the 13-day period during which the Chancellor decided the Petition. (Appellant's Br. 41.) The law doesn't bless this kind of selective attention. It's the totality of an institution's "response to the harassment" that must be deliberately indifferent, not a fraction of the response, placed in a vacuum and under a microscope. *Davis*, 526 U.S. at 648; *see Johnson*, 972 F.3d at 915 (recounting school's "overall response" and determining that it was "not clearly unreasonable"); *Jauquet*, 996 F.3d at 808–09 (same); *Columbia Coll. Chi.*, 933 F.3d at 856–57 (same); *Gordon v. Traverse City Area Pub. Schs.*, 686 F. App'x 315, 325 (6th Cir. 2017) ("[T]he deliberate-indifference inquiry turns on the nature of the harassment, its length, and the school's overall response . . . ." (citation omitted)). The Court should therefore resist Plaintiff's bid to artificially limit its review to 13 days of a response that lasted well over a year.

Ultimately, Title IX did not require a stiffer penalty for Player 1's sexual harassment of Plaintiff, nor did it require the University to "have effectively

ended all interaction between the two students to prevent conclusively any further harassment." *Gabrielle M.*, 315 F.3d at 825. "[B]laming [the University] for failing to take the specific actions that [Plaintiff] would have preferred it to take sounds in negligence, not deliberate misconduct." *Johnson*, 972 F.3d at 912 (citation omitted). All Title IX required was that the University's response not be so clearly unreasonable as to constitute an official decision to permit sex discrimination. The record evidence fails to meet this demanding standard. The Court should affirm on this basis.

## V.    Plaintiff's Title IX claim fails because she did not experience additional sexual harassment as a result of the University's response to the first and only incident of such harassment.

Plaintiff also failed to provide evidence that sexual harassment occurred as a result of the University's response. *Davis*, 526 U.S. at 644. The Court in *Davis* held that "[i]f a funding recipient does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference subjects its students to harassment." *Id.* (brackets and citation omitted).

Thus, there can be no liability for indirect-discrimination unless the recipient's response causes at least one instance of sexual harassment. *E.g.*, *Kollaritsch*, 944 F.3d at 618 (holding that indirect-discrimination plaintiff must prove "that the school had actual knowledge of actionable sexual harassment and that the school's deliberate indifference to it resulted in further actionable sexual harassment against the student-victim, which

caused the Title IX injuries"); *K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1058 (8th Cir. 2017); *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 740 (9th Cir. 2000); *Blue v. Dist. of Columbia*, 850 F. Supp. 2d 16, 35 (D.D.C. 2012). *But see Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1295–97 (11th Cir. 2007).

Several reasons support this rule. Most intuitively, "[t]o be 'subjected' to a harm, as a matter of ordinary English, requires that you experience that harm."[2] *Kollaritsch*, 944 F.3d at 628–29 (quoting 20 U.S.C. § 1681(a)) (Thapar, J., concurring) To hold otherwise would allow violations of Title IX's command that "[n]o person in the United States shall, on the basis of sex . . . be subjected to discrimination," 20 U.S.C. § 1681(a), without someone ever actually experiencing discrimination. Not only does this reading make hash of the statute, it also frustrates the *Davis* Court's attempts to carefully circumscribe the "certain limited circumstances" in which funding recipients will incur indirect-discrimination liability. *Davis*, 526 U.S. at 643, 652 (warning against

---

[2] A seasonal example from the scholarly literature illustrates the point: "[O]ne would not conclude that they been 'subjected' to the cold of a snow storm at the point when it was possible that they were going to have to go outside to perform a task. They could only make such a claim if they already had gone outside and had actually experienced the cold from the storm." Zachary Cormier, *Is Vulnerability Enough? Analyzing the Jurisdictional Divide on the Requirement for Post-Notice Harassment in Title IX Litigation*, 29 Yale J.L. & Feminism 1, 24 (2017).

"characterization of our opinion" that would "impose more sweeping liability than we read Title IX to require").

This reading, furthermore, is consistent with the proof required for deliberate-indifference claims in analogous contexts. *See e.g.*, *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 614 (7th Cir. 2022). For example, a deliberate-indifference claim under the Eighth Amendment requires the plaintiff to prove that deliberate indifference caused the relevant harm. *Id.*

The circuit split on this issue has been the result of some courts misreading a line in *Davis* that says a recipient's "deliberate indifference must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it." *Davis*, 526 U.S. at 645 (brackets and citation omitted). But this merely describes alternative paths leading to further sexual harassment, "an effort to ensure that a student who experiences post-notice harassment may obtain damages regardless of whether the harassment resulted from the institution *placing* the student in a position to experience that harassment or *leaving* the student vulnerable to it." Zachary Cormier, *Is Vulnerability Enough? Analyzing the Jurisdictional Divide on the Requirement for Post-Notice Harassment in Title IX Litigation*, 29 Yale J.L. & Feminism 1, 24 (2017).

Incidentally, the disagreement among various courts of appeals shows that Congress did not—as it must with a Spending Clause statute—"unambiguously" condition Title IX funding on a recipient's failure to limit

58

increased vulnerability to sexual harassment without ever subjecting a student to the harassment. *Pennhurst*, 451 U.S. at 17.

Here, as has been established above, Plaintiff did not experience further sexual harassment after the University was notified of the allegations related to the night in April 2018. Therefore, Plaintiff cannot demonstrate that the University's subsequent response resulted in an instance of sexual harassment, adding yet another reason her claim should end on summary judgment.

## VI. Plaintiff has waived appellate review of her direct-discrimination claim.

In addition to the indirect-discrimination claim discussed above, Plaintiff litigated a direct-discrimination claim at summary judgment. *Bd. of Regents*, 2022 WL 2817839, at *7–9.

"A direct Title IX discrimination claim requires a plaintiff allege (1) the educational institution received federal funding, (2) plaintiff was excluded from participation in or denied the benefits of an educational program, and (3) the educational institution in question discriminated against plaintiff based on gender." *Jauquet*, 996 F.3d at 810 (brackets and citation omitted).

The district court granted the University summary judgment for want of evidence on the second and third of these elements. *Bd. of Regents*, 2022 WL 2817839, at *7–9. Plaintiff has made no argument to this Court that the

decision below should be reversed. (Appellant's Br. 23–24.) She has thus waived appellate review of this claim. *Owens v. Godinez*, 860 F.3d 434, 437 (7th Cir. 2017).

## CONCLUSION

This Court should affirm the judgment below based on any of the five independently sufficient reasons discussed above.

Dated this 23rd day of December 2022.

Respectfully submitted,

JOSHUA L. KAUL
Attorney General of Wisconsin

Electronically signed by:

s/ Jon Whitney*
JON WHITNEY
Assistant Attorney General
State Bar No. 1128444

Attorneys for Defendant-Appellee

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-1001
(608) 294-2907 (Fax)
whitneyjj@doj.state.wi.us

*Counsel of Record*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), typeface requirements of Fed. R. App. P. 32(a)(5), and type style requirements of Fed. R. App. P. 32(a)(6).

 This brief contains 13,682 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 13 point Century Schoolbook.

Dated this 23rd day of December 2022.

<div align="right">

s/ Jon Whitney
JON WHITNEY
Assistant Attorney General

</div>

## CERTIFICATE OF SERVICE

I certify that on December 23, 2022, I electronically filed the foregoing Brief of Defendant-Appellee with the clerk of court using the CM/ECF system, which will accomplish electronic notice and service for all participants who are registered CM/ECF users.

Dated this 23rd day of December 2022.

<div align="right">

s/ Jon Whitney
JON WHITNEY
Assistant Attorney General

</div>