In the

# United States Court of Appeals

## For the Seventh Circuit

―――――――――――

No. 22-2454

ISABELLE ARANA,

*Plaintiff-Appellant,*

*v.*

BOARD OF REGENTS OF THE UNIVERSITY OF WISCONSIN SYSTEM,

*Defendant-Appellee.*

―――――――――――

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:20-cv-00856 — **William M. Conley**, *Judge.*

―――――――――――

ARGUED FEBRUARY 4, 2026 — DECIDED JULY 20, 2026

―――――――――――

Before BRENNAN, *Chief Judge*, and EASTERBROOK, ROVNER, SCUDDER, ST. EVE, KIRSCH, JACKSON-AKIWUMI, LEE, PRYOR, KOLAR, MALDONADO, and TAIBLESON, *Circuit Judges*.

KIRSCH, *Circuit Judge*. Isabelle Arana was a freshman at the University of Wisconsin, Madison when she told police and the University that she had been sexually assaulted by another student—Quintez Cephus. The University provided academic accommodations, separated Arana from her alleged rapist with a no-contact order, and expelled him from cam-

pus. After a jury quickly acquitted Cephus of related criminal charges, the University chose to readmit him, citing new evidence. Arana sued the school under Title IX of the Education Amendments of 1972, and contends that the University acted unreasonably when it readmitted Cephus and refused to provide her with additional safety measures beyond a no-contact order.

The bar for Title IX liability is high. Arana can succeed on this claim only if the University was deliberately indifferent to known acts of sexual harassment. *Davis Next Friend La-Shonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 646–47 (1999). Schools are entitled to flexibility in their approach to student-on-student harassment, a disciplinary process need not be perfect, and a victim of harassment is not entitled to every safety measure she requests. In response to Arana's allegations, the University separated Arana from Cephus, provided support, investigated, and imposed disciplinary penalties. And given the absence of specific threats to Arana, the choice to rely on an apparently effective no-contact order after Cephus was readmitted rather than impose additional measures was not clearly unreasonable. No jury could conclude that the University acted with deliberate indifference.

A panel of this court reached the opposite conclusion. See *Arana v. Bd. of Regents of Univ. of Wis. Sys.*, 142 F.4th 992 (7th Cir. 2025). We vacated that holding and decided to rehear Arana's case en banc to again examine and apply the standards for liability related to student-on-student harassment. There remain questions about the contours of Title IX liability that have divided our sister circuits. We need not answer them to decide this case, and in any event, it is the Supreme Court that will ultimately define the limits of Title IX. This

much is settled: a school that reasonably responds to student-on-student harassment with measures aimed at ending the misconduct and limiting further harassment does not act with deliberate indifference. The University of Wisconsin did that here, and so we affirm the district court's judgment.

## I

### A

Because this is an appeal from summary judgment, we construe the facts in the light most favorable to Arana and draw all reasonable inferences in her favor. *Flynn v. Consol. City of Indianapolis and Marion Cnty.*, 148 F.4th 565, 567 (7th Cir. 2025). This does not compel us to take every conceivable inference Arana proposes, nor must we accept the objective truth of this account. *Waukegan Potawatomi Casino, LLC v. City of Waukegan*, 128 F.4th 871, 873 (7th Cir. 2025).

Isabelle Arana told police that on the night of April 21, 2018, after drinking, she and another woman went to the off-campus apartment of another student—Quintez Cephus. As Arana drifted in and out of consciousness, Cephus sexually assaulted both women. A second student—Danny Davis III—was also present in the apartment and took revealing pictures of the two women.

Within days, Arana's father told the University about the assault. An administrator spoke with Arana, contacted her professors, and arranged for academic accommodations. The University's Title IX Coordinator offered to speak about support services and the possibility of an investigation. And the football team suspended Cephus (a star wide receiver) because he was the subject of a criminal investigation. Arana asked for a no-contact order, which the University promptly

issued. The University indefinitely barred Cephus and Davis from contacting Arana, and violations were punishable under the school's disciplinary procedures. The Title IX Coordinator also took steps to ensure that Arana didn't see either Cephus or Davis, identifying that she was scheduled to share a class with Davis and initiating a change such that the two did not overlap.

After the second woman gave the school a written statement, Arana agreed to participate in a Title IX investigation. The Title IX Coordinator charged Cephus and Davis with sexual harassment and capturing an intimate representation without consent, charged Cephus with sexual assault, and opened a formal disciplinary proceeding. The investigation lasted more than four months. The school interviewed witnesses, collected evidence, and gave Arana, the second woman, Cephus, and Davis (along with their chosen representatives) the opportunity to participate.

The Title IX Coordinator issued a final report in October. An Assistant Dean—assigned as the decisionmaker in the case—applied the University's preponderance of the evidence standard to the charges against Cephus and Davis. He found that Davis had not committed any offense, but decided that Cephus had committed (1) (against Arana) second degree sexual assault as defined by Wis. Stat. § 940.225(2)(cm) ("sexual contact with a person who is … incapable of giving consent if the defendant has actual knowledge that the person is incapable of giving consent and the defendant has the purpose to have sexual contact or sexual intercourse with the person"); (2) (against both women) third degree sexual assault as defined by Wis. Stat. § 940.225(3)(a) ("sexual intercourse with a person without the consent of that person"); and (3) (against

both women) sexual harassment as defined by the University's policy. The Assistant Dean recommended that the University expel Cephus.

As the final step in the University's disciplinary process, a committee held a hearing and Arana, the second woman, Cephus, and their lawyers attended. Before the hearing, Cephus walked towards Arana in (what Arana's attorney took to be) an attempt to intimidate her. The attorney stepped in front of Cephus to stop him from touching her client. Arana's attorney reported the incident to the University as a violation of the no-contact order, and an administrator promptly told Cephus that if he saw Arana he needed to walk in the opposite direction.

After the hearing, the committee found that Cephus had committed (against both Arana and the second woman) third degree sexual assault and harassment but was not responsible for second degree sexual assault against Arana. It voted to expel Cephus, and both the University's Chancellor, Rebecca Blank, and its Board of Regents rejected his appeals. The University expelled Cephus on March 13, 2019.

B

While the University's disciplinary process was playing out, Cephus was also facing criminal charges. The case went to trial in a Wisconsin state court. After just more than a half hour of deliberations, the jury—applying the beyond a reasonable doubt standard of proof—acquitted Cephus of second and third degree sexual assault (Wis. Stat. §§ 940.225(2)(cm), 940.225(3)(a)), two of the same charges that the University had earlier considered under a lesser standard of proof.

Four days later, on August 6, 2019, Cephus asked the University to readmit him. In a 242-page petition filed with Blank, Cephus's attorney wrote that new evidence had been introduced at the trial and urged a swift decision so that Cephus could return to the football field. The petition pointed to surveillance videos and additional testimony about the women's sobriety. While the petition included some evidence (including about 70 video clips), the trial transcript itself was not attached due to "[t]he press of time." The University's semester was to begin shortly, and the first football game of the season was scheduled for the end of August.

State law made Chancellor Blank responsible for deciding whether to readmit Cephus. See Wis. Admin. Code UWS § 17.18 (2016). After Cephus filed his petition, Blank received numerous emails from university stakeholders—alumni, donors, employees, students, and others—asking her to either grant or deny the petition. The University monitored fan support for Cephus, the football team wrote a letter, and Cephus and his lawyers held a press conference. Blank believed the press conference was an attempt to pressure the University. A group of major donors urged Blank to swiftly readmit Cephus. She spoke with one of them and told him what she told everyone else: that she would look at the evidence and make a decision.

At Blank's direction, University attorneys reviewed Cephus's petition and the accompanying evidence. The University's lawyers also reviewed other records from the trial as well—police reports and witness lists—but couldn't access some evidence, including the trial transcript. While one of the University's attorneys (in an email to Cephus's lawyers) characterized the trial transcripts as "an essential element in the

[C]hancellor's review," a court reporter said that it would take at least two months to prepare a full transcript. Blank thought that was too long. Because the fall semester was going to start soon, the trial had attracted significant publicity, and Title IX issues required a timely response, she believed that she needed to quickly decide whether to readmit Cephus.

The University's Title IX Coordinator encouraged Blank to give Arana and the second woman a chance to respond to the petition. Blank did not follow that advice, believing that the Wisconsin regulation governing readmission petitions didn't require her to consult with complainants. See Wis. Admin. Code UWS § 17.18 (2016) (requiring that a complainant be notified of any change to a disciplinary outcome, but not that they be given the opportunity to respond); Wis. Admin. Code UWS § 17.18 (2021) (subsequently amending the Code to require that complainants still enrolled at the time of a petition "shall be provided the opportunity to respond to the petition prior to the readmission decision"). Blank also believed that Arana and her attorney would not have been able to point to additional evidence beyond what Cephus had already submitted.

Blank decided to readmit Cephus to the University eight days after he filed his petition, and she announced her decision five days later, on August 19. Blank vacated the University's prior finding that Cephus was responsible for third degree sexual assault. See Wis. Stat. § 940.225(3)(a) ("sexual intercourse with a person without the consent of that person"). In a written decision, Blank noted that because of the differences in standards of proof, Cephus's criminal acquittal was not, standing on its own, a basis to vacate the University's findings. But she wrote that newly supplied information af-

fected the prior findings: varying witness descriptions of Arana's and the second woman's levels of intoxication, surveillance footage that appeared to show Arana and the second woman without outward signs of incapacitation, divergent accounts of what happened in Cephus's apartment, testimony from individuals who did not participate in the Title IX investigation, and additional detail provided by witnesses who had participated. Blank concluded that the "ambiguity created by these conflicting accounts is, practically speaking, incapable of resolution," such that the evidence fell short of the preponderance of the evidence standard.

Blank upheld the University's finding that Cephus was responsible for sexual harassment. She noted that Cephus admitted to police that he and Davis had photographed the women without their consent, such that he had created a hostile environment. Blank also reviewed Cephus's disciplinary history at the University, noting that he had been previously cited for five instances of academic and non-academic misconduct, including "harassment/disruption" in 2016. Ultimately, Blank converted Cephus's expulsion to a suspension (running from the time of his expulsion to the date of his readmission) and left the no-contact order in place.

On the same day the petition was granted, the University notified Arana of its decision to readmit Cephus. A few weeks later, Arana and her attorneys met with the University's Director of Threat Intervention Services and an Assistant Dean. Arana was terrified about Cephus being on campus and wanted the University to develop a safety plan. While Arana and her attorneys conveyed her concerns about encountering Cephus, University officials determined that they did not identify any specific threats to her safety or contend that Ce-

phus or Davis had violated the no-contact orders. Based on the absence of an actionable threat, the University did not implement additional safety measures. The Director told Arana that she should avoid Cephus if she saw him, and that if she felt unsafe she should call 911.

After Cephus was readmitted, he never tried to contact Arana, and she never saw him again. Cephus dropped out after the fall semester and entered the 2020 NFL draft. Arana continued to attend the University, but (while he remained on campus) Cephus's presence was stressful to her: Arana avoided the library, student union, and public events, and withdrew from a class. She worked harder, socialized less, took fewer and easier classes, and had to remain at the University an extra semester (she had intended to graduate in three years) to complete her degree. Arana eventually graduated and attended law school.

## C

Arana sued the University of Wisconsin in federal court, alleging (as relevant here) that the University violated her rights under Title IX. Both parties moved for summary judgment. The district court granted the University's motion and denied Arana's. On appeal, a divided panel of this Court reversed the district court. We granted the University's petition for rehearing en banc and vacated the panel opinion.

## II

We apply de novo review to a district court's ruling on cross-motions for summary judgment. *Kemp v. Liebel*, 877 F.3d 346, 350 (7th Cir. 2017). Summary judgment is appropriate when there are no genuine issues of material fact and the mo-

vant is entitled to judgment as a matter of law. *Id.*; Fed. R. Civ. P. 56(a).

Title IX bars schools receiving federal funding from discriminating based on sex. As Congress put it, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). Both federal agencies and the victims of discrimination can enforce Title IX. See 20 U.S.C. § 1682; *Cannon v. Univ. of Chi.*, 441 U.S. 677, 689 (1979).

A school discriminates based on sex when it is deliberately indifferent to known acts of sexual harassment between students. *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 646–47 (1999). This sort of misconduct is discriminatory because it wouldn't have happened but for the victim's sex. See *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281 (1998); *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (applying Title VII); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005) ("'Discrimination' is a term that covers a wide range of intentional unequal treatment; by using such a broad term, Congress gave [Title IX] a broad reach."). And a school that is deliberately indifferent causes the discrimination insofar as it makes "an official decision … not to remedy the violation." *Gebser*, 524 U.S. at 290; see *Davis*, 526 U.S. at 645.

*Davis* authorized the victims of student-on-student harassment to sue when that conduct amounts to school-sanctioned discrimination. 526 U.S. at 633. But the Court set a "high standard" such that liability arises only "in certain limited circumstances." *Id.* at 643. Specifically, as relevant to this case,

No. 22-2454                                                         11

*Davis* imposed at least two requirements. A school can be held liable for student-on-student harassment only when (1) it has "actual knowledge" of sexual harassment "that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school," and (2) the school is deliberately indifferent, meaning that its response to the harassment is clearly unreasonable under the known circumstances. *Id.* at 648, 650. *Davis* may have established other limits. But because additional requirements are not necessary to decide this case, we discuss them only at the end of the opinion.

A

We begin and end our analysis with *Davis*'s second requirement—deliberate indifference. This area of our law is settled. Because Title IX imposes liability on schools by way of their acceptance of federal funding (the arrangement is like a contract), only intentional violations can be the basis for damages. See *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 74–75 (1992) (citing *Pennhurst St. Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 25, 27 (1981)) (holding that liability is not permitted for an unintentional violation because a school receiving federal funds lacks notice that it will be responsible in that scenario). And while there are many standards of intent in the law, deliberate indifference is the high bar the Court imposed for Title IX liability. *Gebser*, 524 U.S. at 290–91; *Davis*, 526 U.S. at 646–47.

Deliberate indifference is more than negligence and approaches intentional wrongdoing. See *Davis*, 526 U.S. at 642; *Gebser*, 524 U.S. at 291 (observing that "[c]omparable considerations led to" the adoption of the deliberate indifference standard in both the Title IX and 42 U.S.C. § 1983 contexts);

*Stockton v. Milwaukee County*, 44 F.4th 605, 615 (7th Cir. 2022) (applying § 1983 and the Eighth Amendment). Once school officials have actual notice of actionable harassment, they have a duty to act—they must respond with measures aimed at ending the harassment of which they have knowledge and aimed at limiting further misconduct. *C.S. v. Madison Metro. Sch. Dist.*, 34 F.4th 536, 542 (7th Cir. 2022) (en banc). A school must do something, then, but a response is deliberately indifferent only if it is "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648–49. The standard is intentionally high "to eliminate any risk" that a school will be held liable for the acts of others. *Id.* at 643 (citation modified). And, in appropriate cases, courts can decide as a matter of law whether a school's response satisfies that standard. *Id.* at 649.

Our precedent shows how this works in practice. On the one hand, a school that learns of student-on-student harassment and does nothing probably acts with deliberate indifference. See *Johnson v. Ne. Sch. Corp.*, 972 F.3d 905, 912 (7th Cir. 2020) (quoting *Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1122 (10th Cir. 2008)). A school that takes prompt action, on the other hand—by disciplining a harasser and moving to prevent future harassment—has not responded in a clearly unreasonable way. See *Gabrielle M. v. Park Forest-Chicago Heights, IL., Sch. Dist. 163*, 315 F.3d 817, 824 (7th Cir. 2003) (holding that a school wasn't deliberately indifferent when, "[a]fter each reported or observed instance involving [the harasser] and other students, [the harasser] was disciplined and steps were taken to prevent future inappropriate conduct"); *Doe v. Galster*, 768 F.3d 611, 619–20 (7th Cir. 2014) (finding no deliberate indifference when, "after every reported or observed incident of bullying involving Doe, school officials promptly intervened"); *Jauquet v. Green Bay*

*Area Cath. Educ., Inc.*, 996 F.3d 802, 808–09 (7th Cir. 2021) (holding that a school wasn't deliberately indifferent when it "responded promptly to Plaintiffs' bullying complaints," "suspended the primary perpetrator … for several days," and met with a victim several times to allow the victim to "voice her concerns"). Not every response (prompt or otherwise) will satisfy Title IX. The question that matters is whether, in light of the known circumstances, a school's response to student-on-student harassment is clearly unreasonable. *Davis*, 526 U.S. at 648–49.

In choosing how to discipline students for harassment, schools are entitled to "flexibility." *Davis*, 526 U.S. at 648. For instance, while the victims of harassment often want schools to take remedial steps (expulsion, safety plan, no-contact order), no specific action is required for a response to be reasonable. *Id.*; *Jauquet*, 996 F.3d at 809. Similarly, schools don't have to remedy harassment, and so even an ineffective response doesn't necessarily constitute deliberate indifference. *Davis*, 526 U.S. at 648; *C.S.*, 34 F.4th at 547–48. A flawed or imperfect investigation or disciplinary process is a matter of negligence, not deliberate indifference. See *C.S.*, 34 F.4th at 547–48 (holding that a school wasn't deliberately indifferent when it issued ineffective warnings and didn't investigate additional signs of possible harassment); *Galster*, 768 F.3d at 619–21 (holding that a failure to inform a victim by a certain date that harassers would be expelled was not clearly unreasonable, and noting that a school must "balance the interests of all concerned," including harassers); *Johnson*, 972 F.3d at 912 (failing to gather additional evidence was negligence). Because "judges make poor vice principals," our task isn't to "second guess a school's disciplinary decisions—even a school's decision not to impose any disciplinary measures—so long as those deci-

sions are not clearly unreasonable." *Johnson*, 972 F.3d at 912 (citation modified).

B

The facts that matter in this case are straightforward. After Arana told the University that she had been assaulted, the school separated her from Cephus and Davis with a no-contact order, enforced the order, provided academic accommodations, investigated, and imposed discipline. Cephus was acquitted of related criminal charges, and the University readmitted him while keeping the no-contact order in place. After Cephus returned to campus, Arana never saw him again.

In cases like this one—where school officials reasonably believe a no-contact order has effectively separated an alleged harasser from the victim—we have held that schools are not deliberately indifferent. See *Johnson*, 972 F.3d at 912; *C.S.*, 34 F.4th at 545–48. In *Johnson*, for instance, we found that a school had not been deliberately indifferent when it promptly responded to claims of harassment, investigated, and issued a no-contact order after which no further harassment took place. See 972 F.3d at 912–15. Similarly, in *C.S.*, a middle school principal who warned an employee to limit contact with a student was not deliberately indifferent because she "reasonably believed she had succeeded in minimizing his physical contact" and "received no further reports raising new concerns." 34 F.4th at 547.

Arana contends that *C.S.* and *Johnson* are distinguishable because this case (unlike those) involves a serious assault and a conclusive University finding that Cephus had sexually assaulted Arana. But there is no rule that a school cannot reasonably believe it has responded appropriately to a serious

assault with a no-contact order, or that additional measures are required once a school finds a harasser culpable. Our prior rulings control because, considering the school's overall response, the University took prompt action after a report of assault, investigated, and reasonably believed it had separated the alleged harasser from the victim. See *Davis*, 526 U.S. at 648 (the inquiry is whether the school's response is clearly unreasonable in light of the known circumstances); *Johnson*, 972 F.3d at 913 (assessing the deliberate indifference of a school corporation's overall response); *Jauquet v. Green Bay Area Cath. Educ., Inc.*, 996 F.3d 802, 807–09 (7th Cir. 2021) (same). In other words, the University responded with measures aimed at ending the harassment of which it had knowledge and at limiting further harassment, which is what *Davis* requires. See *C.S.*, 34 F.4th at 542. While Arana offers two arguments to the contrary which we consider below, neither shows that the University made an official decision to permit sex discrimination.

1

Arana argues that the University's decision to readmit Cephus means that it was deliberately indifferent. Although Chancellor Blank wrote that she chose to readmit Cephus based on new evidence, Arana contends that the University is lying, and that the school decided to let Cephus back on campus in a bad faith rush job to win football games and respond to public pressure. She argues that "prioritizing those institutional interests over [her] education was clearly unreasonable," and also takes issue with the University's decision-making process. Arana points out that the University's readmission decision was made swiftly (in just eight days), the start of the football season was weeks away, there was public pres-

sure in favor of readmission, and the University didn't give her a chance to weigh in. Finally, Arana argues that the new evidence Cephus cited didn't undermine the University's prior findings.

On this record, we can assume without deciding that football and public pressure played some role in the University's decision to readmit Cephus. But that doesn't mean that the University was deliberately indifferent to sexual harassment. Even if the school chose to readmit Cephus in part to improve relations with donors and the public and win football games, no jury could conclude that its overall response to the alleged harassment (as discussed above) was clearly unreasonable.

Put differently, that the University may have lied about why it chose to readmit Cephus is neither sufficient nor necessary to show deliberate indifference in this case. Were we considering a direct discrimination claim (involving allegations that the school itself discriminated against Arana based on her sex), a showing of pretext would be important. See *Jauquet*, 996 F.3d at 807 (discussing the distinction between direct and indirect claims); *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 308–09 (2025) (discussing the three-step burden-shifting framework for discrimination claims established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)); *Doe v. Univ. of Denver*, 1 F.4th 822, 828–32 (10th Cir. 2021) (applying the framework to a Title IX direct discrimination claim). In fact, pretext is often central to such claims—a plaintiff who shows that a decisionmaker's stated reasons are inaccurate and that the real reason is prohibited by law succeeds in proving discrimination. See, e.g., *McKinney v. Off. of Sheriff of Whitley Cnty.*, 866 F.3d 803, 814 (7th Cir. 2017) (applying Title VII).

But because Arana brings only an indirect discrimination claim (the school was deliberately indifferent to student-on-student harassment), the cases she cites involving pretext in the direct discrimination context aren't on point, and showing that the University was lying about why it readmitted Cephus isn't significant. The typical burden-shifting framework and pretext analysis associated with direct discrimination cases are wholly inapplicable to a Title IX indirect discrimination claim. See *Ames*, 605 U.S. at 319–20 (Thomas, J., concurring) (the framework is a judge-made evidentiary tool used at summary judgment to organize evidence in direct discrimination cases, which usually center on a single decision and turn on proof of impermissible motives). Rather, if a school lies about why it imposes or declines to impose student discipline, the real reason for the decision is merely one fact to consider as a court weighs the response to harassment. See *Wamer v. Univ. of Toledo*, 27 F.4th 461, 472 (6th Cir. 2022); *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 271–73 (4th Cir. 2021).

In this case, we can assume that a jury could find that football and stakeholder relationships were improper factors for the University to rely on in reaching its decision. Yet it's not reasonable to infer that these were the only factors that motivated the decision—the record also shows that the school readmitted Cephus because new evidence undermined the prior disciplinary findings. Setting aside the University's motivations for the decision, insofar as Arana is arguing that the school's decision-making process shows that its response was clearly unreasonable, she cannot identify a genuine dispute as to a material fact on this basis. Title IX did not require the University to take more time to decide to readmit Cephus, and so the fact that it reached a decision in eight days doesn't matter. See, e.g., *Galster*, 768 F.3d at 620–21 (considering a school in-

vestigation that took only 12 days). Similarly, the University's choice to follow state law to the letter by excluding Arana from the process and its refusal to wait for trial transcripts from Cephus's criminal case (which would have taken months) do not prove that the school's response was clearly unreasonable. See *id.* at 621 (a school district that didn't keep a victim's family updated about a disciplinary process wasn't deliberately indifferent, given competing considerations); *Johnson*, 972 F.3d at 912 (failing to gather additional evidence was negligence, not deliberate indifference).

Finally, Arana challenges the University's assessment of the facts (she argues that the new evidence the school considered didn't undermine the school's prior conclusions). Similarly, the dissent objects that Blank never explained what evidence undermined the University's finding that Cephus committed third-degree sexual assault. Post, at 40–42. These arguments misunderstand our review under *Davis*. Blank and her staff studied the post-trial evidence, concluded that new testimony and surveillance videos created ambiguity such that the preponderance standard was no longer met, and carefully documented Blank's decision. These steps were not clearly unreasonable, and even if Blank failed to correctly consider the evidence, that would be a matter of negligence, not deliberate indifference. See *Davis*, 526 U.S. at 648–49 (rejecting a mere reasonableness standard and noting that schools have flexibility in choosing how to respond to actionable harassment); *C.S.*, 34 F.4th at 547–48; *Johnson*, 972 F.3d at 912.

After a state court acquitted him and with weeks to go before the semester started, Cephus asked the school for readmission. The University needed to "balance the interests of all concerned," *Galster*, 768 F.3d at 621, and the school wasn't re-

quired to be perfect in its response, see *C.S.*, 34 F.4th at 543; *Johnson*, 972 F.3d at 912 (noting that a school could have done more to investigate but holding that its overall response was not deliberate indifference); see also *Metzler v. Loyola Univ. Chi.*, 164 F.4th 612, 621 (7th Cir. 2026) ("Federal courts do not micromanage disciplinary hearings for universities."). Given the University's overall response to the harassment, which included maintaining an apparently effective no-contact order after Cephus returned to campus, no jury could conclude based on the decision to readmit Cephus that the University was deliberately indifferent.

2

Arana's second argument is that the University made an official decision to permit discrimination because it failed to institute additional safety measures after Cephus returned to campus. Arana and her attorneys met with University officials to convey Arana's concerns, and to request a safety plan. University officials decided that there were no specific threats to Arana's safety and declined to implement additional measures, telling Arana to call 911 if she felt unsafe. The University maintained the no-contact order, Cephus never attempted to contact Arana, and she never saw him again.

Arana argues that the University's decision not to take further steps beyond the no-contact order was clearly unreasonable. She contends that the University was disinclined to enforce its order because the school refused to issue additional safety measures and told her to take proactive steps if she felt unsafe. But Arana was not entitled to make "particular remedial demands" about how the University would protect her and punish Cephus. *Davis*, 526 U.S. at 648; see *Gabrielle M.*, 315 F.3d at 825 (Title IX does not require a school to suspend

or expel every student accused of misconduct.). And it would be unreasonable to infer based on the fact that the University wouldn't implement further measures that it wouldn't enforce the no-contact order that it already had in place. The University's decision not to issue additional security measures meant only that the school wasn't willing to go beyond an apparently effective no-contact order absent a showing of a specific threat.

The fact that Cephus violated the no-contact order a single time (we can assume, without deciding, that his encounter with Arana at the disciplinary hearing was a violation of the order), and otherwise never encountered Arana again, distinguishes this case from those where schools needed to escalate their response in light of additional harassment. See, e.g., *Doe v. Sch. Dist. No. 1*, 970 F.3d 1300, 1314 (10th Cir. 2020); *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 262 (6th Cir. 2000). When Cephus crossed the line, the University warned him not to do so again, which is evidence that the school intended to enforce its order. Arana subjectively believed that the school wasn't serious about her safety and Cephus had previously broken school rules. But there's no evidence that the school would have allowed Cephus to approach Arana again without consequence. See *Flowers v. Kia Motors Fin.*, 105 F.4th 939, 946 (7th Cir. 2024) ("Speculation cannot create a genuine issue of fact that defeats summary judgment.").

Considering the University's response as a whole, no jury could find that what the school did here was clearly unreasonable. Beyond a single violation of the order—which resulted in a prompt warning—the University never learned of further interactions between Arana and Cephus. The school had no obligation to take further action. The University's ac-

ademic accommodations and support, investigation, and disciplinary proceedings were prompt, thorough, and reasonable responses to a report of assault. The University quickly issued a no-contact order after Arana requested one, and the single time that it learned that Cephus violated the order, it immediately warned him not to do so again. The University was not deliberately indifferent, which means it cannot be held liable under Title IX.

## III

In affirming the district court's grant of summary judgment based only on the absence of deliberate indifference, our decision leaves for another day a series of questions about the limits on Title IX liability. While we agree that *Davis* imposed the two broad restrictions discussed above—actual knowledge of actionable harassment and deliberate indifference—that case and the language of Title IX itself may have cabined school liability for student-on-student harassment in other ways, too.

First, Title IX only prohibits sex discrimination that occurs "under" "the operations of" a school receiving federal funds. 20 U.S.C. §§ 1681(a) & 1687. Therefore, according to *Davis*, schools can be held liable "only where the funding recipient acts with deliberate indifference to known acts of harassment in its *programs or activities*." 526 U.S. at 633 (emphasis added). The Court explained that the harassment "must take place in a context subject to the school district's control," meaning that the school "exercises substantial control over both the harasser and the context in which the known harassment occurs." *Id.* at 645. We have yet to decide what this requirement means. See, e.g., *Doe v. Trs. of Ind. Univ.*, 101 F.4th 485, 489 (7th Cir. 2024) ("There is some doubt how, if at all, Title IX applies

to student-against-student misconduct that appears to be unrelated to a university or its facilities."). Several of our sister circuits, however, have applied this requirement, and decided whether a school exercises sufficient control over the circumstances such that misconduct is actionable under Title IX. See *Brown v. Arizona*, 82 F.4th 863, 878–79 (9th Cir. 2023) (concluding that reasonable factfinder could decide that a university had sufficient control over an off-campus house where a football player sexually assaulted another student); *Roe v. St. Louis Univ.*, 746 F.3d 874, 884 (8th Cir. 2014) (holding that "a University must have had control over the situation in which the harassment or rape occurs," and finding no evidence of control over "student conduct at [an] off campus party"); *Ostrander v. Duggan*, 341 F.3d 745, 750–51 (8th Cir. 2003) (observing that the university "did not own, possess, or control" an on-campus premises where an alleged assault occurred); *Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 366 (6th Cir. 2012) ("When conduct occurs … off school grounds entirely, the school district has control over neither the harasser, nor the context."); *Roe v. Marshall Univ. Bd. of Governors*, 145 F.4th 561, 568 (4th Cir. 2025) (finding that a university lacked control over the context of an off-campus residence such that an assault wasn't actionable).

Second, we have yet to decide whether a single instance of peer harassment, standing on its own, is actionable. The *Davis* Court wrote that "in theory, a single instance of sufficiently severe one-on-one peer harassment could be said to" have "the systemic effect of denying the victim equal access to an educational program or activity." 526 U.S. at 652–53. But the Court noted that it was "unlikely that Congress would have thought such behavior sufficient to rise to this level in light of the inevitability of student misconduct and the amount of lit-

igation that would be invited by entertaining [such] claims[.]" *Id.* The Court reasoned that "[b]y limiting private damages actions to cases having a *systemic effect* on educational programs or activities, we reconcile the general principle that Title IX prohibits official indifference to known peer sexual harassment with the practical realities of responding to student behavior[.]" *Id.* at 653 (emphasis added); see also *id.* at 677 (Kennedy, J., dissenting) (observing that the majority's systemic effect requirement "exclude[s] the possibility that a single act of harassment perpetrated by one student on one other student can form the basis for an actionable claim"). Whether a victim may sue under Title IX based on a single instance of student-on-student harassment has divided the courts of appeals. See *Kollaritsch v. Mich. State Univ. Bd. of Trs.*, 944 F.3d 613, 620–21 (6th Cir. 2019) (single instance of peer harassment is not actionable); *K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1059 (8th Cir. 2017) (same); *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1297–98 (11th Cir. 2007) (same); *Hill v. Cundiff*, 797 F.3d 948, 972 (11th Cir. 2015) (same); *Fairfax Cnty. Sch. Bd.*, 1 F.4th at 274 (finding a single instance actionable); *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 172–73 (1st Cir. 2007) (same), rev'd on other grounds, 555 U.S. 246 (2009).

Third, and finally, beyond the requirements for actionable harassment and deliberate indifference, *Davis* also limits liability only to situations when schools "subject" their students to discrimination. 526 U.S. at 644–45; see also *id.* at 640–41 ("The [University] itself must … subject persons to discrimination under its programs or activities in order to be liable under Title IX.") (citation modified). Some courts have held that this requirement means that a school cannot be held liable for student-on-student sexual harassment unless, after the

school receives notice of harassment, some further harassment occurs. See *Kollaritsch*, 944 F.3d at 621; *Culver-Stockton Coll.*, 865 F.3d at 1058; *Doe v. Bd. of Trs. of the Nebraska St. Colls.*, 78 F.4th 419, 424 (8th Cir. 2023); see also *Kollaritsch*, 944 F.3d at 628–29 (Thapar, J., concurring) ("To be 'subjected' to a harm, as a matter of ordinary English, requires that you experience that harm."). Alternatively, however, other circuits have held that a school "subjects" a student to sexual harassment if it "makes them liable or vulnerable" to misconduct, *Davis*, 526 U.S. at 630, such that no post-notice harassment is required to show liability under Title IX. See *Fitzgerald*, 504 F.3d at 172–73; *Fairfax Cnty. Sch. Bd.*, 1 F.4th at 274; *Williams v. Bd. of Regents*, 477 F.3d 1282, 1295–97 (11th Cir. 2007); *Farmer v. Kansas St. Univ.*, 918 F.3d 1094, 1104 (10th Cir. 2019). Our court has yet to take a position on the meaning of this requirement.

Because the University of Wisconsin was not deliberately indifferent to Arana's reports of sexual assault, we do not have to decide these questions about the constraints on Title IX liability. We know this much: to hold the University responsible under this law, Arana needed to clear a high bar under *Davis*. We hold schools liable only for their own misconduct, when the response they choose is clearly unreasonable. The University supported Arana, promptly separated her from her alleged rapist, investigated the misconduct, and disciplined Cephus. Under the high standard of Title IX, no reasonable jury could find that the University of Wisconsin was deliberately indifferent.

AFFIRMED

BRENNAN, *Chief Judge*, concurring. I join the majority opinion in full. As described in its final section, though, several questions remain that have divided the circuits. I write separately so parties litigating and courts deciding these Title IX questions bear in mind the Spending Clause.

"[S]trictly speaking," the text of the Constitution has no "Spending Clause." *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 370 (2025). Rather, it arises from Article I, section eight, clause one, which confers the "Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." Thus, under the Spending Clause, "Congress may fix the terms on which it shall disburse federal money to the States." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). To receive federal funds, a state agrees to federally imposed conditions. *Saint Anthony Hosp. v. Whitehorn*, 132 F.4th 962, 969 (7th Cir. 2025) (en banc). That "cooperative federalism" is viewed as a contract, so courts draw on contract-law analogies when interpreting statutes under the Spending Clause. *Id*. at 966, 969.

For that reason, "recipients cannot knowingly accept the deal with the Federal Government unless they would clearly understand the obligations that would come along with doing so." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022) (citation modified). So provides the *Pennhurst* canon of statutory interpretation: damages claimed under a statute passed pursuant to the spending power are available only when a state "voluntarily and knowingly" accepted that it could be liable for the conduct in dispute. *Pennhurst*, 451 U.S. at 17 (citation modified); *Landor v. La. Dep't of Corr. and Pub. Safety*, 146 S. Ct. 1931, 1940-41 (2026) (holding that "con-

ditions attached to federal funds" in Spending Clause legislation "apply only to those who have knowingly and voluntarily agreed to them"). *Pennhurst*'s canon thus functions like a clear statement rule. "At common law, ambiguous contractual language is construed against its drafter," which here is Congress. *Landor*, 146 S. Ct. at 1941. Any ambiguity, then, cuts against holding the state liable. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287–88 (1998); *Saint Anthony*, 132 F.4th at 969.

Congress enacted Title IX of the Education Amendments of 1972 under its Spending Clause authority. *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), holds that a school is liable under Title IX if it was deliberately indifferent to known acts of sexual harassment. *Id*. at 646–47. After *Davis*, important questions of liability were left unanswered, like those in this case. *Pennhurst* and Spending Clause precedents should inform those answers.

*Pennhurst* cautions against creating new theories of liability that do not flow unambiguously from Title IX's text. Some examples are illustrative:

*Pre-notice*. When a school agreed to prevent "discrimination," "exclu[sion]," and "deni[al] [of] benefits" "on the basis of sex," 20 U.S.C. § 1681(a), it was likely not aware it would be liable for pre-notice incidents of student-on-student sexual harassment. *See Doe v. Fairfax Cnty. Sch. Bd.*, 10 F.4th 406, 415 (4th Cir. 2021) (Wilkinson, J., dissental). "How can the state 'discriminate' or 'exclude' anyone when it hasn't a clue?" *Id.* at 416 (citation modified).

*Single instance.* The circuits disagree on whether Title IX imposes liability on schools for a single instance of student-

on-student sexual harassment. *See Kollaritsch v. Mich. State Univ. Bd. of Trs.*, 944 F.3d 613, 628 (6th Cir. 2019) (Thapar, J., concurring). After a school learns of harassment, it is ambiguous whether that school "subjects" a student to discrimination by creating an environment where she is more vulnerable to harassment, or whether she must actually experience harassment. *Id.*; *see also* 20 U.S.C. § 1681(a). That the circuits disagree on the meaning of the text suggests the liability-creating contract term is ambiguous.

*Control.* Student-on-student harassment occurring off school grounds is another open theory of liability, as the majority opinion identifies. *See* Maj. Op. at 21; *see also Doe v. Trs. of Ind. Univ.*, 101 F.4th 485, 489 (7th Cir. 2024). Title IX's text does not unambiguously condition where discrimination must occur. Thus, ambiguity as to whether Title IX imposes liability for harassment off school grounds counsels that the less expansive reading of the statute should control.

Each of these theories of liability is subject to the *Pennhurst* canon, and statutory ambiguity should relieve a state from liability.

Consider the Spending Clause and Title IX in another setting. The statute does not require states to allow biological males to compete on girls' sports teams. *West Virginia v. B.P.J. by Jackson*, Nos. 24–43 and 24–38, 2026 WL 1868739, at *7–8 (U.S. June 30, 2026). "Nothing in Title IX clearly and unambiguously alerts funding recipients that they are prohibited from restricting a school-sponsored sports team to biological women or girls." *Id.* at *18 (Gorsuch, J., concurring).

If anything, Title IX unambiguously forbids biological males from competing in women's sports. When Congress en-

acted the statute in the early 1970s, "[t]he ordinary meaning of the term 'sex' … was biological sex and not gender identity." *Id.* at *8. Title IX and its regulations "plainly recognized the inherent physical differences between biological men and biological women," *id.*, a difference the states also knew when the statute was enacted. And Title IX anticipates and approves of single-sex sports teams in order to provide equal athletic opportunities and competitiveness between the sexes, particularly in contact sports. *Id.* at *7. "Without a gender–based classification in competitive contact sports, there would be a substantial risk that boys would dominate the girls' programs and deny them an equal opportunity to compete in interscholastic events." *O'Connor v. Bd. of Ed. of Sch. Dist. 23*, 449 U.S. 1301, 1307 (1980) (Stevens, J., in chambers). For these reasons, states knowingly accepted the contractual term that males and females should have separate sports teams. Title IX, then, imposes liability on states that allow biological males to compete against girls.

For all that—and as ably argued by Arana's counsel—the *Pennhurst* canon does not operate at too low a level of generality. It does not, for example, "establish a standard resembling qualified immunity" in the deliberate indifference inquiry. *See Soule v. Conn. Ass'n of Schs., Inc.*, 90 F.4th 34, 61 (2d Cir. 2023) (en banc) (Menashi, J. concurring). Say a court holds a school deliberately indifferent on one set of facts. Then on a somewhat different set of facts, a school cannot disclaim liability by pointing to ambiguity in Title IX and the *Pennhurst* canon. That granular analysis conflates *Pennhurst* with qualified immunity and its "clearly established" test. Recall, qualified immunity falls under the "general principles of tort immunities and defenses," not contract law. *Malley v. Briggs*, 475 U.S. 335, 339 (1986).

We are far afield from Title IX's text. The statute has no express cause of action, yet the Court has inferred one. *Cannon v. Univ. of Chi.*, 441 U.S. 677, 717 (1979).[†] Even though Title IX has no express remedies, the Court implied a monetary damages remedy for that implied right. *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 76 (1992). Then, *Davis* imposed liability for "limited circumstances" of student-on-student harassment, despite little supporting statutory text. *Davis*, 526 U.S. at 643; *id.* at 657 (Kennedy, J., dissenting) ("[T]he majority finds statutory clarity where there is none."). But all should remember Title IX's text and its Spending Clause roots before further expanding liability.

The *Pennhurst* canon protects federalism. Public education, after all, "ranks at the very apex of the function of a State." *Wisconsin v. Yoder*, 406 U.S. 205, 213 (1972). In future cases, parties should argue and courts should decide these important questions in keeping with the Spending Clause.

---

[†] Congress later acknowledged this right to sue in amendments to Title IX. *Cummings*, 596 U.S. at 218.

EASTERBROOK, *Circuit Judge*, concurring. I join the majority opinion, which establishes that the record does not demonstrate deliberate indifference by the University of Wisconsin to Arana's interests. Instead it shows an effort to accommodate the potentially incompatible interests of multiple students.

This disposition leaves unresolved an initial question: Deliberate indifference *to what*? As Arana sees things, a university is liable when it neglects any student's welfare after an alleged sexual assault. Under Title IX, however, a university is liable only when it discriminates on account of sex. Deliberate indifference, as a form of intent, see *Farmer v. Brennan*, 511 U.S. 825, 835–40 (1994), can show the state of mind that separates disparate treatment (actionable) from disparate impact (not actionable; see slip op. 11). But Arana does not contend that the University engaged in disparate treatment, favoring men over women when responding to complaints of misconduct. Instead she insists that the University did not give enough consideration to her need for peace of mind. This may be so, but inadequate consideration to a student's well-being differs from sex discrimination.

Title IX provides:

> No person in the United States shall, *on the basis of sex*, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance … .

20 U.S.C. §1681(a) (emphasis added). This tells us the prohibited ground of decision: sex. That one student assaults or harasses another does not imply that *the university* discriminates "on the basis of sex". Ignoring or slighting complaints by women while redressing complaints by men would be dis-

criminatory, but Arana does not contend that the University's disciplinary process favors men over women. The statute does not require any university to protect students from each other; what it does demand is the absence of sex discrimination in whatever protection a university supplies.

Title VII of the Civil Rights Act of 1964 addresses "terms, conditions, or privileges of employment", 42 U.S.C. §2000e–2(a)(1), from which the Court developed the doctrine of "hostile work environment". *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), applies this approach under Title IX too. Yet in litigation under Title VII, hostility or harassment violates the statute only when it is "because of" sex. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64–66 (1986). A generally bad working environment (an employer's indifference to workers' welfare) does not violate Title VII. That statute is not a civility code. *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998). Unpleasant working conditions do not violate the law when the sexes suffer equally.

Likewise with Title IX. How did the University hold Arana's sex against her? She does not tell us. She says that the University should have done more to advance her educational interests, but unless deliberate indifference serves as the mental state that separates disparate treatment from disparate impact, liability does not follow.

It should be possible to show disparate treatment using the sort of data a university keeps. But on this record we do not get even to disparate impact. Women surely commit misconduct against fellow students. When women steal from or plagiarize or punch or sexually misbehave or circulate compromising photos of other students, are they expelled at the same rate as men? (If lower, that's discrimination in favor of

women.) If expelled, are they readmitted at a lower rate than men? Does it increase a woman's probability of reinstatement (or decrease the probability of expulsion) if she is on an athletic team? These parallel the sorts of questions asked in employment-discrimination cases. But our plaintiff did not marshal any of these data and has not argued that she is a victim of sex discrimination by the University as opposed to its failure to do enough to curtail her unease at Cephus's presence on campus.

Everything I have said here is consistent with my understanding of *Davis*, which transplants an approach from Title VII to Title IX. After all, *Davis* tells us that schools can be liable only for their own misconduct. 526 U.S. at 640. That limit is inherent in programs such as Title IX that rely on the Spending Clause. See *Landor v. Louisiana Department of Corrections & Public Safety*, 146 S. Ct. 1931 (2026). But some people read *Davis* to treat sexual assault by one student against another as an act that an educational institution must redress, even though the institution does not discriminate and even though misconduct by persons other than the school's policymakers cannot be imputed to the institution. *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 283 (1998). If the Justices themselves understand *Davis* to dispense with proof that the recipient of federal funds has engaged in discrimination "on the basis of sex", then that decision needs another look in order to respect the statutory text.

No. 22-2454                                                    33

JACKSON-AKIWUMI, *Circuit Judge*, joined by ROVNER, PRYOR, and MALDONADO, *Circuit Judges*, dissenting. For more than half a century, Title IX has protected students from discrimination "on the basis of sex." 20 U.S.C. § 1681(a). Out of fidelity to the statute's purpose, the Supreme Court has interpreted Title IX to give it "a sweep as broad as its language," *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 521 (1982) (citation modified). This appeal turns on the Court's analysis of Title IX in *Davis ex rel. LaShonda D. v. Monroe County Board of Education*. In *Davis*, the Court reaffirmed that "sexual harassment is discrimination in the school context under Title IX." 526 U.S. 629, 650 (1999) (citation modified). *Davis* grants plaintiffs like Isabelle Arana the right to sue federally funded schools that are "deliberately indifferent" to student-on-student harassment—in other words, schools that respond to harassment in a way that is "clearly unreasonable in light of the known circumstances." *See id.* at 647–48.

Such is the case here. Arana filed a Title IX suit against the University of Wisconsin–Madison after her classmate, Quintez Cephus, sexually assaulted her. She alleges that the University's response to her assault was "clearly unreasonable" because it left her "vulnerable to" further harassment. *Id.* at 648, 645 (citation modified). Her theory of the case is drawn straight from *Davis*. Record evidence supports her claim. A reasonable jury could find in her favor. Her case should, therefore, be resolved at trial.

But the majority affirms summary judgment for the University, asserting that no jury could find the University's response to Arana's assault was unreasonable. It achieves this result by departing from Title IX caselaw and the rules governing summary judgment. The Supreme Court has in-

structed that a factfinder must consider the record in its entirety to determine whether a school's response to harassment was "clearly unreasonable." *Id.* at 648. But the majority prunes the facts, disregarding material ones a reasonable jury could use to find in Arana's favor and resting its holding on ones that are not dispositive. Further, in deciding the University's motion for summary judgment, we must construe the record and draw all reasonable inferences in Arana's favor as the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). But the majority does the opposite, skewing the facts in the University's favor. These errors result in a court-constructed narrative that portrays the University as unassailably reasonable.

I cannot agree with the majority's approach or its result. The record contains evidence from which a reasonable jury could conclude that the University responded to Arana's assault with deliberate indifference. In holding to the contrary, the majority does not maintain the high bar *Davis* sets for Title IX claims. The majority raises the bar. *Davis* does not compel this outcome. This court's precedents do not either. I respectfully dissent.

## I. Deliberate Indifference

Start with *Davis*'s articulation of deliberate indifference. Under *Davis*, schools "are deemed 'deliberately indifferent' to acts of student-on-student harassment only where the [school's] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Id.* at 648. *Davis* also instructs that Title IX liability attaches when a school's deliberate indifference "subjects its students to harassment," meaning it either "cause[s] students to undergo harassment or make[s] them liable or vulnerable to it." *Id.* at

644–45 (citation modified). Taken together, these articulations of law yield the dispositive question in this appeal: Considering all "the known circumstances," could a reasonable jury find that the University's response to Arana's assault was "clearly unreasonable" and that it left her "vulnerable to" further harassment?

The answer is yes. I would therefore deny summary judgment to the University. Below, I explain why. In Part II, I lay out the facts of Arana's case—the "known circumstances" against which a judge or jury measures whether a school's response was "clearly unreasonable." Then, in Part III, I identify which of these material facts would allow a reasonable jury to conclude the University acted with deliberate indifference. Before concluding, I examine in Part IV how the majority opinion errs in suggesting that deliberate indifference is measured on a binary scale rather than on a spectrum.

## II. The "Known Circumstances"

There is more to this case than the majority opinion might lead one to believe. In this section, I set forth the facts—in their totality and construed in Arana's favor—to lay the foundation for my later discussion of why the record belies the majority's holding.

### A. The University's initial response to Arana's assault

Cephus raped Arana after a night out, then directed his football teammate to take nude photos of her.[1] After learning

---

[1] The parties previously disputed whether the University exercised sufficient control over Cephus's apartment, where the assault took place, for Title IX liability to attach. *See Davis*, 526 U.S. at 644 (explaining a school's liability for student-on-student harassment depends on, among other things, its "degree of control over the harasser and the environment

Cephus had assaulted Arana, the University sprang into action. Its Title IX coordinator, Lauren Hasselbacher, issued a no-contact order between the two students. Another female student accused Cephus of assaulting her, too. With both students' allegations, Hasselbacher determined she had enough information to charge Cephus with sexual assault.

Hasselbacher spent the next four months investigating both students' allegations, though this appeal concerns only the investigation of Arana's assault. The report that resulted from Hasselbacher's investigation led the University's assistant dean of student life, Ervin Cox, to conclude that Cephus committed three offenses: second-degree sexual assault,[2] third-degree sexual assault,[3] and sexual harassment.[4] Cox recommended that the University expel Cephus, and he set

---

in which the harassment occurs"). But at the en banc oral argument, the University waived consideration of Title IX's "control" element. And the majority has decided not to address this issue. Ante at 21–22.

[2] Second-degree sexual assault criminalizes "sexual contact or sexual intercourse with a person who is under the influence of an intoxicant to a degree which renders that person incapable of giving consent" provided "the defendant has actual knowledge that the person is incapable of giving consent" and nonetheless "has the purpose to have sexual contact or sexual intercourse with the person while the person is incapable of giving consent." Wis. Stat. § 940.225(2)(cm) (2018).

[3] Third-degree sexual assault criminalizes "sexual intercourse with a person without the consent of that person." Wis. Stat. § 940.225(3) (2018).

[4] Under University policy, sexual harassment is conduct of a sexual nature that, among other things, "created an intimidating, hostile, or offensive working or learning environment." R. 94-4 (citing UW-Madison Pol'y on Sexual Harassment and Sexual Violence 17.09(19) (2018)).

the matter for consideration before the University's Nonacademic Misconduct Hearing Committee.

The Committee unanimously found, by a preponderance of the evidence, that Cephus was responsible for sexual harassment (for creating a hostile learning environment) and third-degree sexual assault (for having sex with Arana without her consent). But it disagreed with Cox as to second-degree sexual assault. The Committee found Cephus not responsible for that charge because there was not enough evidence to prove that he had sex with Arana knowing she was too intoxicated to consent.

In the end, the Committee voted to uphold the recommended sanction of expulsion. The University's chancellor, Rebecca Blank, affirmed Cephus's expulsion. The Board of Regents did too.

### B. Cephus's criminal trial and acquittal

As the University's disciplinary process unfolded, Cephus faced charges in state court for sexually assaulting Arana. (He was also prosecuted for assaulting the other student; that charge is not relevant to this appeal.) Though the University had already found Cephus not responsible for second-degree sexual assault, that charge—not the third-degree assault charge for which the University found Cephus responsible—was the basis for his criminal prosecution. Ultimately, the jury acquitted Cephus of second-degree sexual assault for the same reason the University found him not responsible for that crime: There was insufficient evidence to prove Cephus knew Arana was too intoxicated to consent but had sex with her anyway.

### C. The University's readmission decision

Four days after being found not guilty of second-degree sexual assault in state court, Cephus petitioned for readmission to the University. Blank granted the petition.

In a letter justifying her decision, Blank explained that she had examined Cephus's petition and its supporting materials, the record from the University's investigation, and "available police reports." Blank wanted more from Cephus, but he and his counsel "declined to provide other requested information for the review of the petition." A lawyer in Blank's office asked Cephus's counsel for a copy of the trial transcript, describing it as an "essential element in the chancellor's review of [Cephus's] petition for restoration." But when Blank was told that she and her staff would not be able to get a full transcript before the school year and football season began, she decided it was not essential after all. Blank also declined to let Arana respond to Cephus's petition, disregarding Hasselbacher's admonition that Arana should be consulted before Blank made her decision. In fact, neither Blank nor anyone else in her office informed Arana and her lawyers of Cephus's petition, much less the possibility that he might be readmitted.[5]

---

[5] Wisconsin law at the time required only that a complainant be notified of any change to the disciplinary outcome. Wis. Admin. Code UWS § 17.18 (2016). Because the law did not expressly provide for Arana's participation, Blank interpreted it to mean Arana should not be involved before a decision was made. The law was amended a few years later to ensure that "[i]f enrolled as a student at the time of the petition, the complainant shall be provided opportunity to respond to the petition prior to the readmission decision." Wis. Admin. Code UWS § 17.18 (2021).

Just over a week after receiving Cephus's petition, Blank decided to do something she had never done: overturn a finding from a Title IX investigation. In her decision letter, she stated "that the newly supplied information affect[ed] the University's prior findings in this matter related to third-degree sexual assault, but not sexual harassment." Blank went on to list her findings:

> 1) the Complainants were consistently reported as having consumed alcohol; 2) [Cephus] did not consume any alcohol; 3) witness descriptions of the Complainants' levels of intoxication ranged from "drunk", "very drunk", "buzzed", "tipsy", "hammered", "drunk but acting normal" and "blacked out"; 3) [*sic*] the Complainants were also consistently described by nearly all of the same witnesses, as well as viewed in video evidence, as not exhibiting outward signs of incapacitation such as slurred speech or difficulty walking or standing; and 4) there is great divide in the accounts of the activities that occurred in [Cephus's] apartment and bedroom.

Blank concluded that "[t]he level of ambiguity created by these conflicting accounts [was], practically speaking, incapable of resolution. As a result, the evidence f[ell] short of the preponderance of the evidence standard required to find [Cephus] responsible for sexual assault." She therefore allowed Cephus to return to the University, though she kept the no-contact order between him and Arana in place.

With the "known circumstances" of Arana's case laid bare, turn now to the facts that might cause a jury to conclude the University's response was "clearly unreasonable."

### III. A Jury Could Find the University Responded to Arana's Assault with Deliberate Indifference

At first glance, it might seem as though the University's response to Arana's assault was reasonable. A deeper look, however, reveals that Blank's readmission decision may not immunize the University from Title IX liability. As I explain below, a reasonable jury could conclude that: Blank never explained what evidence undermined the University's finding that Cephus had committed third-degree sexual assault; Blank's decision was based on pressure from donors and the public rather than new evidence; Blank had reason to believe the no-contact order would be insufficient to protect Arana from further harassment but readmitted Cephus anyway; and Arana's belief that the University wouldn't enforce the no-contact order was reasonable. These permissible conclusions based on the record evidence reflect a genuine dispute of material fact as to whether the University acted with Title IX deliberate indifference. Because a reasonable jury could find the University's decision to readmit Cephus with only a no-contact order to protect Arana was "clearly unreasonable," summary judgment is inappropriate.

### A. Blank's unreasoned decision

Start by comparing Blank's decision to readmit Cephus with the University's initial finding that he was responsible for third-degree sexual assault. The University's finding, made under a preponderance of the evidence standard, established it was more likely than not that Cephus had sex with Arana without her consent. To vacate this finding—and thereby allow Cephus to return to campus—Blank needed to explain what newly supplied evidence called into question whether Arana consented to sex with Cephus.

Blank provided no such explanation. Blank drew several conclusions from the newly supplied evidence, most of which concerned how intoxicated others believed Arana to be on the night she was assaulted. But Blank did not explain why Cephus's sobriety or Arana's intoxication had any bearing on the University's third-degree sexual assault finding, which requires only that the assaulted person did not consent to intercourse (not that she be too intoxicated to consent, an element of second-degree sexual assault). Nor did Blank's decision letter reference what specific evidence made her question whether it was more likely than not that Cephus had sex with Arana without her consent, one of the reasons why Cephus was expelled. *See* Blank Dep., R. 94 at 265:15–16 (Blank stating "The punishment for rape is expulsion."). Effectively, all Blank did in her decision letter was reaffirm why the University found Cephus not responsible for *second-degree* sexual assault in its Title IX investigation. In its deliberate indifference analysis, a reasonable jury could consider the fact that there is a mismatch between the reasons the University found Cephus responsible for third-degree sexual assault and Blank's reason for overturning that finding. Contrary to our obligation at summary judgment, the majority opinion resolves this factual dispute in the University's favor. *See* Ante at 17 ("[T]he school readmitted Cephus because new evidence undermined the prior disciplinary finding.").

Before proceeding, I should be abundantly clear about why I believe Blank's decision raises a jury question. In a Title IX deliberate indifference analysis, a factfinder's role is not to decide whether a school administrator reached the *correct* decision based on the evidence before her. *See, e.g.*, *Davis*, 526 U.S. at 648 ("[C]ourts should refrain from second-guessing the disciplinary decisions made by school administrators.").

Drawing an erroneous conclusion from facts is an issue of negligence, and a "negligent response is not unreasonable[] and therefore will not subject a school to liability" under Title IX. *Johnson v. Ne. Sch. Corp.*, 972 F.3d 905, 912 (7th Cir. 2020). Blank's ultimate decision, therefore, is not at issue. But her decision-making process is. In determining whether the University acted with deliberate indifference, a jury would consider the fact that Blank decided in eight days to overturn a decision made after a four-month-long investigation, and without adequately explaining her reasoning. Contrary to our obligation at summary judgment, the majority sets aside a key question about why the University readmitted Cephus. Only then is it able to conclude there is no dispute of fact about the reasonableness of the University's decision-making process. *See* Ante at 17 ("Setting aside the University's motivations for the decision, insofar as Arana is arguing that the school's decision-making process shows that its response was clearly unreasonable, she cannot identify a genuine dispute as to a material fact on this basis.").

### B. Pressure on Blank from donors and the public

Move next to why Blank's decision may have been unsound. Based on the facts in the record, a reasonable jury could find that Blank's justification for readmitting Cephus was dishonest: Donors, alumni, and members of the public pressured Blank to overturn Cephus's expulsion.

The record is this: Cephus was more than just a student—he was a star player on the University's Division I football team, bound for the NFL. His acquittal in state court therefore generated fervent calls for his readmission, all directed at Blank. The entire football team signed a letter imploring her to readmit Cephus. The head football coach held a press con-

ference where he announced that Cephus would be welcome back on the team if Blank readmitted him. A donor, Ted Kellner, who had given so much money to the University that it named the football program's building after him, wrote Blank a letter urging her to "fast track and readmit [Cephus] to our University in the next two weeks." Sure enough, thirteen days after receiving Cephus's petition, Blank announced her decision: She was lifting his expulsion. Blank's chief of staff gave her a list of donors to personally notify of her decision; Kellner was at the top of that list.

Alumni wrote Blank, too. One sent a letter accusing Arana of "attempting a lynching" by accusing Cephus of sexual assault. Another emailed Blank the morning Cephus filed his petition for readmission. This alumnus described himself as "distressed" that Blank hadn't already reversed Cephus's expulsion, and he pledged "to initiate a social media campaign to pursue the reversal of the expulsion and demand just treatment of [Cephus] by the UW."

The social media campaign took off. Soon after the alumnus's email, the University began tracking the #LetQTPlay hashtag (a reference to Cephus's nickname) and social media posts that mentioned Cephus while tagging Blank and the University. Emails exchanged by members of the University's communications team showed that the University was tracking the "many tweets calling on Chancellor Blank to 'do the right thing' and #LetQTPlay." Another email monitored the traction of a social media post by an alumnus who had gone on to play in the NFL: "Now that the nonsense is over, there's no reason for [Cephus] not to be on the field with the boys this season." Within a day, the University observed, the post was "up to 466 retweets (including current/former players and

news outlets) and 2421 favorites." Though the majority opinion suggests that Blank was fielding equal pressure from Arana's supporters, *see* Ante at 6, the record does not support this characterization.

All told, that Blank may have been pressured to readmit Cephus—irrespective of whether he remained a threat to Arana—is one of the "known circumstances" bearing on whether her decision to readmit him was "clearly unreasonable."

The majority admits as much, conceding that "football and public pressure played some role in the University's decision to readmit Cephus." Ante at 16. Curiously, though, the majority then insists it "isn't significant" that Blank lied about why she readmitted Cephus "because Arana brings only an indirect discrimination claim." *Id.* at 17. The majority asserts that evidence of what it calls "pretext" is only relevant in "direct discrimination" claims. *Id.* Since Arana's claim is an indirect discrimination claim, the majority continues, an analysis of evidence that Blank readmitted Cephus for public relations reasons—not because she legitimately reconsidered the University's prior assault finding—is "wholly inapplicable" to the deliberate indifference analysis. *Id.*

The majority's argument is, in a word, contrived. One reason why is because the majority responds to an argument of its own making. The majority spends pages refuting the notion that pretext, standing alone, can prove a school acted with deliberate indifference. But Arana never made this argument. Her argument is, instead, exactly what the majority ultimately concludes: "[I]f a school lies about why it imposes or declines to impose student discipline, the real reason for the decision is … one fact to consider as a court weighs the re-

sponse to harassment." Ante at 17 (citing *Wamer v. Univ. of Toledo*, 27 F.4th 461, 472 (6th Cir. 2022); *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 271–73 (4th Cir. 2021)). Put differently, evidence that a school lied is not dispositive in a Title IX deliberate indifference analysis. But neither is it "wholly inapplicable." Ante at 16. It's simply one of the "known circumstances" a jury must use to determine if the school's response to harassment was "clearly unreasonable."

The other problem with the majority's argument is that it's not supported by controlling precedent. None of the Supreme Court's Title IX cases suggest that the type of evidence a jury can consider in a Title IX deliberate indifference analysis depends on whether a plaintiff is alleging direct or indirect discrimination. That's why the majority turns elsewhere to substantiate its novel argument. It first cites this court's decision in *Jauquet v. Green Bay Area Catholic Education, Inc.* for support. True enough, *Jauquet* discusses the elements of an "indirect sex discrimination" claim. 996 F.3d 802, 807–08 (7th Cir. 2021). But *Jauquet* came to us on appeal from a motion to dismiss, so our focus was on the sufficiency of the plaintiff's complaint— that is, what must be alleged at the outset of a case. We said nothing in *Jauquet* about the kind of evidence a plaintiff may use to support her Title IX claim or how courts evaluate that evidence.

The majority also cites Justice Thomas's concurrence in *Ames v. Ohio Department of Youth Services*. *Ames* is a Title VII case, though, and the concurrence contemplates the role of pretext in employment discrimination claims. *See* 605 U.S. 303, 319–20 (2025) (Thomas, J., concurring). A concurrence in a Title VII case does not establish a rule that a jury in Arana's case, tasked with deciding whether the University's conduct

was "clearly unreasonable," could not consider Arana's evidence that Blank was not honest about why she readmitted Cephus.

The majority cites only the Tenth Circuit's decision in *Doe v. University of Denver* as a model of the approach it adopts in this case. But, of course, *Doe* is not controlling—it's a single out-of-circuit case citing only a footnote in a different Tenth Circuit case to support the proposition that "[w]here a Title IX plaintiff relies on indirect proof of discrimination, we apply the three-part burden-shifting framework announced in *McDonnell Douglas*." 1 F.4th 822, 829 (10th Cir. 2021) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 792 (1973); *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1315 n.8 (10th Cir. 2017)). So, though it does not say as much, the majority breaks new ground by adopting the Tenth Circuit's reasoning in this case, changing the way Title IX claims will be resolved in this circuit moving forward.

I disagree with this new approach. The truth is that what the majority calls "pretext" evidence is really just evidence. A jury could use this evidence to conclude that Blank did not tell the truth about why she readmitted Cephus. That would be a finding of consequence. Deliberate indifference in Title IX cases turns on whether the defendant had actual notice of harassment but nevertheless made "an official decision … not to remedy" it. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998). If Blank readmitted Cephus to appease donors, not because newly supplied evidence cast doubt on whether he was responsible for third-degree sexual assault, that fact is a "known circumstance" a jury must consider in its deliberate indifference analysis.

### C. The risk a no-contact order wouldn't protect Arana

Take stock of the evidence of deliberate indifference to this point. The University found Cephus responsible for third-degree sexual assault after a months-long investigation, and Blank reversed that finding without explaining what evidence made her question whether Arana consented to sex with Cephus. The justification Blank did offer may have been dishonest; she may have readmitted Cephus because donors pressured her to. A reasonable jury must consider these facts in determining whether the University's response to Arana's harassment was "clearly unreasonable."

With the legitimacy of Blank's readmission decision undermined, the only way the University's changed response to Arana's assault could be deemed reasonable is because it kept the no-contact order in place between Arana and Cephus. That's what the majority opinion hangs its hat on. The majority highlights that the University responded promptly to Arana's assault, downplays everything else, then insists the "apparently effective" no-contact order means the University was not deliberately indifferent as a matter of law.

To be sure, there are situations where a school can avoid Title IX liability by responding to harassment with a no-contact order. *See, e.g.*, *Johnson*, 972 F.3d at 912–13 (finding no-contact order, standing alone, a reasonable response to harassment where the complaining student refused to be interviewed by school officials). But whether a no-contact order is a sufficient response depends on the specific facts of a case. *See Davis*, 526 U.S at 648. For a jury to find the University was not deliberately indifferent to Arana's assault, it would have to conclude that the no-contact order was sufficient, standing

alone, to prevent her from being "vulnerable to" further harassment. *See id.* at 643, 645.

But reasonable minds can differ as to whether the University responding to Arana's assault only with a no-contact order was "clearly unreasonable," making summary judgment inappropriate. A reasonable jury could conclude the University disregarded the risk that Cephus would violate the no-contact order when he returned to school. For one thing, he violated the order once before. Moments before the Nonacademic Misconduct Hearing Committee heard his case, Cephus "walk[ed] directly toward" Arana "in an intimidating fashion." Decl. of Amy Bogost ¶¶ 7–9. Arana's lawyer stepped in front of Cephus before he could reach Arana. The incident made even Arana's lawyer feel unsafe, and it left Arana "in tears and shaking." *Id.* ¶ 10. Cephus's actions constituted a clear violation of the no-contact order, a fact the majority concedes. Ante at 20. A jury could conclude that this incident gave the University reason to believe the no-contact order would not protect Arana from further harassment.

There's also Cephus's disciplinary history. In Blank's readmission decision, she listed five other incidents where Cephus violated University policies, including one incident of "[h]arassment/[d]isruption" that required him to attend a consultation with a Title IX coordinator. Despite his disciplinary history, Cephus told police investigating Arana's assault that he had "never in [his] life been in any sort of disciplinary trouble." In her readmission decision, Blank stated she was "troubled" that Cephus "lied to police as part of the investigation." But that did not stop her from allowing him to return to campus. A jury might rationally conclude that the University knew a person who routinely violated school rules (in-

cluding a rule implicating Title IX), lied about that fact, and violated the very no-contact order at issue in this case would need more than a no-contact order to comport with expectations. And that conclusion could support the jury's assessment that the University acted with deliberate indifference.[6] *Cf. Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 261 (6th Cir. 2000) ("[W]here a school … has knowledge that its remedial action is inadequate and ineffective, it is required to take reasonable action in light of those circumstances to eliminate the behavior.").

### D. Indications the University wouldn't enforce the no-contact order, and Arana's acts of self-protection

Now consider Arana's belief that the University might not enforce the no-contact order. Arana argued in the district court and on appeal that after being shut out of the process to reevaluate Cephus's expulsion, she believed that the University was not interested in protecting her from him. According to Arana, the University confirmed her belief in a meeting she had with Cox and the University's director of threat intervention once Cephus was back on campus. Concerned that the no-contact order would not be sufficient to protect her, Arana tried to work with the University to develop a safety plan. But the University refused. Its representatives told Arana that her fears were not specific enough to constitute an actionable

---

[6] For this reason, the majority opinion's note that "Arana was not entitled to make 'particular remedial demands' about how the University would protect her and punish Cephus," Ante at 19 (citing *Davis*, 526 U.S. at 648), is true but irrelevant. The question is whether allowing Cephus back on campus with just a no-contact order standing between him and Arana was reasonable "in light of the known circumstances," including his disciplinary history and prior violation of that very order.

threat to her safety. They advised her to do her best to avoid Cephus and to "just call 911 if she felt threatened." Pl.'s Resp. to Def.'s Proposed Findings of Facts, R. 147 ¶ 324. Arana "started crying during the meeting when she realized UW was not going to do anything to help her." *Id.* Accepting Arana's characterization of these developments (as we must at summary judgment), a reasonable jury could infer a lack of interest on the University's part in enforcing the no-contact order.

Given the University's refusal to work with her, Arana took her safety into her own hands. She skipped classes, did not use the student union or communal study spaces, and avoided walking through parts of campus where she might run into Cephus. Arana also reduced her attendance at sorority events, opting to stay in her apartment or return home to Chicago on weekends. As she explained in a declaration submitted during the summary judgment phase, these changes required her to "work[] harder and longer hours to attain the same grades." Believing her fear and anxiety would limit her ability to succeed, she transferred from advanced to easier courses. And although she had been on track to graduate in three years, her reduced courseload delayed her graduation by a semester, which in turn delayed her entry to law school by a full year.

These facts matter in a jury's deliberate indifference analysis. *See Farmer v. Kan. State Univ.*, 918 F.3d 1094, 1105 (10th Cir. 2019) (citing *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1297 (11th Cir. 2007) (accounting for Title IX plaintiff's "objectively reasonable" "fear of encountering her attacker" in finding university deliberately indifferent)). They could lead a reasonable jury to conclude that Arana did not

No. 22-2454                                                   51

face further harassment because of the steps *she* took to protect herself. But by repeatedly lauding the "apparently effective" no-contact order, Ante at 2, 19, 20, the majority credits the University for Arana not being assaulted again. This is a mistake for two reasons.

First, it defies the rules of summary judgment. "Summary judgment is appropriate only if 'the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.'" *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (per curiam) (quoting Fed. R. Civ. P. 56(a)). Our task is to construe the evidence in the light most favorable to Arana as the non-moving party and draw all reasonable inferences in her favor. *See Anderson*, 477 U.S. at 255. Where the parties offer competing factual accounts, summary judgment is "inappropriate." *Jackson v. Sheriff of Winnebago Cnty.*, 74 F.4th 496, 502 (7th Cir. 2023) (citation omitted); *see also Ortiz v. City of Chicago*, 656 F.3d 523, 534 (7th Cir. 2011) (explaining that "at this stage we do not weigh the proof, make credibility determinations, or resolve narrative disputes").

Essentially, there are at least two explanations for why Arana was not harassed by Cephus after he returned to campus: Arana's explanation that she took steps to protect herself due to the University's deliberate indifference, and the University's explanation that its no-contact order shielded Arana. Construing the facts and drawing all reasonable inferences in Arana's favor requires us to credit her evidence-supported explanation. At this stage, it is wrong for the majority to award summary judgment based on a fact construed in the light most favorable to the University—that the "apparently effective" no-contact order stopped Arana from being harassed

again (thereby rendering the University's response reasonable).

Second, the majority's "apparently effective" argument runs counter to *Davis*. The *Davis* Court explained "the range of misconduct that [Title IX] proscribes." *Davis*, 526 U.S. at 644. A school "may not be liable for damages unless its deliberate indifference 'subject[s]' its students to harassment. That is, the deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it." *Id.* at 644–45 (alterations in original) (citations omitted). This last clause is critical. It means that even if a school promptly responds to harassment, it can still be deemed deliberately indifferent if its "clearly unreasonable" response leaves a student "vulnerable to" further harassment. That a student and her harassing classmate do not interact after their school intervenes is not dispositive. A court or jury can still conclude the school acted with deliberate indifference.

Arana's case illustrates why this articulation of actionable deliberate indifference in *Davis* is prudent. In a case like this, which concerns events that happened nearly a decade ago, it is tempting to take the majority's approach: declare that because a school responded quickly to a student's assault, and because the student was not assaulted again, the school was not deliberately indifferent. But this type of post-hoc rationalization allows a school to escape Title IX liability when a student, recognizing that her school's response has left her vulnerable to further harassment, takes matters into her own hands to protect herself. Such acts of self-preservation may be the reason a student does not encounter her harasser; her school should not get the credit for responding "effectively."

This is especially so where the student's acts of self-protection detract from her educational experience such that she is "effectively denied equal access to an institution's resources and opportunities." *Davis*, 526 U.S. at 651; *cf. Williams*, 477 F.3d at 1297–98 (fact that plaintiff withdrew from university after school's clearly unreasonable response to her rape did not preclude court from assessing viability of her Title IX deliberate indifference claim on motion to dismiss). Congress passed Title IX to protect against this type of deprivation.

To be sure, despite *Davis* stating that a school "subjects" a student to harassment by leaving her "liable or vulnerable to it," 526 U.S. at 644–45 (citation modified), there's a circuit split about whether the Supreme Court meant to permit Title IX deliberate indifference liability when a student is harassed only once. Some circuits hold that a student need not experience any further harassment for the school to be deliberately indifferent—it's enough that she's "vulnerable to it." *See Doe (Fairfax Cnty.)*, 1 F.4th at 274; *Farmer*, 918 F.3d at 1103–05; *Williams*, 477 F.3d at 1295–98; *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 172–73 (1st Cir. 2007), *rev'd on other grounds*, 555 U.S. 246 (2009). Others hold that a school cannot be found to have acted with deliberate indifference unless the student suffers additional harassment after the school's initial response. *See Kollaritsch v. Mich. State Univ. Bd. of Trs.*, 944 F.3d 613, 620–21 (6th Cir. 2019); *K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1058 (8th Cir. 2017); *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 740 (9th Cir. 2000).

This court has not yet decided whether *Davis* takes its plain meaning. The majority opinion purports to reserve decision on the issue. Ante at 21, 22–23. Curiously, though, there's an incongruity between what the majority opinion

says and what it does. The majority says it leaves open the question of whether a student must experience additional harassment for her school to be found deliberately indifferent under Title IX. *Id.* But at the same time, the majority rests its holding on the University's response to Arana's assault being "apparently effective"—that is, on Arana not being assaulted again. It seems to me that these two positions are at odds, and that the majority is actually picking a side in the circuit split. If so, my colleagues in the majority should explicitly say as much. The contradiction in the majority opinion creates undue confusion for Title IX litigants and district courts in this circuit.

### IV. What the Majority Gets Wrong About Deliberate Indifference

The underlying logic of the majority opinion—what allows my colleagues to find for the University—is a framing of deliberate indifference that renders the "known circumstances" a nullity. "On the one hand," the majority says, "a school that learns of student-on-student harassment and does nothing probably acts with deliberate indifference." Ante at 12. "A school that takes prompt action, on the other hand … has not responded in a clearly unreasonable way." *Id.* The majority's framework suggests that deliberate indifference is measured in binary terms—don't respond, and you're deliberately indifferent; respond quickly, and you're not.

This conception of deliberate indifference is wholly incorrect. Deliberate indifference isn't measured on a binary scale; it's measured on a spectrum. At one end lies the first school the majority describes—a school that makes "no effort whatsoever either to investigate or to put an end to [known] harassment." *Davis*, 526 U.S. at 654. That school likely acts with

deliberate indifference, just as the majority says. *See id.*; *see also Gebser*, 524 U.S. at 290 (defining deliberate indifference as "an official decision by [a school] not to remedy" a Title IX violation). At the other end is a school that "respond[s] with measures to both 'end the harassment' of which it has knowledge and 'to limit further harassment.'" *C.S. v. Madison Metro. Sch. Dist.*, 34 F.4th 536, 542 (7th Cir. 2022) (en banc) (quoting *Gebser*, 524 U.S. at 289). This school likely cannot be considered to have acted with deliberate indifference. *See id.* The second school the majority describes—the one that takes "prompt action"—could be at this end point. Or it could be somewhere between the two poles, because taking "prompt action" is not the same as responding with measures to end harassment and limit future harassment. Where a school falls on the deliberate indifference spectrum depends on the "known circumstances"—the facts of a given case.

Taking a binary approach to measuring deliberate indifference is doubly problematic. For starters, it's out of step with this court's precedents. Until today, we have never framed the Title IX deliberate indifference analysis as depending on whether a school acted at all or, more narrowly, whether it took "prompt action." Rather, we have followed *Davis*, basing our determination of whether a school's response to harassment was "clearly unreasonable" on all the facts in the record. *See, e.g.*, *Gabrielle M. v. Park Forest-Chicago Heights Sch. Dist. 163*, 315 F.3d 817, 824–25 (7th Cir. 2003) (evaluating reasonableness of school district's response based on what "[t]he record reveal[ed]"); *Johnson*, 972 F.3d at 912 (discussing specific facts that cut against finding a school acted with deliberate indifference); *C.S.*, 34 F.4th at 547–48 (listing specific actions a school district took in response to

harassment that precluded finding of deliberate indifference).[7]

The other problem with taking a binary approach to deliberate indifference is that it doesn't contemplate that in some cases, like this one, a jury could find a school's prompt response to harassment was "clearly unreasonable in light of the known circumstances." The majority acknowledges that "[n]ot every response (prompt or otherwise) will satisfy Title IX." Ante at 13. But its analysis says otherwise.

We had not encountered a Title IX case presenting this fact pattern until Arana's appeal. But our sister circuits have. Consider four cases observing that a school can be found deliberately indifferent even after timely responding to harassment. In *S.B. ex rel. A.L. v. Board of Education of Hartford County*, the Fourth Circuit noted that a school's "half-hearted investigation or remedial action" can support a deliberate indifference finding. 819 F.3d 69, 77 (4th Cir. 2016). The First Circuit made a similar observation in *Fitzgerald v. Barnstable School Committee*, where it explained that "an institutional response to harassment may be carried out so inartfully as to render it clearly unreasonable." 504 F.3d at 175. The Second Circuit, in *Zeno v. Pine Plains Central School District*, held that there was sufficient evidence in the record to support the jury's finding that a school acted with deliberate indifference even though it "immediately suspended nearly every student who was identified as harassing [the plaintiff]" because the "known circum-

---

[7] It's true that in one of our prior Title IX cases, we observed that "[t]he school responded promptly" to the plaintiff's harassment. *Jauquet*, 996 F.3d at 808. But even that case turned on the substance of the school's response, not its speed. *See id.* at 809.

stances" rendered that an unreasonable response. 702 F.3d 655, 668–71 (2d Cir. 2012). And in *Vance v. Spencer County Public School District*, the Sixth Circuit held that a school district was deliberately indifferent because it "continued to employ [an] ineffective method" to address the harassment and therefore "failed to respond in light of the known circumstances." 231 F.3d at 262; *see also id.* at 260 ("[A] minimalist response is not within the contemplation of a reasonable response.").

As these cases make clear, a school's prompt response to harassment is not enough to save it from Title IX deliberate indifference liability. This makes sense. If taking any prompt action could save a school from being deemed deliberately indifferent, then the unique facts of a plaintiff's case wouldn't matter. Schools would then be able to avoid Title IX liability by responding in "clearly unreasonable" ways. That's what the majority allows the University to do here. But this result conflicts with *Davis*. This is not how Congress or the Supreme Court intended Title IX to function.

## V. Conclusion

The record evidence makes clear there are genuine disputes of fact that make this case inappropriate for summary judgment. Disputes remain about how unreasoned and unsupported Blank's decision was, whether it was driven by donor demands, whether the University ignored that the no-contact order left Arana vulnerable to further harassment, and whether Arana's fear the University would not enforce the order was rational. In sum, reasonable minds can differ over whether the University's response to Arana's assault was "clearly unreasonable in light of the known circumstances." A jury should decide Arana's case.

Really, that's all this appeal boils down to—whether Arana has presented sufficient evidence to have her day in court. Perhaps the University would have won at trial. But that's of no moment. To survive summary judgment, all Arana must do is establish that the "facts are disputed to a degree to warrant a trial." *Hinterberger v. City of Indianapolis*, 966 F.3d 523, 527 (7th Cir. 2020) (citing *Anderson*, 477 U.S. at 247–48)); *see also First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968) (explaining plaintiff need only present "sufficient evidence supporting the claimed factual dispute" to defeat summary judgment). In deciding whether Arana has met her burden, we must "consider the totality of the circumstances," *Metzler v. Loyola Univ. Chi.*, 164 F.4th 612, 617 (7th Cir. 2026) (citation modified), and we "may not downplay [her] evidence, or conduct a 'paper trial' on the merits of [her] claim." *Reed v. McBride*, 178 F.3d 849, 852 (7th Cir. 1999) (citation omitted). But that's exactly what the majority has done.

Only in "an appropriate case," *Davis* says, may a court decide at summary judgment whether a school's response is "clearly unreasonable." 526 U.S. at 649. For the reasons I've explained, this is not such a case.

I respectfully dissent.